## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE (Jackson)

| | |
|---|---|
| ROBBIE JOHNSON, an individual,<br><br>Plaintiff,<br><br>v.<br><br>TYSON FOODS, INC., a corporation; and RONDA GOOCH, HR Manger of Tyson Foods,<br><br>Defendants. | **Civil Action No.: 1:21-cv-01161**<br><br>**AMENDED VERIFIED COMPLAINT**<br><br><br><br>[JURY TRIAL DEMANDED] |

## INTRODUCTION

1.      Article I, Section 2 of the Tennessee Constitution states: "That government being instituted for the common benefit, the doctrine of nonresistance against arbitrary power and oppression is absurd, slavish, and destructive of the good and happiness of mankind."

2.      Plaintiff Robbie Johnson seeks relief from Defendants Tyson Foods, Inc. ("Tyson") and Ronda Gooch's (collectively "Defendants")' pattern of discriminatory, unconstitutional, and illegal behavior against employees who request religious exemptions from Tyson's COVID-19 vaccination mandate policy.

3.      On August 3, 2021, Defendants imposed a draconian vaccine mandate for all employees. Defendants' mandate addresses a very remote risk, asymptomatic deadly spread of COVID-19 to fellow employees, by a method (vaccination) that poses a higher risk of deadly spread of COVID-19 than asymptomatic spread.

4.      Defendants responded to their employees seeking medical or religious exemptions by informing those employees that they would be effectively terminated on November 1, 2021 and placed on unpaid leave of absence with no assurance that they would be allowed to return to the workplace for up to one year. Now that the November 1, 2021 deadline has passed, Tyson employees who are unvaccinated are terminated, either actually or constructively through unpaid leave.

5.      Defendants' unlawful actions left Plaintiff with the impossible choice of suffering a physical assault and uninvited invasion of her body by receiving the experimental COVID-19 vaccine, at the expense of her religious beliefs, bodily autonomy, medical privacy, and her health, or losing her livelihood and being unable to provide food, housing, and support for herself and her family.

6.      This Faustian bargain is no bargain at all and is precisely what is forbidden by federal and Tennessee civil rights law.

7.      Defendants' actions violated federal and Tennessee law by mandating an experimental medical treatment, retaliating against employees who engaged in protected activity, failing to provide reasonable accommodations for exemptions, and violating the sacred rights of privacy and bodily integrity.

8.      Plaintiff implores this court to order that Defendants comply with the laws protecting the rights of Tennesseeans against precisely such catch-22 "choices."


///

///

## PARTIES

9.      Plaintiff Robbie Johnson is an employee at Tyson's plant in Newbern, Tennessee. She

has worked there for twenty-three years. She is a citizen of Tennessee and a resident of Dyer

County.  Plaintiff requested a religious exemption for Tyson's vaccine mandate. As a

"reasonable" accommodation, Defendants offered only one year of unpaid leave, with no

promise of a position at the end of the leave of absence, and the vaccine requirement still in

effect upon the Plaintiff's unlikely return. Then, on November 1, 2021, Defendants sent

Plaintiff a permanent discharge notice, notifying her that she was fired.

10.      Plaintiff was infected with, and recovered from, COVID-19 in 2020.

11.      Tyson, together with its subsidiaries, is a corporation that operates as a worldwide food

processing and marketing company.

12.      Tyson is the world's second largest processor and marketer of chicken, beef, and pork.

Tyson employs approximately 139,000 people in the United States and operates five

facilities in the state of Tennessee. Tyson's facilities throughout Tennessee employ

thousands of people.

13.      Defendant Ronda Gooch is the HR manager at Tyson's Newbern plant.

14.      At all relevant times, Defendants knew or should have known of the laws, policies,

practices, and conditions alleged herein.

## JURISDICTION AND VENUE

15.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

1442(a)(1), On October 21, 2201, Defendants removed this action from where it was

originally filed, in Dyer County Chancery Court for the State of Tennessee, to this federal

court [Doc. No.1]. On November 3, 2021, this Court denied the Plaintiff's Motion To Remand this action to state court, on the grounds that Tyson properly removed the action under 28 U.S.C. § 1442(a)(1) [Doc. No. 17].

16. Pursuant to 28 U.S.C. § 1391(e), venue is proper in the Western District of Tennessee, where Plaintiff resides, Defendants transact business, and the wrongful conduct and resulting injuries alleged herein substantially occurred in this state.

17. An actual and justiciable controversy exists between Plaintiff and Defendants.

## FACTS

### A. Coronavirus and Tyson's Unlawful Vaccine Mandate

1. The novel coronavirus SARS-CoV-2, which causes the disease COVID-19, is a contagious virus which spreads via person-to-person contact and through the air.

2. In the spring of 2020, Tyson began implementing mitigation procedures for its workforce, including several of the following requirements for its employees: masks, face shields, social distancing, temperature checks, COVID-19 testing,[1] and self-quarantine measures.[2] Tyson also made several accommodations for hourly employees.[3] For example,

---

[1] Tyson Foods, *Tyson Foods CEO Provides Update on Efforts to Address COVID-19* (April 6, 2021) available at https://www.tysonfoods.com/news/news-releases/2020/4/tyson-foods-ceo-provides-update-efforts-address-covid-19 (last visited Sept. 27, 2021); Tyson Foods, *Why Tyson Has Taken a Leading Position on COVID-19 Testing* (July 1, 2021) available at https://thefeed.blog/2020/07/01/covid-19-testing-at-tyson-foods/ (Last visited Sept. 27, 2021).
[2] Tyson Foods, *Protecting Team Members and Our Company; Ensuring Business Continuity* (March 17, 2020) available at https://www.tysonfoods.com/news/news-releases/2020/3/protecting-team-members-and-our-company-ensuring-business-continuity (last visited Sept. 27, 2021); Chattin Cato, *Tyson Team Innovates to Make Face Shields for Frontline Workers* (July 6, 2021) available at https://thefeed.blog/2020/07/06/tyson-innovates-to-make-face-shields-for-frontline-workers/ (last visited Sept. 27, 2021).
[3] *Ibid.*

in March of 2020, the company relaxed attendance policies in its plants by "[]eliminating any punitive effect for missing work due to illness."[4]

3.      Tyson experienced substantial success reducing the risk of COVID-19 spread through self-quarantining for the symptomatic and testing for the asymptomatic persons.

4.      Despite this, after sixteen months of effective measures, Defendants opted to disregard empirical evidence and scientific studies, and implemented a mandate requiring bodily invasion against a person's will of an experimental drug with unknown long term side effects due to its novel mRNA methodology, with the worst short-term adverse events reported in the government's VAERS database in American history, and whose administration offends the conscience of millions of Americans' deeply held spiritual beliefs and religious faith due to the use of aborted fetal cells in its testing, development and production of each of these experimental vaccines.

5.      On approximately August 3, 2021, Tyson publicly announced it would require all "[]team members at U.S. office locations to be fully vaccinated by October 1, 2021."[5] (A true and correct copy of Tyson's August 3, 2021 COVID-19 vaccine mandate, is attached as *Exhibit A*, and incorporated herein by reference). Tyson also announced that all other team members, thus including plant team members, would be required to be vaccinated by November 1, 2021.[6]

---

[4] *Ibid.*
[5] Tyson Foods, *Tyson Foods to Require COVID-19 Vaccination for its U.S. Workforce* (Aug. 3, 2021) available at https://www.tysonfoods.com/news/news-releases/2021/8/tyson-foods-require-covid-19-vaccinations-its-us-workforce (last visited Sept. 27, 2021).
[6] *Exhibit A.*

6.      Tyson publicly stated that "Exceptions to the vaccination mandate will involve workers who seek medical or religious accommodation."[7]

7.      In announcing the mandate, Tyson CEO Donnie King justified the decision by claiming, "[]the U.S. Centers for Disease Control and Prevention is reporting ***nearly all hospitalizations and deaths*** in the U.S. are among those who are unvaccinated" (emphasis added).[8] As set forth herein below, Mr. King's statement was false.

8.      To seek an exemption, Defendants required employees fill out an official form and turn it into the HR department. Defendants also allowed for an accommodation letter to be sent to the HR department as well as to the plant managers.

9.      Defendants offered those who applied for an accommodation up to one year of unpaid leave of absence or until they received the vaccine. (A true and correct copy of Tyson's "*Explanation of Leave + Accommodation*" policy, is attached as *Exhibit B*, and incorporated herein by reference; A true and correct copy of Tyson's letter to employees who request a disability or religious accommodation dated September 17, 2021, is attached as *Exhibit C* and incorporated herein by reference.) They were informed that after one year they would be effectively terminated from their position at Tyson. *Ibid.* Tyson employees were also informed that even if they did receive the vaccine their positions would not be guaranteed. *Ibid.*

---

[7] *Ibid*.
[8] Donnie King, *Our Next Step inn the Fight Against the Pandemic* (Aug. 3, 2021) available at https://web.archive.org/web/20210803143911/https://thefeed.blog/2021/08/03/our-next-step-in-the-fight-against-the-pandemic/ (last visited Sept. 27, 2021).

10.     Tyson HR stated that this accommodation may not even be available by November 1 as a way to pressure and coerce their employees to either take the vaccine or make a decision as quickly as possible.

11.     Since Defendants' November 1, 2021 deadline has passed, employees who have refused to receive the COVID-19 vaccine have been offered only unpaid leave, with the alternative being immediate termination. In Plaintiff's case, when she did not accept Defendants' offer, she was given written notice that she was permanently discharged from employment at Tyson.

12.     Defendants' mandate is uncompromisingly harsh. Tyson provides no alternative for remote work, periodic testing, mask wearing, social distancing, or exemptions for employees who have recovered from COVID-19 and have natural immunity, even though Tyson successfully protected its employees and reduced the spread of COVID-19 using many of these measures for over 18 months.

13.     Defendants have exercised substantial authoritarianism, pressure, and coercion against employees to enforce its unlawful vaccine mandate, at the expense of employees' personal autonomy, medical freedoms, and sincere religious beliefs.

14.     Plaintiff objects to the COVID-19 vaccine mandate on religious grounds. She has worked at Tyson Foods, Inc. for 23 years and has now been terminated as a result of Tyson's COVID-19 mandate.

15.     Defendants' discriminatory and retaliatory actions have caused Plaintiff to suffer various harms, including a substantial loss of income, loss of professional advancement opportunities, not to mention the loss of a substantial twenty-three year career at Tyson.

 ///

**B.** **Tyson Exaggerates the Specter of the Virus to Justify the Vaccine Mandate**

16.     Tyson maintains several facilities across Tennessee, including sites in Dyer, Obion and Gibson counties on the western side of the state.[9]

17.     Tyson's Chief Medical Officer, Dr. Claudia Coplein, appealed to fear, not science, when she publicly opined that forced vaccination was the "single most effective" thing Tyson could do because unvaccinated people were causing rising case counts.[10]

18.     But data from Tennessee Department of Health ("TDH") does not support Dr. Coplein's hyperbolic remarks. TDH reports 7,796 cases of COVID-19 in Dyer County since March of 2020.[11] As of September 24, 2021, TDH reports 7,377 of the 7,796 cases of COVID-19 are considered either "inactive" or "recovered."[12] This is true even though only 31.6 percent of the county is fully vaccinated.[13] Thus far, only 131 deaths caused or associated with COVID-19 have been reported in Dyer County since the advent of the virus nearly two years ago.[14]

---

[9] Charles Choate, *West Tennessee Lawmakers Ask Tyson Foods to Reconsider Vaccine Mandate*, WCMT (Aug. 20, 2021) https://www.thunderboltradio.com/west-tennessee-lawmakers-ask-tyson-foods-to-reconsider-vaccine-mandate/ (last visited Sept. 27, 2021); *see* also, available at Melissa Moon, *Employees at Tennessee Tyson Foods plant fight vaccine mandat*e, WJHL (Aug. 11, 2021) available at https://www.wjhl.com/national-coronavirus-coverage/employees-at-tennessee-tyson-foods-plant-fight-vaccine-mandate/ (last visited Sept. 27, 2021).

[10] Tyson Foods, *Tyson Foods to Require COVID-19 Vaccination for its U.S. Workforce* (Aug. 3, 2021) available at https://www.tysonfoods.com/news/news-releases/2021/8/tyson-foods-require-covid-19-vaccinations-its-us-workforce (last visited Sept. 27, 2021).

[11] Tennessee Department of Health, *COVID-19 Data for: Dyer County* (Sept. 24, 2021) available at https://covid19.tn.gov/data/dashboards/?County=Dyer (last visited Sept. 27, 2021).

[12] *Ibid*.

[13] Tennessee Department of Health, *Tennessee COVID-19 Vaccination Reporting* (Sept. 26, 2021) available at https://data.tn.gov/t/Public/views/TennIISCOVID-19VaccineReporting/SUMMARY?:showAppBanner=false&:display_count=n&:showVizHome=n&:origin=viz_share_link&:toolbar=no&:embed=yes (last visited Sept. 27, 2021).

[14] *COVID-19 Data for: Dyer County.*

19.     Similarly, in Obion County, THD's COVID dashboard shows 6,727 cases of COVID-19 have been reported since March of 2020.[15] Like in Dyer County, the vast majority of the reported cases in Obion County show either "inactive" or "recovered."[16] This is despite the fact that only 32.7 percent of the county is fully vaccinated.[17] Data for Obion County shows only 105 reported deaths as a result of COVID-19 since March of 2020.[18]

20.     What is more, in Gibson County, TDH reports 10,164  cases of COVID-19 since approximately March of 2020.[19] Currently, 9,559 of those cases are considered "inactive" or recovered", even though only 36.8 percent of the county is fully vaccinated.[20] Like in the other two counties, data for Gibson County shows most people do not die from COVID-19 with only 178 deaths being reported since March of 2020.[21]

21.     Thus, TDH's data shows that even in counties with low vaccination rates, the overwhelming majority of people do not die from COVID-19, nor end up even being hospitalized.[22] Yet, Tyson grossly exaggerates the specter of the virus, appealing to fear, not rationality, in a failed attempt to justify its unlawful mandate on its employees.


///

///

---

[15] Tennessee Department of Health, *COVID-19 Data for: Obion County* (Sept. 24, 2021) available at https://covid19.tn.gov/data/dashboards/?County=Obion (last visited Sept. 27, 2021).
[16] *Ibid*.
[17] *Tennessee COVID-19 Vaccination Reporting.*
[18] *COVID-19 Data for: Obion County.*
[19] Tennessee Department of Health, *COVID-19 Data for: Gibson County* (Sept. 24, 2021) available at https://covid19.tn.gov/data/dashboards/?County=Gibson (last visited Sept. 27, 2021).
[20] *Tennessee COVID-19 Vaccination Reporting.*
[21] *COVID-19 Data for: Gibson County.*
[22] *See, COVID-19 Data for: Dyer County; COVID-19 Data for: Gibson County; COVID-19 Data for: Obion County.*

C.    __The Risks Associated with Coronavirus__

22.    Coronavirus presents a risk primarily to individuals aged 85[23] or older and those with

comorbidities such as hypertension and diabetes.[24]

23.    The vast number of deaths associated with COVID-19 occur in those over the age of

55.[25]  Within the most heavily impacted age group (age 85 and up), only 13.3% of deaths

from February 2020 to February 2021 were attributed to COVID-19.[26]

24.    One of the most useful measures for calculating the risk of dying from a virus is the

infection-fatality rate ("IFR"). The IFR is calculated by dividing the number of COVID

deaths by the number of COVID infections. It attempts to answer the critical question: "If I

get sick, what is the chance that I will die?" The Center for Disease Control and Prevention

estimates the IFR for the bulk of most working-age adults is exceedingly low.[27] For adults

under age 50, the CDC's "current-best estimate" is that 500 people will die per 1,000,000

infections nationwide.[28] In other words, for every one million adults infected age 50 or

younger, 999,500 of them will survive COVID-19.[29]

---

[23] Mayo Clinic, *COVID-19: Who's at higher risk of serious symptoms* (Aug. 24, 2021) available at https://www.mayoclinic.org/diseases-conditions/coronavirus/in-depth/coronavirus-who-is-at-risk/art-20483301?p=1 (last visited on Aug. 28, 2021).
[24] Wern Hann, et. al., *Comorbidities in SARS-CoV-2 Patients: a Systematic Review and Meta-Analysis*, (February 2021) available at https://journals.asm.org/doi/10.1128/mbio.03647-20?permanently=true& (last visited on Aug. 28, 2021).
[25] Heritage Foundation, *COVID-19 Deaths by Age,* Heritage Foundation (Feb. 17, 2021) available at https://datavisualizations.heritage.org/public-health/covid-19-deaths-by-age/ last visited (Sept. 1, 2021); *See also*, See, *COVID-19: Who's at higher risk of serious symptoms.*
[26] *Ibid.*
[27] CDC, *COVID-19 Pandemic Panning Scenarios*, Centers for Disease Control and Prevention (March 19, 2021) available at https://www.cdc.gov/coronavirus/2019-ncov/hcp/planning-scenarios.html last visited (Sept. 1, 2021).
[28] *Ibid.*
[29] *Ibid.*

25.     Assuming the data regarding COVID-19 infections is accurate, the CDC's numbers show

Americans across the board are far more likely to die of something other than COVID-19.[30]

Almost all employees at Tyson are in the very low-risk category in terms of COVID-19

lethal risk, a significant factor in evaluating the interests Tyson had when imposing its

mandate.

**D.     Asymptomatic People Pose Little Risk of Transmitting the Virus**

26.     Tyson's vaccination mandate only addresses one risk: asymptomatic lethal spread. The

problem with Tyson's approach is two-fold. First, asymptomatic lethal spread is a less than

a one-in-a-million risk at worst, rendering forced injections of unwanted experimental,

potentially life-altering drugs developed in ways that offend the conscience of many,

unnecessary.

27.     Second, Tyson uses the specter of "asymptomatic spread" -- the notion that

fundamentally healthy people could transmit COVID-19 to others without having any

symptoms of COVID-19 -- to justify its vaccine mandate. But there is little credible

scientific evidence that demonstrates the phenomenon of "asymptomatic spread" poses any

meaningful danger to Tyson employees or anyone else, for that matter. Indeed, it is "very

rare," even according to Anthony Fauci. Tyson's response to COVID-19 is predicated in

part on the flawed assumption that asymptomatic individuals pose a meaningful risk of

spreading the disease.

---

[30] *See,* Smiriti Mallapaty, *The Coronavirus Is Most Deadly If You Are Older and Male*, NATURE (Aug. 28, 2020) [individuals under 50 face a negligible threat of a severe medical outcome from a coronavirus infection, akin to the types of risk that most people take in everyday life, such as driving a car].

28.     Evidence of transmission requires that an individual can be shown to be the source of

infection for another person who then developed symptoms of a disease/illness. Basic

microbiology shows that infectiousness or transmission of viruses such as COVID-19

require an active infection resulting in elevated levels of viral replication in the host and

shedding of the virus.[31]

29.     Decades of research demonstrates that symptomatic people (i.e. those coughing,

sneezing, and wheezing) are the real drivers of viral spread, a fact Dr. Anthony Fauci

initially acknowledged during the early days of the pandemic when he told the press:

"[E]ven if there is some asymptomatic transmission, in all the history of respiratory-borne

viruses of any type, asymptomatic transmission has never been the driver of outbreaks. ***The***

***driver is always a symptomatic person***"[32] (emphasis added).

30.     When the viral replication process is blocked by a healthy immune system, the virus is

neutralized, preventing significant viral replication and shedding. This occurs in

approximately half the people exposed to the virus. Their immune system's defenses

effectively ward off COVID-19 before it can take hold and cause symptomatic disease.

Research demonstrates that asymptomatic people are not the driver of COVID-19

transmission as demonstrated in the following points.

---

[31] *See generally*, Samuel Baron, et. al., *Medical Microbiology* (4th ed. 1996) available at
https://www.ncbi.nlm.nih.gov/books/NBK8149/ (last visited Sept. 27, 2021); *See also*, Hitoshi
Kawasuji, et. al., *Transmissibility of COVID-19 depends of the viral load around onset in adult
and symptomatic patients*, PLOS ONE (Dec. 9, 2020) available at
https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0243597 (last visited Sept. 27,
2021).
[32] U.S. Department of Health and Human Services, *Update on the New Coronavirus Outbreak
First Identified in Wuhan*, China, YouTube (Jan. 28, 2020) available at
https://www.youtube.com/watch?v=w6koHkBCoNQ&t=2638s (last visited Sept. 27, 2021).

31.     Researchers studying real-world laboratory samples of more than a quarter-million people found that even with a positive RT-PCR test, asymptomatic people have a much lower probability of being infectious.[33] According to a meta-analysis of contact tracing studies published in the *Journal of the American Medical Association*, at most, asymptomatic COVID-19 spread was only 0.7%.

32.     A research article published in the CDC's *Emerging Infectious Diseases* journal notes that little to no transmission of COVID-19 occurred from asymptomatic people studied by researchers in Germany.[34] The researchers note, "The fact that ***we did not detect any*** laboratory-confirmed SARS-CoV-2 transmission from asymptomatic case-patients is in line with multiple studies…"[35] (emphasis added). The lack of scientific and medical evidence surrounding asymptotic spread led the researchers to conclude that asymptomatic spread is "[]unlikely to substantially spread COVID-19."[36]

33.     A review in March 2021 of all the published meta-analyses on asymptomatic transmission from Dr. John Lee, a retired British Professor of Pathology, reveals that in many cases, the same few studies have been recycled repeatedly to support the flawed proposition that those who are asymptomatic pose a real danger.[37] In the words of Allyson M. Pollock, a professor of public health at Newcastle University in the United Kingdom,

---

[33] *The performance of the SARS-CoV-2 RT-PCR test as a tool for detecting SARS-CoV-2 infection in the population*

[34] Jennifer K. Bender, *Analysis of Asymptomatic and Presymptomatic Transmission in SARS-CoV-2 Outbreak, Germany, 2020*, 27 Emerging Infectious Diseases 4 (April 2021) available at https://wwwnc.cdc.gov/eid/article/27/4/20-4576_article (last visited Sept. 27, 2021).

[35] *Ibid*.

[36] *Ibid*.

[37] See, John Lee, *Asymptomatic spread: who can really spread COVID-19*, Health Advisory & Recovery Team (March 2021) available at https://www.hartgroup.org/wp-content/uploads/2021/03/ASYMPTOMATIC-SPREAD.pdf, (last visited Aug. 28, 2021).

"Searching for people who are asymptomatic yet infectious is like searching for needles that appear and reappear transiently in haystacks, particularly when rates are falling."[38]

34.     Moreover, according to the FDA, there is insufficient data to determine the vaccines authorized for emergency-use[39] actually prevent asymptomatic infection or the transmission of SARS-CoV-2.

35.     Recently, the CDC reported that "new scientific data" demonstrated that vaccinated people who experienced breakthrough infections carried similar viral loads to the unvaccinated (but not naturally immune), leading the CDC to infer that vaccinated people transmit the virus at concerning levels.[40]

36.     Tyson's vaccine mandate "accommodation" -- limiting asymptomatic unvaccinated employees from its workplace by effectively terminating them -- flies in the face of the current scientific literature, which shows asymptomatic spread of COVID-19 is virtually non-existent.

37.     In sum, there is little objective evidence to support a finding that asymptomatic spread is a driver of COVID-19 and therefore, poses a danger to Tyson's workplaces. Rather, the epidemic spread of COVID-19 is propelled almost exclusively by *symptomatic persons* (some of whom are fully vaccinated) who can easily self-isolate or quarantine from their co-workers.

---

[38] Allyson M. Pollock, *Asymptomatic transmission of covid-19*, theBMJ (Dec. 21, 2020) available at https://www.bmj.com/content/371/bmj.m4851 (last visited Sept. 27, 2021).
[39] The Pfizer and BioNTech BNT162b2 COVID-19 vaccine (hereafter, "the Pfizer vaccine"); the ModernaTX mRNA-1273 COVID-19 vaccine (hereafter, "the Moderna vaccine"); the Janssen Biotech, Inc. (Johnson & Johnson) Ad26.COV2.S COVID-19 vaccine (hereafter, "the Johnson & Johnson vaccine") (collectively, "COVID-19 vaccines").
[40] *See CDC reversal on indoor masking prompts experts to ask,* "*Where's the data?*", WASHINGTON POST (July 28, 2021), *available at* wapo.st/2THpmIQ (last visited Oct. 2, 2021).

38.     Tyson's COVID-19 vaccination mandate is nonsensical, unjust, and a violation of federal and Tennessee law.

**E.     Defendants' Vaccine Mandate Will Not Stop the Spread of COVID-19**

39.     Data and studies published since the vaccines have been released are demonstrating that the vaccine has been ineffective at preventing the transmission and infection of SARS-CoV-2.

40.     A study published on September 9, 2021 in the European Journal of Epidemiology analyzed data from 68 countries and 2947 counties in the United States.  They found "no discernable relationship between percentage of population fully vaccinated and new COVID-19 cases."[41] Nor was there a significant indication of "COVID-19 cases decreases with higher percentages of population fully vaccinated. Rather, they found a "marginally positive association such that countries with higher percentages of population fully vaccinated have higher COVID-19 cases per 1 million people."[42]

41.     Recent Israeli data found that those who had received the BioNTech vaccine were 6.72 times more likely to suffer a subsequent infection than those with natural immunity. [43] Israeli data also indicates the protection BioNTech grants against infection is short-lived compared to natural immunity and degrades significantly faster. In fact, as of July 2021, vaccine recipients from January 2021 exhibited only 16% effectiveness against infection

---

[41] S.V. Subramanian, et al., *Increases in COVID-19 are unrelated to levels of vaccination across 68 countries and 2947 counties in the United States,* European Journal of Epidemiology (September 9, 2021), available at http://doi.org/10.1007/s10654-021-00808-7.
[42] *Ibid.*
[43] David Rosenberg, *Natural Infection vs Vaccination: Which Gives More Protection?* Israel National News, (Jul. 13, 2021), available at https://www.israelnationalnews.com/News/News.aspx/309762 (last visited Aug. 26, 2021).

and 16% protection against symptomatic infection, increasing linearly until reaching a level of 75% for those vaccinated in April.[44]

42.     Similarly, scientists studying over 4,000 frontline workers found that between December 2020 until April 2021, the effectiveness of the vaccines cratered from 91 percent to 66 percent. This drastic decline occurred *before* the SARS-CoV-2 Delta variant became the predominant variant.[45]

43.     Even more alarming, research focusing on the Pfizer vaccine's effectiveness in America shows that from December 14, 2020 until August 8, 2021, the vaccine plummeted in effectiveness, Collapsing from 88 percent to 47 percent.[46]

44.     State-level data strongly indicates the vaccines wane in effectiveness over time too. As recorded by Tennessee Department of Health[47] and reported by *Chattanooga Times Free Press*, 13 percent of all COVID-19 cases in Tennessee during August 2021 were made up of vaccinated people, compared to just 4 percent in May.[48] From May 2021 to August of 2021,

---

[44] Nathan Jeffay, Israeli, *UK Data Offer Mixed Signals on Vaccine's Potency Against Delta Strain*, THE TIMES OF ISRAEL (July 22, 2021), available at bit.ly/3xg3uCg (last visited Aug. 26, 2021).

[45] Ashley Fowlkes, et. al., *Effectiveness of COVID-19 Vaccines in Preventing SARS-CoV-2 Infection Among Frontline Workers Before and During B.1.617.2 (Delta) Variant Predominance – Eight U.S. Locations, December 2020 – August 2021*, 70 Morbidity and Morality Weekly Report, (Aug. 27, 2021) available at https://www.cdc.gov/mmwr/volumes/70/wr/mm7034e4.htm (last visited Sept. 27, 2021).

[46] Sara Y. Tartof, et. al., *Six-month effectiveness of BNT162b2 mRNA COVID-19 vaccine in a large US integrated health system: a retrospective cohort study*, MedRxiv (July 28, 2021) available at https://www.medrxiv.org/content/10.1101/2021.07.28.21261159v1 (last visited Aug. 26, 2021).

[47] Tennessee Department of Health, *COVID-19 Critical Indicators* (Sept. 23, 2021) available at https://www.tn.gov/content/dam/tn/health/documents/cedep/novel-coronavirus/CriticalIndicatorReport.pdf (last visited Sept. 27, 2021).

[48] Elizabeth Fite, *What Tennessee's latest data on COVID-19 breakthrough infections means*, Chattanooga Times Free Press (Sept. 20, 2021) available at https://web.archive.org/web/20210924041444/https://www.timesfreepress.com/news/local/story/

the number of vaccinated people that were hospitalized or reportedly killed by COVID-19 skyrocketed from just a few percentage points to double-digits.[49] The state's data shows a full 17 percent of all COVID-19 deaths and 14 percent of hospitalizations in Tennessee during August 2021 were among the vaccinated.[50]

45.     Israel, the most aggressively vaccinated nation in the world, saw its COVID-19 cases dramatically rise to unprecedented levels while its neighbors saw no such increase, even as the country became more and more vaccinated.

46.     A paper published in *Eurosurveillance*, a journal published by the European Centers for Disease Control, documents a significant outbreak of COVID-19 among fully vaccinated patients and staff at a hospital in Tel Aviv.[51] At the time of the outbreak, investigators determined 238 out of 248 of exposed patients and staff had been fully vaccinated with Pfizer's mRNA vaccine.[52] Ultimately, 39 out of the 238 exposed vaccinated people (16 percent) were infected, along with 3 out of 10 unvaccinated people - a difference that doesn't reach statistical significance because the unvaccinated group is too small.[53] Of the infected, 23 were patients and 19 staff.[54] The staff all recovered quickly, but five patients

---

2021/sep/20/what-tennessees-latest-covid-19-breakthrough-dat/554538/ (last visited Sept. 27, 2021).

[49] *Ibid.*

[50] *Ibid.*

[51] Pinina Shitrit, et. al., *Nosocomial outbreak caused by the SARS-CoV-2 Delta variant in a highly vaccinated population, Israel, July 2021*, (July 2021) available at https://www.eurosurveillance.org/content/10.2807/1560-7917.ES.2021.26.39.2100822#html_fulltext (last visited on Oct. 3, 2021).

[52] *Ibid.*

[53] *Ibid.*

[54] *Nosocomial outbreak caused by the SARS-CoV-2 Delta variant in a highly vaccinated population, Israel, July 2021.*

died and another nine had severe or critical cases.[55] *All were vaccinated*.[56] On the other hand, the two unvaccinated infected patients both had only *mild* cases of COVID-19.[57]

47.      The fact that 96 percent of the people in the Tel Aviv hospital population had been vaccinated -- a level far above early estimates of the percentages required for herd immunity -- apparently made no difference in stopping the spread of COVID-19.[58] As the authors explained: "This communication…challenges the assumption that high universal vaccination rates will lead to herd immunity and prevent COVID-19 outbreaks…"[59]

48.      The crumbling effectiveness of the vaccines should come as little surprise as currently all available COVID-19 "vaccines" do not function the way vaccines are expected to work by the public. As currently understood, the main benefit the available vaccines may confer is a reduction of serious clinical disease, thus, lessening a person's symptoms from COVID-19; but the vaccines have not shown that they are effective at stopping infection or preventing vaccinated persons from spreading the virus.

**F.      <u>Natural Immunity is Durable, Lasting, and Superior to Vaccination</u>**

49.      There is strong evidence that persons who have been infected with SARS-CoV-2 and recovered are protected from future reinfection for over a year, and potentially have lifelong immunity – unlike vaccinated persons for whom boosters are already being recommended

---

[55] *Ibid*.
[56] *Ibid*.
[57] *Ibid*.
[58] *Nosocomial outbreak caused by the SARS-CoV-2 Delta variant in a highly vaccinated population, Israel, July 2021.*
[59] *Ibid*.

and administered.[60] It is therefore a true medical mystery why Tyson wholesale disregards the relevance of natural immunity entirely.

50.    Natural immunity includes antibodies, B-cells, plasma cells, T-helper cells, T-presenting cells, natural killer cells, and a host of innate defenses against the virus. Natural immunity is robust, durable, and complete against all variations of SARS-CoV-2.

51.    A bevy of epidemiological studies demonstrate to a reasonable degree of medical certainty that natural immunity following infection and recovery from the SARS-CoV-2 virus provides robust and durable protection against reinfection, at levels equal to or better than the most effective vaccines currently available.[61]

52.    For example, a recent analysis of an outbreak among a small group of mine workers in French Guiana found that 60 percent of fully vaccinated miners suffered breakthrough infections compared to **zero** among those with natural immunity.[62]

---

[60] *See*, Yair Goldberg; Micha Mandel, et al., *Protection of previous SARS-CoV-2 infection is similar to that of BNT162b2 vaccine protection: A three month nationwide experience from Israel*, medRxiv (April 20, 2021) available at https://www.medrxiv.org/content/10.1101/2021.04.20.21255670v1 (last visited on Aug. 26, 2021); *See*, also Jackson S. Turner; Wooseob Kim, et al., *SARS-CoV-2 infection induces long-lived bone marrow plasma cells in humans*, Nature 595 (pp. 421-425) (May 24, 2021).

[61] *See, e.g*. N. Kojima; A. Roshani, et al., *Incidence of Severe Acute Respiratory Syndrome Coronavirus-2 Infection among previously infected or vaccinated employees*, medRxiv (July 3, 2021) available at https://www.medrxiv.org/content/10.1101/2021.07.03.21259976v2 (last visited on Aug. 26, 2021).

[62] Nicolas Vignier, et al., *Breakthrough Infections of SARS-Co V-2 Gamma Variant in Fully Vaccinated Gold Miners, French Guiana, 2021,* 27(10) EMERG. INFECT. DIS. (Oct. 2021), *available at* bit.ly/2Vmjx43 (last visited Oct. 2, 2021).

53.    Likewise, scientists from the University of California, San Diego who assessed multiple mechanisms of adaptive immunity (e.g. CD4+ T cell, CD8+ T cell, and humoral immunity) demonstrated that immunity for COVID-19 following infection is likely durable.[63]

54.    What is more, Israeli researchers conducting a massive group study found exceedingly low reinfection rates for people previously infected with COVID-19 too.[64] More interestingly, the Israeli scientists found people who receive both doses of the EUA-approved Pfizer shot were up to *13 times more likely to contract the virus than those who were previously infected with the virus*.[65]

55.    Studying more than 800,000 people split into three groups, the Israel team concluded:[66]

"This study demonstrated that *natural immunity confers longer lasting and stronger protection against infection*, symptomatic disease and hospitalization caused by the Delta variant of SARS-CoV-2, compared to the BNT162b2 two-dose vaccine-induced immunity." (emphasis added)

56.    The above findings are particularly important because the Delta variant accounted for nearly all coronavirus infections in Israel by the summer of 2021 thus, conclusive evidence that natural immunity *remained protective against Delta*.

57.    Consistent with the Israeli research team's findings, the Cleveland Clinic found similar data supporting the strong durability of natural immunity. In June of 2021, the Cleveland Clinic released a study of 1,359 previously infected health care workers. Researchers found

---

[63] Jennifer M. Dan, et. al., *Immunological memory to SARS-CoV-2 assessed for up to 8 months after infection*, National Center for Biotechnology Information (Jan. 6, 2021) available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7919858/ (last visited Oct. 3, 2021).
[64] *See*, Svian Gazit, et. al., *Comparing SARS-CoV-2 natural immunity to vaccine-induced immunity: reinfections versus breakthrough infections*, medRxiv, https://www.medrxiv.org/content/10.1101/2021.08.24.21262415v1.full.pdf (last visited on Aug. 26, 2021).
[65] *Ibid.*
[66] *Ibid.*

a reinfection rate of ***zero***, despite some of the studied individuals having been around COVID-positive patients more than the regular population.[67] Not one of the 1359 previously infected subjects who remained unvaccinated, had a SARS-CoV-2 infection over the duration of the Cleveland Clinic study.[68]

58.    The Cleveland Clinic researchers concluded: "***Individuals who have had SARS-CoV-2 infection are unlikely to benefit from COVID-19 vaccination***, and vaccines can be safely prioritized to those who have not been infected before." (emphasis added).[69]

59.    Similarly, researchers studying patients in Seattle and Atlanta found that most recovered COVID-19 patients produced durable antibodies, memory B cells, and durable polyfunctional CD4 and CD8 T cells, which target multiple parts of the virus.[70] "Taken together, these results suggest that broad and effective immunity may persist long-term in recovered COVID-19 patients," concluded the authors. Thus, unlike with the vaccines, no boosters are required to assist natural immunity.

60.    Moreover, Researchers in California conclude: "Natural infection induced expansion of larger CD8 T cell clones occupied distinct clusters, likely due to the ***recognition of a***

---

[67] Nabin K. Shrestha, et. al., *Necessity of COVID-19 vaccination in previously infected individuals*, medRxiv, (June 5, 2021) available at https://www.medrxiv.org/content/10.1101/2021.06.01.21258176v2, (last visited on August 26, 2021).

[68] *Ibid*.

[69] Nabin K. Shrestha, et. al., *Necessity of COVID-19 vaccination in previously infected individuals*, medRxiv, (June 5, 2021) available at https://www.medrxiv.org/content/10.1101/2021.06.01.21258176v2, (last visited on August 26, 2021).

[70] Kristen W. Cohen, et. al., *Longitudinal analysis shows durable and broad immune memory after SARS-CoV-2 infection with persisting antibody responses and memory B and T cells,* Cell Reports Medicine (July 20, 2021).

***broader set of viral epitopes*** presented by the virus ***not seen in the mRNA vaccine***"

(emphasis added).[71]

61.    Further, in June of 2021, Rockefeller University researchers published a paper

in *Nature* examining how antibodies changed up to a year after coronavirus infection and

recovery.[72] The authors report: "B cell clones expressing broad and potent antibodies are

selectively retained in the repertoire over time and expand markedly after vaccination. The

data suggest that immunity in convalescent individuals will be very long lasting*."*[73]

62.    Aside from more robust T cell and memory B cell immunity, which is likely more

important than antibody levels, another team of Israeli researchers found that antibodies

wane slower among those with prior infection." In vaccinated subjects, antibody titers

decreased by up to 40% each subsequent month while in convalescents they decreased by

less than 5% per month."[74]

63.    Given the mounting body of compelling research, it is medically unnecessary for persons

who have recovered from COVID-19 and present evidence of natural immunity, to undergo

vaccination for SARS-CoV-2. Indeed, it is beneficial for most individuals to be naturally

introduced to the virus.

---

[71] Suhas Sureschandra, et. al. *Single cell profiling of T and B cell repertoires following SARS-CoV-2 mRNA vaccine*, bioRxvi, (July 15, 2021).
[72] Zijun Wang, et. al., *Naturally enhancing neutralizing breath against SARS-CoV-2 one year after infection*, Nature, (June 14, 2021) available at https://www.nature.com/articles/s41586-021-03696-9, (last visited August 26, 2021).
[73] *Ibid*.
[74] Ariel Israel, et. al., *Large-scale study of antibody titer decay following BNT162b2 mRNA vaccine or SARS-CoV-2 infection*, medRxiv, (August 22, 2021).

64.     Therefore, forcing immune employees to receive the COVID-19 vaccines would not only

offer them or those around them little benefit, but it would also subject them to an elevated

risk of adverse side effects, including death, as demonstrated below.

G.     **COVID-19 Vaccines Pose Serious and Life-Threatening Health Risks to Recipients**

65.     All three of the available COVID-19 vaccines available in the United States are

marketable under Emergency Use Authorization ("EUA"). The Food and Drug

Administration ("FDA") issued an EUA for the Pfizer-BioNTech vaccine on December 1,

2020. One week later a second EUA for the Moderna COVID-19 vaccine. Finally, the FDA

issued a EUA for the Johnson & Johnson COVID-19 vaccine on February 27, 2021.

66.     Though the FDA has approved the use of a currently unavailable vaccine for future use,

as of September 13, 2021, Pfizer has admitted that it "does not plan to produce [Comirnaty]

over the next few months while EUA authorized product is still available and being made

available for U.S. distribution."[75]

67.     Governmental authorities revised their definition of the word "vaccine" itself in order to

continue to label these experimental drugs with novel ingredients because they fail to meet

the test of traditionally defined vaccines, which actually inoculated against infection and

prevented transmission, neither of which this drug can any longer claim credit for. This is

reflected in the fact there has never been a successful coronavirus vaccine in history due to

the viral evolution each virus mutates into.

68.     The government-operated VAERS database is intended to function as an "early warning"

system for potential health risks caused by vaccines, especially those whose side effects are

---

[75] https://dailymed.nlm.nih.gov/dailymed/dailymed-announcements-details.cfm?date=2021-09-13

not understood. Presently, VAERS is broadcasting a red alert, but Tyson refuses to heed the warning and instead is barreling down the tracks of forced vaccination at full steam.

69.     Recent data presents an alarming picture: As of early September, there have been 14,506 deaths reported to VAERS from COVID-19 vaccines, compared to just 8,673 for the preceding 30 years for all other vaccines.[76] That is more than **50 times** the annual average (see chart by Dr. Guetzhow below).[77]

70.     According to Josh Guetzhow, Ph.D, there are **91 times** the number of deaths and **276 times** the number of coagulopathy events reported after COVID-19 vaccination than after flu vaccination.[78]



71.     Moreover, new research suggests the heightened risk of adverse effects results from "preexisting immunity to SARSCov-2 [that] may trigger unexpectedly intense, albeit

---

[76] Josh Guetzhow, Safety Signals for COVID Vaccines Are Loud and Clear. Why Is Nobody Listening?, THE DEFENDER, (Sept. 29, 2021) available at https://childrenshealthdefense.org/defender/safety-signals-covid-vaccines-full-transparency-cdc-fda/ (last visited Oct. 2, 2021).
[77] *Ibid*.
[78] *Ibid*.

relatively rare, inflammatory and thrombotic reactions in previously immunized and predisposed individuals."[79]

72.     Although the number of VAERS reports is alarming in its own right, it is likely that the true number of adverse effects associated with the COVID-19 vaccines far exceeds cases reported to VAERS. In 2010, a federal study commissioned by the U.S. Health and Human Services and performed by Harvard consultants on behalf of the Agency for Healthcare Research and Quality (AHRQ) found that "fewer than 1% of vaccine adverse events" are ever reported to VAERS.[80] Thus, it is likely scores of adverse events associated with the COVID-19 vaccines, including deaths, are going unreported.

73.     But it is not just VAERS that is broadcasting a red alert. On October 1, 2021, the European Union's drug regulator, the European Medicines Agency ("EMA"), identified a new possible link between rare cases of blood clotting in deep veins with Johnson & Johnson's COVID-19 vaccine.[81] The EMA said the new, possibly life-threatening clotting condition known as venous thromboembolism (VTE) should be included on the Johnson & Johnson product label as a possible side-effect of the shot.[82]

74.     What is more, the Moderna and Pfizer Vaccines are made with polyethyline glycol ("PEG"). PEG has been linked to anaphylaxis in numerous recipients of the vaccine andis

---

[79] Angeli et al., *SARS-CoV-2 Vaccines: Lights and Shadows*, 88 EUR. J. INTERNAL MED. 1, 8 (2021).

[80] Lazarus, Ross, MMBS, et. al., *Electronic Support for Public Health–Vaccine Adverse Event Reporting System (ESP:VAERS)*, Agency for Healthcare Research and Quality (Sept. 30, 2010) available at https://digital.ahrq.gov/sites/default/files/docs/publication/r18hs017045-lazarus-final-report-2011.pdf (last visited Oct. 2, 2021).

[81] Reuters, EU finds J&J COVID shot possibly linked to another rare clotting condition, REUTERS (Oct. 1, 2021) available at https://www.reuters.com/business/healthcare-pharmaceuticals/eu-finds-jj-covid-shot-possibly-linked-another-rare-clotting-condition-2021-10-01/ (last visited Oct. 2, 2021).

[82] *Ibid*.

the delivery mechanism to the cells which keeps the mRNA from dispersing and not reaching its intended target. PEG performs its intended use. Unfortunately, about 70% of the U.S. Population is slightly to somewhat allergic to PEG. Despite that most of the United States is only mildly allergic to PEG, approximately 7% of the U.S. Population is highly allergic to PEG. "The Pfizer/BioNTech COVID-19 vaccine can cause severe anaphylaxis" tied to the PEG used,[83] necessitating the National Institute of Health ("NIH") to begin a clinical trial of "systemic allergic reaction to the Moderna or Pfizer-BioNTech COVID-19 vaccines" due to recipients of those vaccines experiencing anaphylaxis."[84]

75.     Despite the very well-known anaphylaxis risks associated with the COVID-19 vaccines, Tyson is not offering PEG allergy testing as part of its vaccine mandate.

76.    A host of other alarming side effects have been reported as a result of the COVID-19 vaccines, including myocarditis, pericarditis, Guillain-Barre syndrome, antibody-dependent enhancement, fertility concerns, menstrual health issues, etc.

77.     Furthermore, spike proteins, the putative antigen induced by Pfizer-BioNTech COVID vaccine, are a toxin. They are produced and enter the circulatory system, have predictable negative consequences to vascular endothelium, activate platelets, and cross the blood brain barrier.  It would be expected to trigger the destruction of cells that produce it and present it on their surfaces. We now know that vaccine-induced spike proteins circulate throughout the body and accumulate in large concentrations in organs and tissues, including the spleen, bone marrow, liver, adrenal glands, and especially the ovaries.[85] Since there exists no way

---

[83] *See* https://onlinelibrary.wiley.com/doi/10.1111/cea.13874.
[84] *See* https://www.nih.gov/news-events/news-releases/nih-begins-study-allergic-reactions-moderna-pfizer-biontech-covid-19-vaccines
[85] Megan Redshaw, *'We Made a Big Mistake' – COVID Vaccine Spike Protein Travels From Injection Site, Can Cause Organ Damage,* THE DEFENDER (June 3, 2021),

to turn off spike production, the actual dose of spike protein may vary by orders of magnitude from person to person. Strong but not yet conclusive evidence links spike protein *in vivo* to blood clots, thrombocytopenia, hemorrhages, heart attacks and strokes.

78.     Moreover, Tyson is not offering any indemnity or disability coverage from any of the known and potential adverse effects of the COVID-19 vaccines.

79.     To summarize, the potential adverse effects employees in being coerced to receive the COVID-19 vaccines pursuant to Tyson's mandate are not theoretical, hypothetical or academic—they are very real and have real victims. Given the alarming reports of adverse side-effects associated with the COVID-19 vaccines, subjecting employees to vaccination exposes them to a variety of health risks ranging from headaches and blood clots, to death.

80.     This is hardly surprising, as the EUAs granted for COVID-19 vaccines are based entirely on a limited set of clinical trials executed over a matter of mere months before vaccines were administered to the public. Recent breaking information has revealed that these trials were riddled with massive fraud, falsified data, and negligent and intentional error.

81.     On November 2, 2021, the BMJ published alarming information regarding Pfizer's phase III trial for the COVID-19 vaccine. This information was brought forward by whistleblower Brook Jackson, a regional director at the Ventavia Research Group, which is a privately owned clinical research company in Texas that conducted a portion of the clinical research upon which Pfizer, the FDA, and our country, based their faith on the safety and efficacy of COVID-19 vaccines. Jackson conveyed that "the company falsified data, unblinded patients, employed inadequately trained vaccinators, and was slow to follow up on adverse events

---

https://childrenshealthdefense.org/defender/covid-vaccine-spike-protein-travels-from-injection-site-organ-damage/.

reported in Pfizer's pivotal phase II trial." Jackson expressed her concerns regarding "poor

laboratory management, patient safety concerns, and data integrity issues" to her supervisors

at Ventavia, to no avail. Documentation gathered by Jackson demonstrates that these

problems have been continuously occurring since shortly after the clinical trial began. When

Jackson was unsuccessful submitting her concerns to Ventavia, on September 25, 2020, she

called and emailed a written complaint to Defendant FDA regarding the unsound practices

she had witnessed. That same day, Jackson was fired from Ventavia.[86]

82.     The email sent to the FDA document a number of concerning practices Jackson had

witnessed: "participants placed in a hallway after injection and not being monitored by

clinical staff;" "lack of timely follow-up of patients who experienced adverse events;"

"protocol deviations not being reported;" "vaccines not being stored at proper

temperatures;" "mislabelled laboratory specimens;" and "targeting of Ventavia staff for

reporting these types of problems."[87] Although the FDA responded to her email, the agency

failed to follow up or inspect Ventavia after the complaint was made.[88]

83.     These clinical trials can hardly be relied upon to guarantee the safety of the COVID-19

vaccine. The empirical evidence and recent studies have provided definitive proof that these

vaccines cannot boast safety and effectiveness. In no such circumstances should these

experimental medical products be mandated in any setting.

///

///

---

[86]  Paul Thacker, *Covid-19: Researcher Blows the Whistle on Data Integrity Issues in Pfizer's Vaccine Trial,* available at https://www.bmj.com/content/375/bmj.n2635.full.print.
[87] *Ibid.*
[88] *Ibid.*

### H.    COVID Vaccines Violate Plaintiff's Religious Beliefs

84.    Plaintiff holds sincere concerns surrounding the process used to manufacture the vaccines.

85.    Presently, all COVID-19 vaccines have made use either in production or testing of fetal cell lines developed from tissues originally derived from aborted fetuses (see excerpt below).[89]



**Los Angeles County**
**COVID-19 VACCINE AND FETAL CELL LINES**

In various stages of vaccine development and manufacturing, some of the COVID-19 vaccines used cells originally isolated from fetal tissue (often referred to as fetal cells), some of which were originally derived from an aborted fetus. The use of fetal cell lines is a very sensitive and important topic within some faith communities and among individuals with concerns about the ethics of using materials derived in this way.

86.    For example, the Johnson & Johnson vaccine used fetal cell cultures, specifically PER.C6, a retinal cell line that was isolated from a terminated fetus in 1985.[90]

87.    In an interview with WREG, Dr. Steve Threlkeld, president of the medical staff at Baptist Hospital in Memphis, Tennessee acknowledged fetal cell lines used to produce or test the Johnson & Johnson COVID-19 vaccines "were actually recovered from an aborted fetus in the 70s or 80s and there are several of these cell lines."[91]

---

[89] *See,* Los Angeles County Public Health, *COVID-19 Vaccine and Fetal Cell Lines,* http://publichealth.lacounty.gov/media/Coronavirus/docs/vaccine/VaccineDevelopment_FetalCellLines.pdf (last accessed August 26, 2021)

[90] *Are the vaccines made with fetal cells,* Institute for Clinical Systems Improvement, https://www.icsi.org/covid-19-vaccine-faq/are-the-mrna-vaccines-made-with-fetal-cells/ (last accessed August 26, 2021), see also, Tennessee Department of Health, *Fact v. Fiction: Johnson & Johnson Vaccine* (2021) available at https://covid19.tn.gov/stay-informed/blogs/fact-v-fiction-johnson-johnson-vaccine/ (last visited Sept. 27, 2021) (acknowledging the Johnson & Johnson vaccine was developed from a fetal cell line).

[91] WREG, *State: Fetal cell lines, not fetal tissue, were used to make Johnson & Johnson vaccine* (March 5, 2021) available at https://www.wreg.com/news/state-fetal-cell-lines-not-fetal-tissue-was-used-to-make-johnson-johnson-vaccine/ (last visited Sept. 27, 2021).

88.     As for the EUA-Pfizer and Moderna COVID-19 vaccines, fetal cell line HEK 293 was used during the research and development phase.[92] All HEK 293 cells are descended from tissue taken in 1973 from either an elective abortion or miscarriage[93] that took place in the Netherlands.[94]

89.     While the production of the vaccines did not reportedly require any new abortions, Plaintiff objects to receiving the COVID-19 vaccines on the basis that, even assuming the vaccines do confer a meaningful health benefit, that benefit is one from ill-gotten gains.

90.     Plaintiff believes any benefit the COVID-19 vaccines may confer, flows from the unjust exploitation of unborn human life. On this basis alone, Plaintiff refuses on religious grounds to accept or be forced to accept the COVID-19 vaccines.

I.      **Employers Who Have Failed to Provide Reasonable Accommodations for Vaccine Mandates Have Been Held Liable**

91.     The discouragement or denial of religious accommodations from employers' mandatory vaccine policies has been found unlawful, even when those mandates were proscribed by hospitals. Indeed, numerous employers have been sued and lost over forced vaccines. *See, e.g. EEOC v. Mission Hosp. Inc.*, No. 1:16-cv-118-MOC-DL, 2017 WL 3392783 (W.D.N.C. Aug. 2017) [resulting in permanent injunction against the employer from improperly denying religious exemptions from mandated vaccines and requiring employer to pay $89,000 in damages]; *United States v. Ozaukee County*, No 18-cv-343-pp (E.D. Wis.

---

[92] *See*, Nebraska Medicine, *You asked, we answered: Do the COVID-19 vaccines contain aborted fetal cells?*, https://www.nebraskamed.com/COVID/you-asked-we-answered-do-the-covid-19-vaccines-contain-aborted-fetal-cells, (last visited on Aug. 26, 2021).
[93] *COVID-19 Vaccine and Fetal Cell Lines.*
[94] *Ibid.*

2018) [resulting in a permanent injunction against the employer for failure to grant religious exemptions from compulsory vaccines and order payment of damages to employee].

92.    Likewise, in *EEOC v. Saint Vincent Health Center*, Civil Action No. 1:16-cv-234 (2016), the employer agreed to pay $300,000 to a class of six aggrieved former employees and provided substantial injunctive relief to settle a religious discrimination lawsuit based upon a failure to grant a religious exemption as part of a mandatory seasonal flu vaccination requirement for its employees.

93.    Moreover, in *EEOC v. Memorial Healthcare*, Civil Action No. 2:18-cv-10523 (2018), the defendant employer paid $74,418 ($34,418 in back pay, $20,000 in compensatory damages and $20,000 in punitive damages) for refusing to hire a medical transcriptionist because of her religious beliefs against receiving flu shots and refusing to accommodate those beliefs.

94.    In fact, as recently as 2018, the U.S. Equal Employment Opportunity Commission sued Nashville-based Saint Thomas Health, after the employer failed to make a reasonable religious accommodation for the flu vaccine. *EEOC v. Saint Thomas Health*, Civil Action No. 3:18-cv-00978 (M.D. Tenn. 2018).

95.    The *Saint Thomas Health* case resulted in consent decree enjoining the employer from failing to provide religious accommodations to an employees' sincerely held religious beliefs unless such requests created an undue hardship. The decree also awarded the injured employee $75,000 in damages and directed the employer to issue the employee an apology letter.

96.    Indeed, on November 12, 2021, the U.S. Court of Appeals for the Fifth Circuit granted a stay of the Occupational Safety and Health Administration's nationwide vaccine mandate, stating that the mandate "raises serious constitutional concerns" and that "a denial of the

petitioners' proposed stay would do them irreparable harm," as the Mandate threatens to substantially burden the liberty interest of reluctant individual recipients put to a choice between their job(s) and their jab(s)." *BST Holdings v. OSHA,* Order Granting Stay (U.S. Ct. App. 5th Cir.) (November 12, 2021). In implementing the mandate, the 5th Circuit concluded that OSHA likely "violates the constitutional structure that safeguards our collective liberty." *Ibid.*

**J. Tyson's Mandate Continues the Inglorious History of Medical Experiments**

97.     Born amidst malaria and smallpox pandemics, the Constitution authorized no emergency exception to the liberties secured under it. The Founding Fathers understood the virus of concentrated power posed more of a threat than any biological virus could.  The Ninth Amendment to the Constitution safeguarded all ancient rights and liberties, including the ancient tort of battery. *United States Constitution, Amendment IX*. The right against battery assured "the right of every individual to the possession and control of his own person, free from all restraint or interference of others," which would be "sacred" and protected under the law. *Union Pacific R. Co. Botsford*, 141 U.S. 250, 251 (1891). The famed Justice Cardozo defined the doctrine as the universal right of every person "to determine what shall be done with his own body." *Schloendorff v. Society of New York Hospital*, 105 N.E. 92, 93 (1914). This right to informed consent incorporates necessarily the right to refuse treatment: "The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty." *Washington v. Harper*, 494 U.S. 210, 229  (1990). The Nuremberg Code enshrines the right of informed consent as a matter of universal law, so widely recognized, courts consider it a *jus cogens* legal principle enforceable everywhere. *Abdullah v. Pfizer, Inc.*, 562 F.3d 163 (2d Cir. 2009). Based on

these precepts, courts require clear and convincing evidence that a person poses an imminent, severe risk to others before those individuals may be subject to forced medical care. *O'Conner v. Donaldson*, 422 U.S. 563 (1975); *Addington v. Texas*, 441 U.S. 418 (1978).

### Eugenics Era

98.     We only deviated from this Informed Consent standard of medical care during the Eugenics Era, a diseased doctrine birthed in the medical academies of the United States at the turn of the last century, as a deformed outgrowth of the then in-vogue school of Social Darwinism. A trio of decisions carved out emergency exceptions to Constitutional liberties, including authorizing a fine for not taking a vaccine (*Jacobson v. Massachusetts*, 197 U.S. 11 (1905)), forced sterilizations of poor and politically unprotected populations (*Buck v. Bell*, 274 U.S. 200 (1927), which relied exclusively on expanding *Jacobson*), and culminated in the kind of "emergency exception" logic that led a court to authorize forced detention camps. *Korematsu v. United States*, 323 U.S. 214 (1944). This trilogy of infamy sees its corpses rise again as "precedents" seemingly permitting governments to reinstate Eugenics-Era logic across the legal landscape. Indeed, recent governmental defendants cited the forced sterilization decision in *Buck* as the basis for forced vaccine mandates of teenagers. *Buck v. Bell,* 274 U.S. 200 (1927).

### Nuremberg Code Era

99.     Reeling from the moral horror of the Nazi regime, and its enthusiastic embrace of eugenics, American jurists led the way in reestablishing the Constitutional order by invalidating the Eugenics-Era precedents and by instituting the Nuremberg Code of 1947, whose governing principles of Informed Consent for all matters of medicine form a *jus*

*cogens* principle of universal, internationally recognized law, enforceable amongst all civilized nations, as federal courts established. The right to bodily autonomy formed the foundation for Supreme Court recognition of the right to privacy and guided the standards governing all matters of medical care concerning the state. Only clear and convincing evidence of an imminent danger to others justifies forced medical care. *Washington v. Harper*, 494 U.S. 210, 229 (1990); *Addington v. Texas*, 441 U.S. 418 (1978). Only business necessity warrants a place of public accommodation or employer to discriminate against someone based on her perceived medical status. 42 U.S.C. § 12101. The Nuremberg Code-derived governance of medical authority reversed the eugenics-era precedents, empowered individuals with a meaningful participatory role, and empowered democratic oversight, judicial supervision, and procedural safeguards on the medical regulatory process, enshrining informed consent as the ethical foundation of modern medicine and a fundamental human liberty so universal that courts acknowledge it as a peremptory norm.

### *Rushed Drugs & Medical Experiments*

100.    The concern over uninformed, nonconsensual and pharmacological failures haunt the history of rushed drugs, biologics and negligent courts. From Tuskegee to the military, from the foster homes of young women to the Indian health care services on reservations, from facilities for the mentally ill to jails for women, the least powerful and most trusting have been victimized by government medical experimentation, without recourse or remedy. Deceptive denial of syphilis treatment, forced sterilizations, testing of radioactive ingredients on unwitting patients, psychological experimentation on unsuspecting students (like the MK-Ultra type testing on Ted Kaczynski at Harvard), the LSD testing on government employees, the chemical testing over San Francisco or in New York City

34

subways, the mustard gas secret tests on drafted soldiers – history has taught us that government must be reined in lest it treat its citizenry as rats in a cage or guinea pigs for experimentation.

101.     In 1955, regulators rushed approval of a polio vaccine that caused an outbreak of polio in hundreds of children, known as the Cutter Incident. Later scholars attributed the blame to the federal government's failures in rushing the product to market. In 1959, the Belgian Congo rushed another polio vaccine. Twenty-five years later, a new virus emerged in the population: AIDS. Detailed journalistic investigations have attributed it to the use of contaminated monkey kidneys in the development of polio vaccines.  In 1963, Americans discovered that the polio vaccine from monkey kidneys contained the Simian Virus 40 that could cause cancer in humans.  In 1976, the Ford administration rushed a vaccine for swine flu. The virus proved less deadly than anticipated, but the vaccine proved far more dangerous, causing thousands of Americans to develop a serious neurological disorder known as Guillain-Barre Syndrome, causing paralysis. As the "60 Minutes" report from the time identified, the FDA was again the source of failure because of the rushed, pressured political environment of the time. Most recently, in 2018, the World Health Organization rushed approval of a vaccine against Dengue Fever, despite warnings from dissident doctors, which left hundreds of children dead and thousands more injured.

102.     The Ninth Amendment to the Constitution safeguarded all ancient rights and liberties, including the ancient tort of battery. *United States Constitution, Amendment IX*. The right against battery assured "the right of every individual to the possession and control of his own person, free from all restraint or interference of others," which would be "sacred" and protected under the law. *Union Pacific R. Co. v. Botsford*, 141 U.S. 250, 251, 11 S. Ct.

1000, 35 L.Ed. 734 (1891).

103.   Famed Justice Cardozo defined the doctrine as the universal right of every person "to determine what shall be done with his own body." *Schloendorff v. Society of New York Hospital*, 105 N.E. 92, 93 (1914).

104.   This right to informed consent necessarily incorporates the right to refuse treatment: "The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty." *Washington v. Harper*, 494 U.S. 210, 229 (1990).

105.   The Nuremberg Code enshrines the right of informed consent as a matter of universal law so widely recognized that courts consider it a *jus cogens* legal principle enforceable everywhere. *Abdullahi  v. Pfizer, Inc.*, 562 F.3d 163 (2d Cir. 2009).

106.   Based on these precepts, courts require clear and convincing evidence that a person poses an imminent, severe risk to others before that person may be subject to forced medical care. *O'Conner v. Donaldson*, 422 U.S. 563 (1975); *Addington v. Texas*, 441 U.S. 418 (1978).

## FIRST CAUSE OF ACTION
**Violation of the Free Exercise Clause of the First Amendment to the United States Constitution**

107.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein, and pleads this cause of action in the alternative to other causes of action.

108.   As Defendant Tyson admitted and the court already found, all of Tyson's actions relevant to this proceeding, including their adverse employment actions, is as a federal officer, and as such, subjects them to liability as a federal officer. If Tyson is a federal officer, then it is obligated to follow Constitutional limits on their action.

109.    The Free Exercise Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits the State from restricting Plaintiff's rights to their free exercise of religion, stating "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." *U.S. Const. Amend I.*  It also guarantees an affirmative right to practice sincerely held religious beliefs.

110.    This free Exercise Clause "protects religious observers against unequal treatment and subjects to the strictest scrutiny laws that target the religious for special disabilities based on their religious status . . . Applying that basic principle, this Court has repeatedly confirmed that denying a generally available benefit solely on account of religious identity imposes a penalty on the free exercise of religion that can be justified only by a state interest of the highest order." *Trinity Lutheran Church of Columbia, Inc. v. Comer,* 137 S.Ct. 2012, 2019 (2017) (Internal citation and quotation marks omitted).

111.    The government may not "impose special disabilities on the basis of religious views or religious status." *Employment Div. v. Smith,* 494 U.S. 872, 876, 110 S. Ct. 1595, 108 L.Ed.2d 876 (1990).

112.    "The Sixth Circuit has held that the Free Exercise Clause is 'predicated on coercion.' As such, a litigant suffers an injury to her free exercise rights when the state compels her 'to do or refrain from doing an act forbidden or required by one's religion, or to affirm or disavow a belief forbidden or required by one's religion.' " *Mozert v. Hawkins Cty. Bd. of Educ.,* 827 F.2d 1058, 1066 (6th Cir. 1987) (quoting *Abington Sch. Dist. v. Schempp,* 374 U.S. 203, 223, 83 S. Ct. 1560, 10 L.Ed. 2d 844 (1963)).

113.    As the Supreme Court has recognized, an employee's "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First

Amendment protection." *Thomas v. Red. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 714 (1981); *See also*, *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993).

114.     "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373 (1976).

115.     Defendants granted Plaintiff's religious exemption on the grounds that she would go on unpaid leave of absence after November 1, 2021, with the guarantee of termination at the end of one year. Defendants' so-called "accommodation" is a thinly-veiled punishment that constructively and/or affirmatively terminates employment.

116.     Defendants do not provide less invasive alternative measures, such as testing schedules, mask requirements, social distancing, or quarantines, which Defendants have been implementing successfully since March 2020. Nor do Defendants recognize natural immunity, which is stronger and longer-lasting than vaccine-induced immunity. Rather, Defendants have opted for the *most* restrictive ultimatum: take a dangerous and conscience-violating medical product or lose your livelihood.

117.     Defendants' coercive ultimatum is a severe infringement of Plaintiff's constitutionally protected rights and violative of the Free Exercise Clause of the First Amendment to the United States Constitution. By forcing Plaintiff and all Tyson employees to choose between their jobs and the jab, Defendants are abrogating Plaintiff's liberty interests and unquestionably causing irreparable injury.


///

///


38

**SECOND CAUSE OF ACTION**
**Religious Discrimination**
**[Tennessee Constitution, Article I, Section 3]**

118.     Plaintiff hereby incorporates by reference the allegations contained in the preceding

paragraphs as if fully set forth herein.

119.     Tyson admits they were acting as a state officer for the purposes of their vaccine related

employment actions at issue here.  If Tyson is a state officer, then it is obligated to follow

Constitutional limits on their action.

120.     The Tennessee Constitution grants "that all men have a natural and indefeasible right to

worship Almighty God according to the dictates of their own conscience, . . . that no human

authority can, in any case whatever, control or interfere with the rights of conscience; and

that no preference shall ever be given, by law, to any religious establishment or mode of

worship." Tenn. Const. art. I § 3.

121.     The Tennessee Supreme Court has noted that "the language of [Article I, Section 3 of the

Tennessee Constitution,] when compared to the guarantee of religious freedom contained in

the federal constitution, is a stronger guarantee of religious freedom." *Planned Parenthood

of Middle, Tenn. v. Sundquist,* 38 S.W.3d 1, 13 (Tenn. 2000), [**8] citing *Carden v. Bland,*

199 Tenn. 665, 288 S.W.2d 718, 721 (Tenn. 1956); *see also  State ex rel Comm'r of Transp.

v. Medicine Bird,* 63 S.W.3d 734, 761 (Tenn. Ct. App. 2001) (concluding that the "Tenn.

Const. art. I § 3 is 'broader and more comprehensive' than the First Amendment.").

122.     "Our constitutions place the freedom of belief beyond government control or interference

so that the freedom to believe is absolute and inviolate." *Medicine Bird,* 63 S.W.3d at 762.

"It [also] includes the right to act, or to refrain from acting, in a manner inconsistent with

one's religious beliefs." *Ibid.*

123.    While "the freedom to act is subject to reasonable control for the protection of others,"

here Plaintiff's failure to act, in the form of refusing to receive a COVID-19 vaccine, on

religious grounds, is protected by the Tennessee Constitution. *Wolf v. Sundquist,* 955

S.W.2d 626, 630 (Tenn. Ct. App. 1997).

124.    Defendants' mandate violates the Tennessee Constitution by infringing upon Plaintiff's

"rights of conscience" by implementing a coercive mandate and punishing Plaintiff for

following the tenets and dictates of her own religious beliefs.

125.    Here, Plaintiff's freedom to refrain from receiving the COVID-19 vaccine, an act that is

contrary to her sincere religious beliefs, is protected by the Tennessee Constitution and is

beyond Defendants' control.

## THIRD CAUSE OF ACTION
### Religious Discrimination
**[Violation of Title VII of the Civil Rights Act of 1964; 42 U.S.C. § 2000e et seq.]**

126.    Plaintiff hereby incorporates by reference the allegations contained in the preceding

paragraphs as if fully set forth herein.

127.    Title VII prohibits "discriminat[ion] against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such individual's

race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII also

prohibits retaliation against an employee for engaging in protected activity. *Walborn v. Erie*

*Cnty Care Facility*, 150 F.3d 584, 588 (6th Cir. 1998.).

128.    Title VII imposes upon an employer the duty to make reasonable accommodations for the

religious observances short of incurring an undue hardship. *Reed v. UAW*, 569 F.3d 576,

579 (6th Cir. 2009) (citing *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 75, 97 S. Ct.

2264, 53 L. Ed. 2d 113 (1977)).

129.   The analysis of a religious accommodation case begins with whether an employee has established a prima facie case of religious discrimination. *Tepper v. Potter*, 505 F.3d 508, 514 (6th Cir. 2007) (quoting *Smith v. Pyro Mining Co.*, 827 F.2d 1081, 1085 (6th Cir. 1987)).

130.   "To establish a prima facie case, [a plaintiff] must show that '(1) he holds a sincere religious belief that conflicts with an employment requirement; (2) he has informed the employer about the conflict; and (3) he was discharged or disciplined for failing to comply with the conflicting employment requirement.'" *Id*.

131.   "Once an employee has established a prima facie case, [the defendant] has the burden 'to show that it could not reasonably accommodate the employee without undue hardship.'" *Id*. (quoting *Virts v. Consol. Freightways Corp.*, 285 F.3d 508, 516 (6th Cir. 2002)).

132.   Plaintiff requested religious exemptions from Tyson's COVID-19 vaccine mandate.

133.   Defendants' only accommodation for employees opting not to receive a COVID-19 vaccine on religious grounds is one year of unpaid leave, which is akin to termination, with a promise of termination if the employee does not receive a COVID-19 vaccine at the end of the year.

134.   Defendants failed to provide Plaintiff with reasonable accommodations for her religious observances as is required under Title VII, as one year of unpaid leave is not reasonable accommodation, but rather a punitive measure taken against employees who choose to exercise their religious rights.

135.   By denying reasonable accommodation and executing punitive measures against employees who refrain from obtaining a COVID-19 vaccine on religious grounds, Defendants discriminated against Plaintiff due to her religious beliefs.

41

136.   Defendants' failure to provide religious accommodations has injured and will continue to injure Plaintiff by discriminatorily denying her employment and income.

137.   On these facts, Plaintiff establishes a prima facie case that shows Defendants failed to make any reasonable accommodation and violated her Title VII rights.

138.   Because Plaintiff will be able to establish a prima facie showing, the burden shifts to Defendants to show that they could not accommodate the Plaintiff's religious needs without undue hardship. *Tepper,* at 514. Defendants are unable to make this showing for several reasons.

139.   First, upon receiving Plaintiff's request for a religious accommodation, Defendants did not give that request the individualized consideration demanded by Title VII. In the EEOC's recent Technical Assistance, *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws* (the "COVID-19 Technical Assistance", the EEOC addressed this precise issue. See https://www.eeoc.gov/newsroom/eeoc-issues-updated-covid-19-technicalassistance, last visited on September 26, 2021. In the COVID-19 Technical Assistance, the EEOC posed the following question: "Under Title VII, how should an employer respond to an employee who communicates that he . . . is unable to be vaccinated . . . because of a sincerely held religious belief." *Id*. at K.12. The EEOC's response was as follows:

> Once an employer is on notice that an employee's sincerely held religious belief, practice, or observance prevents the employee from getting the COVID-19 vaccine, the employer must provide a reasonable accommodation unless it would pose an undue hardship . . . . Under Title VII, **an employer should thoroughly consider all possible reasonable accommodations** . . . . In many circumstances, it may be possible to accommodate those seeking reasonable accommodations for their religious beliefs, practices, or observances.

*Id.* (emphasis added). Elsewhere in that document, the EEOC identified the types of reasonable accommodations employers must consider when they receive requests for religious accommodations, including "masks," "testing," "telework," "social distancing protocols," "making changes in the work environment (such as [modification] to ventilation systems or limiting contact with other employees and non-employees," and "regular hand washing." *Id.* at K.5.

140.    Here, Defendants failed to "thoroughly consider all possible reasonable accommodations," as required by the EEOC and provided a far cry from the "individualized" assessment required by the EEOC. *Id.* at K.5.

141.    Second, Defendants cannot show that affording Plaintiff the types of accommodations the EEOC identified in the COVID-19 Technical Assistance as being reasonable in the context of employer vaccination policies—i.e., "masks," "testing," "telework," "social distancing protocols," "making changes in the work environment," "hand washing," etc.—would impose an undue hardship on it.

142.    As such, Defendants have violated Plaintiff's rights under Title VII by discriminating against her on the basis of religion and failing to provide reasonable accommodations or demonstrate undue hardship.

**FOURTH CAUSE OF ACTION**
**Religious Discrimination**
**[Violation of the Tennessee Human Rights Act; Tennessee Code § 4-21-401]**

143.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

144.    Tenn. Code. Ann. § 4-21-401(a)(1)-(2) of the Tennessee Human Rights Act ("THRA") prohibits an employer form "discriminat[ing] against an individual with respect to

compensation, terms, conditions, or privileges of employment because of such individual's

… religion, …; or limit, segregate or classify an employee or applicants for employment in

any way that would deprive or tend to deprive an individual of employment opportunities or

otherwise adversely affect the status of an employee, because of . . . religion."

145.    The THRA also forbids an employer from limiting, segregating, or classifying an

employee in a way that would deprive or tend to deprive an individual of employment

opportunities or otherwise adversely affect the status of the employee because of the

employee's religion. Tenn. Code. Ann. § 4-21-401(a)(2).

146.    Under the THRA: "any person injured by any act in violation of the" THRA may forgo

the administrative process and file a "civil action in chancery court or circuit court." *Sneed

v. City of Red Bank*, 459 S.W.3d 17, 27 (Tenn. 2014) [quoting in part Tenn. Code. Ann. § 4-

2-311(a)]; *see also*, *Moore v. Nashville Elec. Power Bd.*, 72 S.W.3d 643, 649 (Tenn. Ct.

App. 2001) [citing *Hoge v. Roy H. Park Broadcasting of Tenn., Inc.*, 673 S.W.3d 157, 158

(Tenn. Ct. App. 1984)].

147.    Ultimately, a claim brought under the THRA is analyzed in the same manner as claims

brought under Title VII of the Civil Rights Act of 1964. *Tero v. Elliot Popham Pontiac,

Olsmoblie, Buck & GMC Trucks, Inc.*, 173 F.3d 988, 933 (6th Cir. 1999) [citing *Campbell v.

Fla. Steel Corp.,* 919 S.W.2d 26, 31 (Tenn. 1996)]; *Ferguson v. Middle Tenn. State Univ.*,

451 S.W.3d 375, 381 (Tenn. 2014) ["Generally, we interpret the THRA similarly, if not

identically, to Title VII, but we are not obligated to follow and we are not limited by federal

law when interpreting the THRA."]. The stated purpose and intent of the THRA is to

provide for execution within Tennessee of the policies embodied in the federal civil rights

laws. *Campbell v. Fla. Steel Corp*. 919 S.W.2d 26, 31 (Tenn. 1996).

148.    The analysis of a religious accommodation claim begins with whether an employee has established a prima facie case of religious discrimination. *Tepper v. Potter*, 505 F.3d 508, 514 (6th Cir. 2007) [quoting *Smith v. Pyro Mining Co.*, 827 F.2d 1081, 1085 (6th Cir. 1987)]; Tenn. Code Ann. sec. 4-21-311(e) et seq.

149.    To prevail on a claim of religious discrimination under the THRA, a plaintiff must present either direct evidence of discrimination or make a prima facie case of indirect discrimination. *Tepper v. Potter,* 505 F.3d 508, 515 (6th Cir. 2007) ("*Tepper*"). Where the discrimination claim is based on circumstantial evidence, a burden-shifting framework is used, as set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-804 (1973). This framework generally requires the following elements relating to the plaintiff: "(1) is a member of a protected group; (2) was subjected to an adverse employment action; (3) was qualified for the position; and (4) was treated less favorably than similarly-situated nonprotected employees." *Ibid.* "If the plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to offer evidence of a legitimate, nondiscriminatory reason for its adverse action." *Tepper, supra,* 505 F.3d at 515.

150.    Tyson qualifies as an "employer" under Tenn. Code Ann. §. 4 21-102(5).

151.    The statutory definition imposes upon an employer the duty to make reasonable accommodations for religious observances short of incurring an undue hardship. *Reed v. UAW*, 569 F.3d 576, 579 (6th Cir. 2009) [citing *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 75 (1977)].

152.    To establish a claim on a failure to accommodate an employee's religious beliefs under the THRA, the employee must demonstrate that: (1) the employee holds a sincere religious belief that conflicts with an employment requirement; (2) the employee informed the

employer of the conflict; and (3) the employee was discharged or disciplined for failing to comply with the conflicting employment requirement. *Burdette v. Fed. Express Corp. Burdette v. Fed. Express Corp.,* 367 F. App'x 628 (6th Cir. 2010) [citing *Tepper, supra,* 505 F.3d at 514].

153.    The State of Tennessee has expressly committed to the principle of fair and equal employment opportunities for its citizens, regarding religious accommodations, defining a protected religious practice or belief as follows: "Religious beliefs are not only those beliefs held by traditional, organized religions, but also include moral or ethical beliefs as to what is right or wrong which are sincerely held with the strength of traditional religious views."[95] Plaintiff Robbie Johnson holds sincere religious beliefs that precludes her from receiving a COVID-19 vaccine.

154.    While there may be some who consider COVID-19 vaccines to be acceptable, no employer in Tennessee, public or private, is permitted to decide for itself whose religious beliefs are valid, and whose are not.

155.    Once an employee has articulated his or her sincerely held religious objections to acceptance or receipt of the currently available COVID-19 vaccines, the proper inquiry is thus at its end as to that element.

156.    Plaintiff informed Defendants of her beliefs and requested religious accommodations from Tyson's vaccine mandate.

157.    Plaintiff has now faced termination and disciplinary action for failing to comply with Tyson's vaccination requirements, which directly conflicts with her sincere religious beliefs.

---

[95] *See*, Religious Accommodation Guidelines, available at
https://www.tn.gov/content/dam/tn/hr/documents/Religion_Accommodation_Guidelines.pdf

158.    Tyson's draconian COVID-19 mandate discriminates against employees who do not wish to receive the vaccine on religious grounds.

159.    Tyson's only accommodations provided for employees who sought religious exemptions is one year of unpaid leave, with no guarantee of a position if they comply with the mandate within that year. Noncompliant employees such as Mrs. Johnson, who do not receive a COVID-19 vaccine at the end of the leave of absence period are promised nothing short of termination. This is no reasonable accommodation at all, but rather a punitive measure taken against employees who choose to exercise their religious rights. Indeed Defendants' professed "accommodation" resulted in Plaintiff being fired from her job.

160.    As a result of Tyson's draconian vaccine mandate, most employees will be forced to seek alternative employment during that year and those that refuse the vaccination on religious grounds are unlikely to comply with the mandate within the year due to their religious beliefs, and thus will effectively be terminated. Or, like Plaintiff, are in fact permanently terminated.

161.    Tyson's failure to provide reasonable religious accommodations has injured and will continue to injure Mrs. Johnson, by discriminatorily denying her income and terminating her livelihood.

162.    Because Mrs. Johnson will establish a prima facie showing of discrimination and failure to reasonably accommodate, the burden shifts to the Defendants to demonstrate that they could not accommodate Mrs. Johnson's religious needs without undue hardship. *Tepper, supra,* 505 F.3d at 514.

163.    Defendants cannot make a showing of undue hardship. In fact, Defendants would not face any hardship in granting Plaintiff's exception without any further adverse employment

action, as it would not financially or operationally burden Defendants to accommodate Plaintiff. Furthermore, Defendant cannot show that affording Plaintiff other accommodations (scheduled testing, masking, social distancing etc.) in the context of employer vaccination policies would impose an undue hardship. Defendants thus failed to consider any reasonable accommodations to Plaintiff.[96]

164.     As such, Defendants have and continue to discriminate against Plaintiff, based on her sincerely held religious beliefs, failed to provide a reasonable accommodation for Plaintiff's exemption based on religious grounds, and therefore, violated the Tennessee Human Rights Act.

**FIFTH CAUSE OF ACTION**
**Violation of the Religious Freedom Restoration Act**
**[42 U.S.C. § 2000bbb, et seq.]**

165.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

166.     As Defendant Tyson admitted and the court already found, all of Tyson's actions relevant to this proceeding, including their adverse employment actions, is as a federal officer, and as such, subjects them to liability as a federal officer. If Tyson is a federal officer, then it is obligated to follow the limits imposed on federal officers under the Religious Freedom Restoration Act.

---

[96] See EEOC Guidance for employers whose employees are unable to be vaccinated due to their sincerely held religious beliefs. *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws* (the "COVID-19 Technical Assistance", https://www.eeoc.gov/newsroom/eeoc-issues-updated-covid-19-technicalassistance, last visited on September 26, 2021.

167.    The Religious Freedom Restoration Act of 1993 ("RFRA") prohibits the "Government [from] substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb-1(a).

168.    There is one exception to this prohibition: "Government may substantially burden a person's exercise of religion *only* if it demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b) (emphasis added). In essence, a federal actor's burden on a person's exercise of religion must satisfy strict scrutiny.

169.    "Congress's express decision to legislate the compelling interest test indicates that RFRA challenges should be adjudicated in the same manner as constitutionally mandated applications of the test, including at the preliminary injunction stage." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,* 546 U.S. 418, 430 126 S. Ct. 1211, 163 L.Ed.2d 1017 (2006).

170.    "RFRA, and the strict scrutiny test it adopted, contemplate an inquiry more focused than the Government's categorical approach. RFRA requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person' -- the particular claimant whose sincere exercise of religion is being substantially burdened." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,* 546 U.S. 418, 430-431, 126 S. Ct. 1211, 163 L.Ed.2d 1017 (2006).

171.    In implementing the Religious Freedom Restoration Act ("RFRA"), Congress found that "the framers of the Constitution, recognizing free exercise of religion as an unalienable right, secured its protection in the First Amendment to the constitution; laws 'neutral'

toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise; [and] governments should not substantially burden religious exercise without compelling justification." 42 U.S.C. § 2000bb(a)(1)-(3).

172.   "A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." 42 U.S.C. § 2000bb-1(c).

173.   RFRA "secures Congress' view of the right to free exercise under the First Amendment, and it provides a remedy to redress violations of that right. *Tanzin v. Tanvir,* 141 S. Ct. 486…

174.   "The term 'government' includes a branch, department, agency, instrumentality, and official (or ***other person acting under color of law***) of the United States." 42 U.S.C. § 2000bb-2(1) (emphasis added).

175.   "To assert a viable defense under RFRA, a religious claimant must demonstrate that the government action at issue 'would (1) substantially burden (2) a sincere (3) religious exercise" *EEOC v. R.G.,* 884 F.3d 560, (quoting *Gonzalez v. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,* 546 U.S. 418, 428, 126 S. Ct. 1211, 163 L. Ed. 2d 1017 (2006)). Courts must not determine whether the asserted "religious beliefs are mistaken or insubstantial," rather they look at "whether the line drawn reflects 'an honest conviction.' " *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2779, 189 L. Ed. 2d 675 (2014) (quoting *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 716, 101 S. Ct. 1425, 67 L. Ed. 2d 624 (1981)).

176.    Furthermore, RFRA, as amended by the Religious Land Use and Institutionalized

Persons Act of 2000 ("RLUIPA") protects "any exercise of religion, whether or not

compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A).

177.    Plaintiff has demonstrated a sincere religious belief as grounds for her opposition to

receiving a COVID-19 vaccine in compliance with Defendants' mandate. The use of aborted

fetal cells in the production of these vaccines understandably violates her conscience.

178.    Defendants, acting as federal officers and on the government's behalf when they

implemented Tyson's company-wide COVID-19 vaccine mandate, are subject to the

limitations imposed by RFRA as a government actor.

179.    Defendants have imposed a substantial burden on Plaintiff's exercise of religion by only

offering unpaid leave as an accommodation to Plaintiff. Plaintiff was since permanently

discharged based upon her request for a religious exemption

180.    This burden imposed on Plaintiff's exercise of religion by Defendants' mandate is

substantial. Defendants have sabotaged Plaintiff's livelihood, threatened her career

prospects, inflicted untold stress and emotional suffering, and damaged the reputation of

Plaintiff based on her religious beliefs.

181.    The only interest furthered by this mandate is to reduce the transmission of SARS-CoV-2

and any resulting injury or death.

182.    Defendants' vaccination policy is certainly *not* the least restrictive means of furthering

that interest. Defendants do not provide less invasive alternative measures, such as testing

schedules, mask requirements, social distancing, or quarantines, which Defendants have

been implementing successfully since March 2020. Nor do Defendants recognize natural

immunity, which is stronger and longer-lasting than vaccine-induced immunity. Rather,

Defendants have opted for the *most* restrictive ultimatum: take a dangerous and conscience-violating medical product or lose your livelihood.

### SIXTH CAUSE OF ACTION
**Disability Discrimination**
**[Violation of the Americans with Disabilities Act; 42 U.S.C. § 12010 et seq.]**

183.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

184.   The Americans with Disabilities Act of 1990, set forth in 42 U.S.C. §§ 12010 et seq. (hereinafter the "ADA Act") prohibits, among other things, discriminating against disabled persons' full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations by any person who owns, leases, leases to, or operates a place of public accommodation.

185.   Under the ADA Act, an individual has a protected disability if he or she either has a "physical or mental impairment that substantially limits one or more major life activities …" (ADA Act, § 12102(1)(A)), or is: "being regarded as having such an impairment []." (*Id.,* at subparagraph (C)). Under section 12102(3)(A) of the ADA Act: "An individual meets the requirement of 'being regarded as having such an impairment', if the individual establishes that he or she has been subjected to an action prohibited [by the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment substantially limits, or is perceived to substantially limit, a major life activity." (See also, 28 Code of Federal Regulations ("C.F.R.") §§ 35.108(f)(1) and 36.105(f)(1).)

186.   To succeed on an ADA claim, "a plaintiff must establish that (1) he is disabled; (2) he was qualified to perform either the job he previously held or another available job, with or without reasonable accommodation; and (3) he was denied a reasonable accommodation of

his disability, or otherwise suffered an adverse employment decision because of his

disability." *Thompson v. E.I. DuPont deNemours & Co.,* 70 F. App'x 332 (6th Cir. 2003);

*see also Burns v. Coca-Cola Enterprises, Inc.,* 222, F.3d 247, 253 (6th Cir. 2000).

187.     "An employer who fails to make 'reasonable accommodations to the known physical or

mental limitations of an [employee] with a disability' discriminates '*unless'* the employer

'can demonstrate that the accommodation would impose an *undue hardship* on the operation

of [its] business.' " *US Airways, Inc. v. Barnett,* 535 U.S. 391, 395 (2002) (quoting 42

U.S.C. § 12112(b)(5)(A)) (emphasis added). The employer bears the burden of persuasion to

show that a proposed accommodation would impose an undue hardship. *Monette v.

Electronic Data Sys. Corp.,* 90 F.3d 1173, 1183 (6th Cir. 1996).

188.     "When an employee informs his employer that he has a disability that would require an

accommodation, the employer has a duty under the ADA to engage in an "interactive

process" with the employee in an attempt to determine whether, based on an *individualized

assessment* of the employee's needs, a reasonable accommodation is possible." *Chaniott v.

DCI Donor Servs.,* 481 F. Supp. 3d 712, 725 (M.D. Tenn. 2020) (quoting *Rorrer v. City of

Stow,* 743 F.3d 1025, 1040 (6th Cir. 2014).

189.     Defendants regarded unvaccinated individuals as being "disabled" and unable to perform

their duties of their employment. Based on this perceived disability, Defendants

discriminated against Plaintiff by threatening termination if she failed to receive the

COVID-19 vaccine, a "condition" regarded as a disability under Tyson's policy. Indeed,

Plaintiff was terminated due to her COVID-19 vaccination status, despite the fact that

Plaintiff has successfully performed this same position from which she was just removed

since before COVID-19 was introduced to the world.

190.     Furthermore, Defendant cannot show that offering alternative, less intrusive

accommodations would cause an undue hardship, for the same reasons outlined in the

context of Defendants' religious discrimination.

191.     Defendants' failure to provide medical accommodations has harmed and continues to

harm plaintiff; injury includes, but is not limited to, coercing employees to take an untested

and potentially unsafe substance, and withdrawing the employment, income, and livelihood

of non-compliant employees such as Plaintiff.

192.     By failing to engage in the interactive process, offer any reasonable accommodation, and

terminating Plaintiff based on her medical decision, Defendants' discriminatory actions

were intentional and/or reckless, and in violation of the ADA.


## SEVENTH CAUSE OF ACTION
### Disability Discrimination
### [Violation of Tennessee Disability Act; Tennessee Code § 8-50-103]

193.     Plaintiff hereby incorporates by reference the allegations contained in the preceding

paragraphs as if fully set forth herein.

194.     The Tennessee Disability Act ("TDA") prohibits employment practices that discriminate

on the basis of physical, mental, or visual disability. Tenn. Code. Ann. § 8-50-103.

Specifically, under the TDA, an employer may not discriminate against a "qualified

individual on the basis of disability in regard to job application procedures, the hiring,

advancement, or discharge of employees, employee compensation, job training, and other

terms, conditions and privileges of employment. *Bolden v. Lowes Home Ctrs*., LLC, 783

Fed. App'x. 589, 599 (6th Cir. 2019).

195. Tennessee Code § 8-50-103(b) prohibits "discrimination in the hiring, firing, and other terms and conditions of employment of the state of Tennessee or any department, agency, institution or political subdivision of the state, or of any private employer, against any applicant for employment based solely upon any physical, mental or visual disability of the applicant, unless such disability to some degree prevents the applicant from performing the duties required by the employment sought or impairs the performance of the work involved."

196. To succeed on a claim under the TDA, a plaintiff must show "(1) that the individual was qualified for the position; (2) that the individual was disabled; and (3) that the individual suffered an adverse employment action because of that disability." *Jones v. Sharp Elecs. Corp.*, No. W2013-01817-COA-R3-CV, 2014 Tenn. App. LEXIS 107 (Ct. App. Feb. 28, 2014).

197. Although the TDA does not define "disabled," the definition stated in the THRA is applicable to TDA claims. The THRA defines disability with respect to a person as: (i) a physical or mental impairment that substantially limits one (1) or more of such person's major life activities; (ii) a record of having such an impairment; or (iii) being regarded as having such an impairment. Tenn. Code Ann. § 4-21-102(3)(A).

198. A claim brought under the Tennessee Disability Act is also analyzed under the same principles as the federal Americans with Disabilities Act (ADA). *Bolden* at 599 (citing *Cardenas-Meade v. Pfizer, Inc.,* 510 F. App'x 367, 369 n.2 (6th Cir. 2013)).

199. Plaintiff sought reasonable medical exemptions from Tyson's COVID-19 mandate. Plaintiff was qualified for her position at Tyson, and successfully performed it over a twenty-three year career with the company.

200.     Plaintiff informed Defendants of her medical concerns regarding the COVID-19

vaccines.

201.     Yet the Defendants discriminated against Plaintiff on the basis of disability, by forcing

her to choose between either taking an untested, experimental mRNA COVID-19 vaccine

that could potentially damage her health, or losing her job and livelihood.

202.     Tyson's vaccine mandate discriminates against Plaintiff because it treats her as though

she is medically disabled. This is based upon the Defendants' erroneous belief that Plaintiff

lacks immunity to COVID-19. Yet, the medical evidence set forth herein demonstrates that

immunity gained from previous COVID-19 infection is equal to or superior to the protection

offered by vaccination. Therefore, Defendants engaged in unlawful discrimination in

violation of the TDA, because Defendants regard Plaintiff as having a physical impairment

that disqualifies her from doing her job, and who can only be allowed in the workplace if

she takes the COVID-19 vaccine.

203.     Plaintiff has been infected with SAR-CoV-2 and has successfully recovered, thus

providing her with natural immunity that is stronger and more robust than vaccine-induced

immunity.

204.     Because of Tyson's company policy and inherent discrimination on the basis of

disability, Mrs. Johnson has been forced to endure adverse employment action, including

her permanent discharge from the company.

205.     Defendants discriminated against Plaintiff by categorizing her as disabled because of her

choice not to take the COVID-19 experimental vaccine, and subsequently taking adverse

employment action against her as a result. The lack of regard for Plaintiff's medical

autonomy and insufficiency of the provided accommodation resulted in blatant

discrimination against her.

206.     Defendants' COVID-19 vaccine mandate has harmed and continues to harm Plaintiff.

Such injury includes, but is not limited to, coercing and harassing her to take an untested

and potentially unsafe substance, threatening and then terminating her employment, and

threatening and then terminating her income, livelihood and twenty-three year career, on the

basis of disability.


## EIGHTH CAUSE OF ACTION
### Racial Discrimination
### [Violation of Title VII of the Civil Rights Act of 1964; 42 U.S.C. § 2000e et seq.]

207.     Plaintiff hereby incorporates by reference the allegations contained in the preceding

paragraphs as if fully set forth herein.

208.     Title VII prohibits "discriminat[ion] against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such individual's

race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

209.     Title VII prohibits both disparate treatment, intentional discrimination, as well as

disparate impact, "practices that are not intended to discriminate but in fact have a

disproportionately adverse effect on minorities." *Ricci v. DeStefano,* 557 U.S. 557, 577

(2009). Therefore, even facially neutral policies that are "discriminatory in operation" are

violative of US civil rights laws. *Griggs v. Duke Power Co.,* 401 U.S. 424, 431, 91 S. Ct.

849, 28 L.Ed. 2d 158 (1971).

210.     To establish that an employer has committed an unlawful employment practice based on

this principle, a plaintiff must demonstrate that the employment practice "causes a disparate

impact on the basis of race, color, religion, sex, or national origin and the respondent fails to demonstrate the challenged practice is job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A)(i).

211.    The "touchstone" of this analysis is "business necessity;" a policy is prohibited if an employment practice that disparately impacts a minority is not related to job performance. *Griggs,* 401 U.S. 431. Even if an employer satisfies that burden, a plaintiff can still succeed if they can demonstrate that the "employer refuses to adopt an available alternative employment practice that has less disparate impact and serves the employer's legitimate needs." *Ricci,* 557 U.S. at 578; *see also* 42 U.S.C. § 2000e-2(k)(1)(A)(ii).

212.    Black individuals are disparately impacted by Defendants' COVID-19 vaccine mandate.

213.    As a race that has been subject to human experimentation at the hands of the United States government in the past, the unwillingness of black Americans to take an experimental, untested mRNA vaccine is a natural consequence of this lamentable history and is founded in deep-rooted mistrust.

214.     Studies and polls have found that COVID-19 vaccine hesitancy is higher among racial minorities, with black individuals being less likely than white individuals to receive a vaccine in the United States.[97]

---

[97] Nguyen LH, Joshi AD, Drew DA, et al. *Racial and ethnic differences in COVID-19 vaccine hesitancy and uptake.* Preprint. *medRxiv.* 2021;2021.02.25.21252402. Published 2021 Feb 28. doi:10.1101/2021.02.25.21252402; *see also* Beth JoJack, *Which US demographics are more likely to refuse a COVID-19 vaccine?,* Medical News Today (January 11, 2021) available at https://www.medicalnewstoday.com/articles/which-us-demographics-are-more-likely-to-refuse-a-covid-19-vaccine#Demographic-differences.

215. Defendants should have known that there would be a racial disparity in the willingness to comply with their mandate, and that their policy could disproportionately yield adverse employment action towards minority employees.

216. Rather than work collaboratively with employees who hold these well-founded fears, Defendants implemented a rigid and unyielding mandate that can disproportionately impact black Americans.

217. Plaintiff, a black American, has been terminated based on her unwillingness to receive a COVID-19 vaccine and Defendants' racially discriminatory mandate.

218. Defendants cannot show that COVID-19 vaccination status is sufficiently related to job performance. Plaintiff has successfully performed her job for twenty-three years, including the twenty months since March 2020 when COVID-19 was declared an emergency. Furthermore, Defendants failed to consider alternatives to their punitive actions.

219. Defendants' policy generates a clear disparate impact on minority groups, of which Plaintiff is a part, and is therefore violative of federal civil rights laws and cannot be sustained.

## NINTH CAUSE OF ACTION
### Violation of 21 U.S.C. § 360bbb-3

220.  Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

221. Federal law generally prohibits anyone from introducing or delivering for introduction into interstate commerce any "new drug" or "biological product" unless and until FDA has approved the drug or product as safe and effective for its intended uses. *See, e.g.,* Food, Drug, and Cosmetic Act ("FDCA") §§ 301(a), 505(a), 21 U.S.C. §§ 331(a), 335(a); 42

U.S.C. § 262(a). A vaccine is a drug and a biological product. *See* FDCA § 201(g), 21

U.S.C. § 321(g); 42 U.S.C. § 262(i)(1); FDCA § 564(a)(4)(C) (defining "product" as "a

drug, device, or biological product").

222.    However, the FDCA authorizes the FDA to issue Emergency Use Authorization ("EUA")

for non-approved medical products under certain emergency circumstances. 21 U.S.C. §

360bbb-3.

223.    An EUA allows a product to be introduced into interstate commerce and administered to

individuals despite the medical product not being fully approved nor going through the

required testing and long-term observation that is required for approval.

224.    21 U.S.C. § 360bbb-3(e) states that "with respect to the emergency use of an unapproved

product, the Secretary . . . shall, for a person who carries out any activity for which the

authorization is issued, establish such conditions on an authorization under this section as

the Secretary finds necessary or appropriate to protect the public health, including the

following . . . (ii) Appropriate conditions designed to ensure that individuals to whom the

product is administered are informed . . . (II) of the **significant known and potential**

**benefits and risks of such use**, and of the extent to which such benefits and risks are

unknown; and (III) of the **option to accept or refuse administration of the product**, and

of the alternatives to the product that are available and of their benefits and risks.'

225.    Since December 2020, the FDA has issued an EUA for the Pfizer-BioNTech vaccine.

As part of the EUA, the FDA imposed a condition that all recipients must have the "option

to accept or refuse" the non-approved product. To satisfy this, the EUA requires all

recipients to receive a Fact Sheet ("BioNTech Fact Sheet"), stating: "It is your choice to receive or not receive [the vaccine]."[98]

226.   All three *available* vaccines in the United States, Moderna, Johnson & Johnson, and Pfizer, are still under Emergency Use Authorization.

227.   As a corporation mandating a vaccine that is only marketable under EUA, Defendants failed to follow the requirements associated with EUA products and did not provide employees "the option to accept or refuse administration of the product." 21 U.S.C. § 360bbb-3(e).

228.    Furthermore, although the purpose of obtaining the vaccine is to achieve immunity from SARS-CoV-2, Defendants did not acknowledge alternatives to obtaining the COVID-19 vaccine, such as natural immunity. Natural immunity is far more robust and long-lasting than vaccine-induced immunity.

229.   As Defendant Tyson admitted and the court already found, all of Tyson's actions relevant to this proceeding, including their adverse employment actions, is as a federal officer, and as such, subjects them to liability as a federal officer. If Tyson is a federal officer, then it is obligated to follow Constitutional and statutory limits on their action.

230.   As a direct result of Defendants' actions, Plaintiff has suffered irreparable harm and violation of her right to refuse an experimental medical product.

///

///

---

[98] FDA, Fact Sheet for Recipients and Caregivers at 6 (revised October 29, 2021), https://www.fda.gov/media/144414/download.

**TENTH CAUSE OF ACTION**
**Violation of the Nuremberg Code**

231.    Plaintiff hereby incorporates by reference the allegations contained in the preceding

paragraphs as if fully set forth herein.

232.    The Nuremberg Code is a jus cogens principle of international law, enforceable against

all those who violate it, including in the federal courts of the United States.

233.    The first enforcement of the principles of the Nuremberg Code was the war crimes

tribunal at Nuremberg following World War II. The judgment of that tribunal established

ten universal standards for ethical medical behavior and human experimentation. The

Nuremberg Code documents "certain basic principles in order to satisfy moral, ethical, and

legal concepts."

234.    International law makes clear that "[t]he voluntary consent of the human subject is

absolutely essential. This means that the person involved should have legal capacity to give

consent; should be so situated as to be able to exercise *free power of choice, without the

intervention of any element of force, fraud, deceit, duress, overreaching, or other ulterior

form of constraint or coercion*; and should have sufficient knowledge and comprehension

of the elements of the subject matter involved as to enable him to make an understanding

and enlightened decision." *The Nuremberg Code* § 1 (1947) (emphasis added).

235.    Here, Defendants have offended long-held and fundamental principles of international

law. These experimental mRNA COVID-19 vaccines, hiding behind fraudulent clinical

trials and a misrepresentation of facts to the public, have been falsely labeled by state and

federal authorities as "safe and effective." Given that it is neither, employees of the

Defendants are being coerced into unknowingly participating in a national medical experiment, at the behest and insistence of the Defendants.

236.   Defendants have failed to provide balanced information sufficient to satisfy informed consent. Rather, Defendants have refused to entertain any discussion or sharing of information that reflects negatively on the COVID-19 vaccines.

237.   This trend of duress, intimidation, and blatant disregard for bodily autonomy is reminiscent of some of the darkest periods of human history, the likes of which must not be repeated.

238.   As Defendant Tyson admitted and the court already found, all of Tyson's actions relevant to this proceeding, including their adverse employment actions, is as a federal officer, and as such, subjects them to liability as a federal officer. If Tyson is a federal officer, then it is obligated to follow Constitutional and statutory limits on their action.

### ELEVENTH CAUSE OF ACTION
**Violation of Rights to Privacy, Bodily Integrity, and Medical Freedom
[Fourth & Fifth Amendments to the United States Constitution]**

239.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

240.   As Defendant Tyson admitted and the court already found, all of Tyson's actions relevant to this proceeding, including their adverse employment actions, is as a federal officer, and as such, subjects them to liability as a federal officer. If Tyson is a federal officer, then it is obligated to follow Constitutional limits on their action.

241.   Defendants' vaccine mandate violates the liberties protected by the U.S. Constitution, which includes the rights of self-determination, personal autonomy, bodily integrity, and medical freedom.

242.     "No person shall . . . be deprived of life, liberty, or property, without due process of law."

*U.S. Const. Amend. V.*

243.     "The protections of substantive due process have for the most part been accorded to

matters relating to marriage, family, procreation, and *the right to bodily integrity.*" *Albright*

*v. Oliver,* 510 U.S. 266, 272, 114 S. Ct. 807, 812, 127 L.Ed. 2d 114 (1994). As such,

"plaintiffs have a fundamental liberty interest liberty interest under the Due Process Clause

in refusing unwanted medical treatment." *Cruzan v. Dir., Mo. Dep't of Health,* 497 U.S. 261,

278, 110S. Ct. 2831, 111 L.Ed.2d 224 (1990); *see also* 21 U.S.C. § 360bbb-3 *et seq.*

244.     "The right to be free of state-sponsored invasion of a person's bodily integrity is

protected by the [constitutional] guarantee of due process." *In re Cincinnati Radiation*

*Litig.,* 874 F. Supp. 796, 810-11 (S.D. Ohio 1995). In fact, the Supreme Court has held that

"no right is held more sacred, or is more carefully guarded by the common law, than the

right of every individual to the possession and control of his own person, free from all

restraint or interference of others, unless by clear and unquestionable authority of law."

*Union Pac. Ry. Co. v. Botsford,* 141 U.S. 250, 251, 11 S. Ct. 1000, 1001, 35 L.Ed. 734

(1891).

245.     "Every person who, under color of any statute, ordinance, regulation, custom, or usage . .

. subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of

any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to

the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

" 42 U.S.C. § 1983.

246.     However, when determining whether Plaintiff's constitutional rights have been violated,

courts must "balanc[e] [Plaintiff's] liberty interests against the relevant state interests."

64

*Youngberg v. Romeo,* 457 U.S. 307, 321, 73 L.Ed.2d 28, 102 S. Ct. 2452 (1982); *see also*

*Cruzan v. Dir., Mo. Dep't of Health,* 497 U.S. 261, 279, 110S. Ct. 2831, 111 L.Ed.2d 224

(1990). "The government's burden [is] to provide more than minimum justification for its

action." *In re Cincinnati Radiation Litig.,* 874 F. Supp. 796, 813 (S.D. Ohio 1995).

247.    Defendants' vaccine mandate requires Plaintiff to disclose personal health information,

which is a violation of their privacy rights under the Constitution.

248.    Defendants' vaccine mandate also requires Plaintiff to undergo a medical procedure that

is experimental, potentially dangerous, and that she does not want. This is a violation of her

liberty and privacy rights under the Constitution.

249.    The medical procedure, taking the vaccine, will permanently alter Plaintiff's body and

cannot be undone.

250.    Receiving the vaccine carries substantial risks, both known and unknown, to Plaintiff's

health, with irreparable and irreversible harm.

251.    Plaintiff has constitutionally protected liberty and privacy rights to exercise sovereignty

over her own body and to decline undesirable medical procedures.

252.    As a government actor, Defendants' interests must be weighed against the Plaintiff's

individual rights to decline an unwanted medical procedure.

253.    The individual right to decline the vaccine outweighs the government interests because:

    a.   All available COVID-19 vaccines are experimental. The short- and long-term

       negative effects of the medical product have yet to be fully determined.

    b.   The long-term effectiveness of COVID-19 vaccines is not known and scientific

       studies demonstrate substantially waning efficacy at preventing transmission of

       SARS-CoV-2 mere months after receiving the vaccine.

    c.   The clinical trials upon which the authorization of the COVID-19 vaccines were based were inadequate and fraudulent.

    d.   As an mRNA gene therapy, the Pfizer and Moderna vaccines have the potential to permanently alter recipients' genetic makeup.

    e.   The benefit-risk ratio does not justify mandating the vaccine for all employees.

    f.   Plaintiff has every right and reasonable desire to prevent the injection of an untested, unsafe substance into her body.

**TWELFTH CAUSE OF ACTION**
**Violation of Tenn. Code Ann. § 14-1-101 et al.**

254.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

255.    In a new bill signed into law by the governor on November 12, 2021, Tennessee has prohibited a governmental entity from "mandat[ing] that a person receive a COVID-19 vaccine." Nor shall a private business or governmental entity "compel or otherwise take adverse action against a person to compel the person to provide proof of vaccination if the person objects to receiving a COVID-19 vaccine for any reason." Tenn. Code Ann. § 14-2-102.

256.    "Consistent with our constitutionally recognized and inalienable right of liberty, every person within this state is and must remain free to choose or to decline to be vaccinated against COVID-19 without penalty or threat of penalty." Tenn. Code Ann. § 14-1-102(3).

257.    A person injured as a result of a violation of this chapter is "entitled to maintain a private right of action for injunctive relief and to recover compensatory damages and reasonable attorneys' fees against an alleged violator." Tenn. Code Ann. § 14-6-103(a).

258.    Defendants have done precisely what is now prohibited within the state of Tennessee. As a self-declared governmental entity, Defendant Tyson cannot mandate its employees to receive a COVID-19 vaccine, take adverse action against employees who object to receiving a COVID-19 vaccine, nor infringe upon employees' freedom to choose whether or not to receive a vaccine.

259.    Defendants' coercive mandate has already inflicted substantial damage to Plaintiff, who has become a casualty in Defendants' illegal actions. Plaintiff is therefore entitled to damages under Tennessee law and this Court should enjoin Tyson from continuing its attack upon its employees' Constitutionally-protected liberties.

## THIRTEENTH CAUSE OF ACTION
### Common Law Assault

260.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

261.    Under Tennessee state law, a person commits assault who "intentionally or knowingly causes another to reasonably fear imminent bodily injury." Tenn. Code § 39-13-101(a)(2).

262.    Defendants have threatened intentional, imminent harmful and offensive contact upon Plaintiff by way of forced vaccine injection of an experimental, untested, and ineffective mRNA vaccine, under penalty of being terminated from her employment. A penalty they in fact exercised.

263.    Furthermore, Defendant Rhonda Gooch has continuously harassed and threatened Plaintiff regarding her choice not to receive the vaccine.

264.    Defendants' coercion, emboldened by tight deadlines, uncompromising exemption protocols, and a hostile and censored work environment, contributed to Plaintiff's stress and fear concerning Defendants' vaccine mandate.

265.    Tyson's COVID-19 vaccine mandate caused Mrs. Johnson to reasonably fear imminent bodily injury from being forced to inject an experimental, untested, and potentially unsafe substance into her body, under penalty of termination from employment for failure to comply. A penalty that was in fact exercised by Defendants.

266.    Plaintiff did not consent to Defendants' conduct, nor did she consent to receiving the COVID-19 vaccine. Defendants' unlawful requirement of employment was an unwelcome invasion of Plaintiff's privacy and bodily integrity.

267.    Tyson's vaccine mandate has and continues to cause Plaintiff harm, including but not limited to by way of fear, anxiety, fright over being threatened with the injection of an untested and potentially unsafe substance into the body, and the imminent and subsequent loss of her income and livelihood.

268.    Defendants' conduct alleged herein was a substantial factor in causing Plaintiff's harm.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff respectfully prays for the following relief:

a.  A finding that Defendants violated the Constitutional rights of Plaintiff;

b.  A finding that Plaintiff has a fundamental right to her bodily autonomy, and to make health decisions in accordance with her beliefs and conscience.

c.  A finding that Defendants Tyson and Gooch discriminated against Plaintiff in violation of Title VII, the THRA, RFRA, the ADA, and the TDA.

d.  Enjoin Defendants from taking adverse employment action against Plaintiff;

e. An order that Plaintiff be compensated, to the extent allowable under Tennessee state and Federal law, for her monetary damages;

f. An order that Defendants pay Plaintiff's costs associated with bringing this lawsuit, including her reasonable attorneys' fees and costs; and

g. A grant of any such further relief as the Court deems necessary and proper in the public interest.

DATED: November 18, 2021                    Respectfully submitted,

BY: /s/ Robert E. Barnes
Robert E. Barnes, Esq. (*pro hac vice*)
Tennessee BPR No. 020617
BARNES LAW
700 South Flower Street, Suite 1000
Los Angeles, California 90017
Telephone: (310) 510 -6211
Facsimile: (310) 510-6225
Email: robertbarnes@barneslawllp.com

B. Tyler Brooks
Tennessee BPR No. 025291
LAW OFFICE OF B. TYLER BROOKS, PLLC
P.O. Box 728
Cary, North Carolina 27512
Telephone: (336) 707-8855
Fax: (336) 900-6535
btb@btylerbrookslawyer.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document was filed electronically on November 18, 2021.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt, including the counsel of record for defendants indicated below.  Parties may access this filing through the Court's system.

<u>/s/ Robert E. Barnes</u>
Robert E. Barnes
Tennessee BPR No. 020617

**SERVED:**

J. Gregory Grisham
FISHER & PHILLIPS, LLP
1715 Aaron Brenner Drive, Suite 312
Memphis, TN 38120
ggrisham@fisherphillips.com

*Counsel for Defendant*