**IN THE UNITED STATES DISTRICT COURT**

**FOR THE WESTERN DISTRICT OF TENNESSEE (Jackson)**

| | | |
|---|---|---|
| ROBBIE JOHNSON, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **CASE NO.: 1:21-cv-01161** |
| | ) | |
| TYSON FOODS, INC., et al., | ) | |
| | ) | |
| *Defendants.* | ) | |
| ——————————————— | ) | |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**TO THE HONORABLE JUDGE OF THE ABOVE-ENTITLED COURT AND TO DEFENDANT AN ITS ATTORNEYS OF RECORD:**

Plaintiff Robbie Johnson files the within memorandum in opposition to Defendants Tyson Foods, Inc. and Ronda Gooch (collectively "Tyson")'s Motion to Dismiss Plaintiff's Amended Verified Complaint pursuant to Rule[1] 12(b)(6) (the "MTD", ECF No. 24).[2]

///

///

---

[1] All references to "Rule" are to the Federal Rules of Civil Procedure, unless designated otherwise.

[2] Per order of this Court, Plaintiff was granted an extension of time to file the within opposition (ECF No. 26), and to file a memorandum up to a maximum of thirty-five (35) pages (ECF No. 28).

---

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## ARGUMENT

A court's review of a Rule 12(b)(6) motion assumes all factual allegations in a complaint true. *Braden v. Wal-Mart Stores, Inc,* 588 F.3d 585, 595 (8th Cir., 2009) ["[I]nferences are to be drawn in favor of the non-moving party. [citation] *Twombly* and *Iqbal* did not change this fundamental tenet of Rule 12(b)(6) practice. [citations]."]. Moreover, motions to dismiss civil rights complaints are "scrutinized with special care." *Lillard v. Shelby County Board of Ed.* (6th Cir. 1996) 76 F.3d 716, 724; *Johnson v. State of California,* 207 F.3d 650, 653 (9th Cir. 2000) ["we have emphasized that [when reviewing dismissal under Rule 12(b)(6)], the rule of liberal construction is 'particularly important in civil rights cases.' [citation].] Tyson's MTD does not come close to meeting the high standard required to dismiss Plaintiff's claims, all of which arise from civil rights violations, at the pleading stage. In the event this Court finds that any of Plaintiff's claims are insufficiently pled, Plaintiff respectfully requests leave to amend to correct any such insufficiencies. *National Council of La Raza v. Chegavske* 800 F.3d 1032, 1041 (9th Cir. 2015); *Davoodi v. Austin Independent School Dist.* 755 F.3d 307, 310 (5th Cir. 2014).

I.    **TYSON'S COVID MANDATE CONSTITUTES STATE ACTION, ACCORDINGLY, PLAINTIFF'S CONSTITUTIONAL CLAIMS STATE A CAUSE OF ACTION (First & Eleventh Causes of Action)**

   A.    **Tyson's Vaccine Mandate Constitutes State Action**

In arguing that all of Plaintiff's constitutional claims should be dismissed as a matter of law, because Tyson's vaccine mandate does not constitute state action, Tyson disingenuously abandons the very arguments it makes later in its own motion. MTD, pp. 29-33. Moreover, Tyson's argument that it is not a state actor would also have this Court abandon the very findings it made in denying Plaintiff's Motion to Remand on November 3, 2021 (ECF Doc. No. 17). Tyson cannot be allowed shuffle the deck and frame the relation of its COVID-19 vaccine

---

mandate to the government at its convenience. Finally, Tyson's arguments claiming lack of state action are contrary to decisions of the U.S. Supreme Court and Circuit courts.

1. **The U.S. Supreme Court and Circuit Court Decisions Hold That Deciding Whether To Attribute State Action To Private Parties Is A Fact-Based Inquiry Inappropriate At The Pleading Stage**

The U.S. Supreme Court holds that evaluating whether a private party's conduct constitutes state action, is an "impossible task" to "fashion and apply a precise formula". *Burton v. Wilmington Parking Auth*., 365 U.S. 715, 722 (1961) ("*Burton*"). *Burton* went on to hold: "Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." In the same vein, the Supreme Court held in *Brentwood Academy v. Tennessee Secondary Ass'n,* 531 U.S. 288 (2001): "No one fact is a necessary condition for finding state action, nor is any set of circumstances sufficient, …" (*Id.,* at 295-296), ultimately finding in that case: "[] The necessarily fact-bound inquiry leads to the conclusion of state action here." *Id.,* at 298-299.

The Sixth Circuit similarly holds that the issue of state action attributable to a private party, is one fundamentally unsuited for adjudication at the pleading stage of the case. In *Minges v. Butler County Agricultural Society*, 585 Fed.Appx. 879, 879-880 (6th Cir. 2014) ("*Minges*"), the Sixth Circuit reversed a district court's grant of the defendant's motion to dismiss: "Because we think plaintiffs should at least have the benefit of discovery before that question is decided, …" In reversing the agricultural society's motion to dismiss at the pleading stage, the *Minges* court held:

> "Remember that this case is before us on the [defendant'] motion to dismiss. Because the [defendant] prevailed in the district court, the [plaintiffs] never had the chance to use discovery to develop more facts about the nature of the State's relationship with **this** particular [defendant] and **this** particular competition." *Id.,* at 881 (emphasis original)

The Fifth, Fourth and Second Circuits are also in accord. *Albright v. Longview Police Department*, 884 F.2d 835, 838, fn. 1 (5th Cir. 1989) ["in those cases not obviously controlled by a previous case, the issue is one mingling law and fact."]; *Phillips v. Pitt County Memorial Hospital*, 572 F.3d 176, 181-182 (4th Cir. 2009) [explaining that although some courts have categorized state action doctrines, the Supreme Court has stated that in the end there is no specific formula and the issue is a matter of normative judgment]; *International Society for Krishna v. Air Canada*, 727 F.2d 253, 255 (2nd Cir. 1984) [holding that when state action facts are in dispute, a trial is necessary to determine those facts]. Accordingly, the fact-based standard for deciding whether state action is fairly attributed to a private actor, espoused by the Supreme Court and Circuit Court authority discussed above, renders a dismissal of any of Plaintiff's constitutional claims at the pleading stage, disfavored and subject to reversal on appeal.

2.    **Even Under The More Rigid Categorical Standard Under *Lansing v. City of Memphis*, Tyson's Vaccine Mandate Constitutes State Action**

In *Lansing v. City of Memphis*, 202 F.3d 821 (6th Cir. 2000) ("*Lansing*"), a decision older than *Minges* that is cited in the MTD, the court attempted to lay out a more categorical analysis of state action (arguably at odds with the Supreme Court and Circuit Court decisions discussed immediately above). *Lansing* held that if at least one of three state action tests are met, then imposing constitutional liability upon private actors is satisfied. Those three tests are: "(1) the public function test; (2) the state compulsion test; and (3) the symbiotic relationship or nexus test. [citations]" *Lansing, supra*, 202 F.3d at 328. Even under *Lansing*'s more rigid state action approach, Tyson's vaccine mandate constitutes state action.

First, Tyson exercised powers traditionally reserved exclusively to the state, in providing a critical infrastructure to exercise the federal government's public function of guaranteeing an adequate food supply during the government declared COVID-19 pandemic. Tyson's vaccine

mandate thus meets *Lansing*'s public function test. Indeed, one need look no further than Tyson's arguments later in its own MTD, wherein it argues (in support of preemption of Plaintiff's state claims), that its vaccine mandates are an exercise of federal power over "the functioning of the national food supply chain" during a "national emergency". MTD, pg. 31, ¶¶ 1 and 2.[3]

Furthermore, this Court found in its Order Denying Plaintiff's Motion For Remand:

"'When a **national emergency** was declared in response to the COVID-19 pandemic on March 13, 2020, Tyson Foods, along with other components of the Food and Agriculture Sector, was designated as **critical infrastructure**.' [citation]. From that point forward, Tyson Foods … 'work[ed] directly with' federal officers to assist the U.S. government **to fulfill the government's responsibility of** '**guarantee[ing] that there was an adequate food supply**.' [citation]" (emphasis added) Order Denying Remand (ECF No. 17), pg. 7, ¶ 3.

Second, Tyson's vaccine mandate also satisfies *Lansing*'s state compulsion test, finding state action where a state: "exercise[s] such coercive power or provide[s] such significant encouragement, either overt or covert, that in law the choice of the private actor is deemed to be that of the state." *Lansing, supra*, 202 F.3d at 829-830. Tyson disingenuously attempts to characterize its vaccine mandate as "guided, but not coerced by, the federal government." MTD, pg. 5, ¶ 1. Yet again, Tyson's arguments later in its own motion reveal otherwise: "President

---

[3] Tyson made similar arguments in opposition to Plaintiff's Motion to Remand: "Tyson Foods has been acting at the behest of the federal government since the early days of the pandemic, and was expressly directed to continue its operations in the April 28, 2020 Executive Order. By assisting with and carrying out the federal government's directives and actions to maintain the national food supply, Tyson Foods went far beyond 'simple compliance with the law' …" Tyson's Opposition to Plaintiffs' Motion to Remand filed October 28, 2021 (ECF No. 12), pg. 12, ¶ 2; "Like the defendant in *Doe v. ProMedica,* Tyson Foods has assisted the federal government with 'achieving [its] goal' of maintaining the nation's food supply. Tyson Foods did far more than 'act[] upon advisory guidance from the federal government,' as Plaintiff[] contend[s]." *Id.,* at pg. 13, ¶ 1.

Trump … under the Defense Production Act … **instruct[ed]** meat and poultry processing companies to **stay open and continue operations**, …" MTD, pg. 30, ¶ 1 (emphasis added).

Similarly, the explicit findings by this Court in its Order Denying Remand found that Tyson's COVID-19 vaccine mandate to be an exercise of coercive power and/or significant encouragement, by the federal government:

> "'The relevant relationship is that of a private person 'acting under' a federal 'officer' or 'agency.' … In this context, the word 'under' must refer to what has been described as a relationship that involves 'acting in a certain capacity, **considered in relation to one holding a superior position or office**.' [citation]. That relationship typically involves '**subjection, guidance, or control**.' [citation]" Order Denying Remand (ECF No. 20), pg. 5, ¶ 2 (emphasis added).[4]

In short, the above-discussed excerpts show that Tyson operating without a vaccine mandate (as misguided and unconstitutional as such mandate is), was simply not an option. State action on the grounds Tyson was coerced and encouraged to impose a vaccine mandate, is thus fairly attributable to Tyson even under the rigid *Lansing* standard.

Third and finally, Tyson's vaccine mandate satisfies the nexus test for imposing state action under *Lansing* as well, that standard being: "when there is a sufficiently close nexus between the state and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the state itself. [citation]" *Lansing, supra*, 202 F.3d at 830.[5] The decision in *U.S. v. Miller*, 982 F.3d 412 (6th Cir. 2020) ("*Miller*") is cited in the MTD as instructive on the issue of state action under the nexus test. MTD, pg. 6. In *Miller*, the Sixth

---

[4] *See also:* "The **ongoing direction** from both the CDC and OSHA to food processors is that vaccination against COVID-19 is **critical** to keeping the workforce healthy, …" Order Denying Remand (ECF No. 20), at pg. 6, ¶ 1 (emphasis added); "By assisting with and carrying out the **federal government's directives** to maintain the national food supply, Tyson Foods **went beyond "simple compliance with the law**;" *Id.*, at pg. 6, ¶ 2 (emphasis added).

[5] The *Lansing* court clarified that its nexus test for determining state action has no clear standard, as the Supreme Court reminds that "'readily applicable formulae may not be fashioned' [citing *Wilmington Parking Authority*, 365 U.S. 715, 726]." *Ibid.*

Circuit held: "[A]t common law, an agency relationship was created through a 'manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.' [citing *Ackerman,* 831 F.3d 1292, 1301 (2016) ("*Ackerman*"); and Restatement (Second) of Agency § 1]." *Miller, supra,* 982F.3d at 425. In *Ackerman*, *supra,* 831 F.3d at 1301, the Tenth Circuit held that: "[A] principal may delegate general authority to his or her agent to act in the ordinary course, without constant supervision or awareness of every discrete act. [citing Restatement (Second) of Agency, § 7, comment c.]."

As discussed above, Tyson's vaccine mandate constituted an exercise of powers traditionally reserved exclusively to the state, in fulfilling the U.S. government's responsibility of guaranteeing adequate food supply to the people of the United States. *Supra,* at 4-5 above. By providing critical infrastructure to guarantee national food supply at the direction of executive order, the CDC and OSHA, Tyson necessarily acted as an agent of the government under the *Miller* and *Ackerman* decisions as well. Specifically, by imposing strict worker vaccination rules to (in the estimation of the federal government), in order to preserve the integrity of the national food supply. There is therefore a sufficiently close nexus with the federal government in Tyson imposing its COVID-19 vaccine mandate, such that Tyson's actions can fairly be treated as that of a government actor

In sum, Tyson's COVID-19 vaccine mandate constitutes state action even under all three tests laid out in *Lansing*'s categorical approach to evaluating state action. Furthermore, under the Supreme Court and more recent Sixth Circuit fact-specific standards discussed above, Tyson's vaccine mandate readily meets the standard for state action at the pleading stage of this case.

///

///

---

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

3.      **The Cases Cited By Tyson Fail To Support That Employers Who Impose Vaccine Mandates Are Not State Actors As A Matter Of Law**

In *Beckerich v. St. Elizabeth Medical Center*, 2021 WL 4398027 (E.D. Ky. Sept. 24, 2021), cited in Tyson's motion (at pp. 10-11), the District Court denied the plaintiffs' motion for injunctive relief, on the grounds they had not demonstrated a likelihood of success on the merits because they argued the defendant hospital met the state action requirement due to their receipt of government funding. No such allegation is made by Plaintiff as against Tyson here.

Nor is Tyson's citation of *Harsman v. Cincinnati Children's Hospital*, 2021 WL 4504245 of service to its argument. In *Harsman*, the District Court for the Southern District of Ohio, denied the plaintiffs' motion for injunctive relief on the grounds of lack of likelihood of success on the merits, due predominantly to the fact plaintiffs' moving papers simply referenced the allegations in their verified complaint and exhibits, the *Harsman* court noting: "The Court has waded through the entire complaint, probing the seemingly insurmountable obstacles to Plaintiffs' likelihood of success of any of their claims … '[t]he district court an defendants should not have to fish a gold coin from a bucket of mud to identify the allegations really at issue.' [citation omitted]" *Harsman, supra*, 2021 WL at *3.

As such, none of the authority cited in the MTD support Tyson's sweeping contention, that employers instituting COVID-19 vaccination mandates are immune to constitutional liability as a matter of law, because employee plaintiffs are barred from "characterizing the private employers as government actors." MTD, pg. 10, ¶ 4.

B.      **Plaintiff's First Amendment Claim For Violation of the Free Exercise Clause Is Not An Impermissible Expansion of the *Bivens* Doctrine (First Cause of Action)**

The MTD next contends that the First Cause of action for violation of the Free Exercise Clause is barred because it impermissibly attempts to apply liability under *Bivens v. Six*

*Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971) ("*Bivens*"). MTD, pp. 11-12. This argument fails for no less than two reasons.

First, it assumes that Plaintiff's Free Exercise claim is brought under authority of *Bivens* in the first instance. This is simply not the case. Plaintiff's Free Exercise claim sets forth (among other authority), the following Supreme Court cases in support of its Free Exercise claim: *Church of the Lukumi v. City of Hialeah*, 508 U.S. 520, 532-533 (Amended Complaint, ¶ 113); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S.Ct. 2012, 2019 (2017) (Amended Complaint, pg. 37, ¶ 110). None of the aforementioned authority even mentions *Bivens*, much less conditions the validity of a plaintiff's Free Exercise claims upon that constitutional right being extended under the *Bivens* doctrine.

The second flaw with Tyson's argument in this regard, is that it assumes *Bivens* is the sole and exclusive authority upon which a Free Exercise claim can be brought as a matter of law. Again, and as alleged in the Amended Complaint itself, this is simply not the case. *See:* Amended Complaint, ¶¶ 110, 113. Nor does any of the authority discussed in the MTD support the proposition that a Free Exercise claim is barred as a matter of law because the *Bivens* doctrine does not extend to First Amendment claims. Rather, the cases cited in the Motion attempting to support this flawed contention all relate to case specific circumstances where those decisions declined to hold the particular First Amendment claim at issue could be brought under *Bivens*. For example, in *Ziglar v. Abbasi*, 137 S.Ct. 1843, 1857 (2017), the court simply listed prior decisions demonstrating that expanding the *Bivens* remedy was generally disfavored, including *Bush v. Lucas,* 462 U.S. 367 (1983), where the Supreme Court declined to supplement the regulatory scheme enacted by Congress by recognizing employee's First Amendment claims under the regulations of the Civil Service Commission pursuant to the Lloyd-LaFollette Act.

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

MTD, at pg. 12, ¶ 1. Similarly, *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009) was a decision regarding whether qualified immunity was overcome by a clearly established constitutional right, the Supreme Court stating: "we assume, without deciding, that respondent's First Amendment claim is actionable under *Bivens*.". Finally, in *New Doe Child #1 v. Cong. of the U.S.*, 891 F.3d 578, 593 (6th Cir. 2018), there was no discussion of *Bivens* at all, rather that decision affirmed a district court's dismissal of a Free Exercise claim on the grounds certain currency statutes were neutral and generally applicable laws and not actionable simply because they may incidentally burden religious practices protected by the First Amendment. In sum, none of the authority cited by Tyson support its argument that Plaintiff's Free Exercise claim is barred as an impermissible extension of *Bivens*, simply because being an extension of *Bivens* is not a required element of a Free Exercise claim.

### C.  The Amended Complaint States A Claim For Tyson's Violation Of the Fourth Amendment (Eleventh Cause of Action)

In *Schmerber v. California,* 384 U.S. 757, 767-768 (1966), the Supreme Court ruled: "[a] compelled intrusion[n] into the body for blood to be analyzed for alcohol content" is a Fourth Amendment search. Similarly, in *Winston v. Lee,* 470 U.S. 753, 760 (1985), the Supreme Court held in an action involving the surgical intrusion into a person's chest area to recover a bullet that was evidence in a crime: "The reasonableness of surgical intrusions beneath the skin depends on a case-by-case approach, in which the individual's interests in privacy and security are weighed against society's interests in conducting the procedure. *See also: Katz v. United States,* 389 U.S. 347, 360 (1976) [a search under the Fourth Amendment occurs where a government actor "invades an area in which 'a person ha[s] a constitutionally protected reasonable expectation of privacy.'"].

Plaintiff adequately pleads that Tyson's vaccine mandate constituted an unconstitutional search under the Fourth Amendment. Specifically, Plaintiff's Amended Complaint alleges that Tyson's COVID-19 vaccine mandate: "will permanently alter Plaintiffs' body and cannot be undone." (*Id.*, at pg. 65, ¶ 249), and: "As of early September, there have been 14,506 deaths reported to VAERS from COVID-19 vaccines, compared to just 8,673 for the preceding 30 years for all other vaccines. [citation] That is more than 50 times the annual average (see chart by Dr. Guetzhow below). [citation]."  Amended Complaint, pg. 24, ¶ 69. One would be hard pressed to imagine a more invasive "search" under the Fourth Amendment, than a government sanctioned intrusion into body, by forced injection of an untested and dangerous substance into a person's blood stream, under penalty of immediate termination. Accordingly, Plaintiff's Fourth Amendment claim cannot be dismissed at the pleading stage.

### D.   The Amended Complaint Sufficiently Alleges A Claim For Tyson's Violation of the Due Process Clause of the Fifth Amendment (Eleventh Cause of Action)

The MTD contends that Plaintiff's Due Process Clause claim fails because Plaintiff has no "fundamental right" to work unvaccinated at Tyson. This contention entirely misframes the operative issue, which is whether Plaintiff states a claim for a violation of a right protected by the Due Process Clause. The Amended Complaint does, namely, that Tyson's vaccine mandate violates Plaintiff's Constitutional rights to bodily integrity and medical free choice. These are rights recognized by the Supreme Court and Circuit Courts alike, in a long line of decisions as alleged in the Amended Complaint: *Albright v. Oliver,* 510 U.S. 266, 272 (1994); *Cruzan v. Dir., Mo. Dep't of* Health, 497 U.S. 261, 278 (1990); *Union Pac. Ry. Co. v. Botsford,* 141 U.S. 250, 251 (1891). Amended Complaint, pp. 64-65.

---

Additionally, Plaintiff alleges that Tyson's COVID-19 vaccine mandate: "requires Plaintiff to disclose personal health information and undergo a medical procedure that is experimental, potentially dangerous, and that they do now want." (*Id.*, at pg. 65, ¶ 248), and "Plaintiff has constitutionally protected liberty and privacy rights to exercise sovereignty over her own body, and to decline undesirable medical procedures. (*Id.*, at pg. 65, ¶ 251.) Plaintiff's Fifth Cause of Action is thus adequately alleged and should not be dismissed at the pleading stage.

## II.  THE AMENDED COMPLAINT SUFFICIENTLY ALLEGES A CLAIM UNDER THE RELIGIOUS FREEDOM RESTORATION ACT (Fifth Cause of Action)

The MTD makes the same absence of state action argument to argue that Plaintiff's RFRA claim fails to allege a cause of action. *Id.,* at pp. 14-15. For the same reasons discussed in detail above, this argument fails as to Plaintiff's RFRA claim. *See: supra,* at pp. 2-8 above.

Tyson further contends that Plaintiff's RFRA claim fails because: "Title VII is the exclusive federal remedy for an employment discrimination claim based on failure to accommodate a religious practice." MTD, pg. 15, ¶ 3. The case law fails to support Tyson's contention. In *Burwell v. Hobby Lobby Stores, Inc*, 573 U.S. 682, 706 (2014), the Supreme Court held: "[the] RFRA was designed to provide very broad protection for religious liberty." The statute prohibits government actors from imposing burdens on the free exercise of religion without satisfying strict scrutiny.

Additionally, Title VII does not preclude Plaintiff's claim under RFRA because this claim is "separate and distinct from the claim of discrimination in employment." *Lister v. Def. Logistics Agency*, No. 2:05-CV-495, 2006 U.S. Dist. LEXIS 5007 at 7 (S.D. Ohio Jan. 20, 2006). The intention of RFRA is different from that of Title VII; while Title VII focuses on prohibiting discriminatory intent or treatment, RFRA aims to alleviate government-created burdens on the

exercise of religion. RFRA is an independent claim based upon the nature and extent of a state actor's burden imposed on religious exercise that raises the responsibility of the government imposing the burden to satisfy the compelling interest test. This distinction between RFRA and Title VII is further supported by *Tagore v. United States,* 735 F.3d 324 (5th Cir. 2013) ("*Tagore*"). In that case, the Plaintiff, an employee at the IRS was dismissed for wearing a ceremonial blade, as part of a religious practice. The court considered the plaintiff's claims under both Title VII and RFRA and, finding that the employer did not violate Title VII, held that further proceedings were necessary to evaluate the RFRA claim as a separate analysis. *Id.,* at 331-332. The *Tagore* Court thus declined to dismiss the RFRA claim on the basis that a Title VII claim was also alleged, which is precisely what Tyson argues here.

## III.   THE AMENDED COMPLAINT SUFFICIENTLY ALLEGES A CLAIM UNDER THE TENNESSEE CONSTITUTION (Second Cause of Action)

The MTD contends that Plaintiff's claims under the Tennessee Constitution fail because "there is no private right of action for an alleged violation of the Tennessee Constitution." MTD, pg. 16, ¶ 2. While Tyson is correct that "the established precedent demonstrates that there is no private cause of action **for damages** under the Tennessee Constitution," in *Aguilar v. City of Englewood,* No. 1:10-CV-258, 2010 U.S. Dist. LEXIS 138202, *5-6 (E.D. Tenn. Dec. 28, 2010) ("*Aguilar*"), the court agreed that "the relevant precedent in this area does not clearly preclude Plaintiffs' claims for injunctive relief." The *Aguilar* Court declined to dismiss a claim for injunctive relief brought under the Tennessee Constitution because it was "premature and [was] in conflict with the Court's preference for adjudicating cases on the merits." *Id.,* at *5-6. Similarly, other Tennessee decisions have declined to distinguish between claims for damages and claims for injunctive relief. *Parker v. Henderson City*, 450 F. Supp. 2d 842 (W.D. Tenn. 2006); *Boling v. Gibson Cty.*, No. 05-1129-T-An, 2005 U.S. Dist. LEXIS 42010 (W.D. Tenn.

Aug. 1, 2005). As Plaintiff is seeking injunctive relief in her claims under the Tennessee Constitution, she is not barred from bringing said claims as a private cause of action under the precedent discussed in the MTD.

## IV.   THE AMENDED COMPLAINT SUFFICENTLY ALLEGES A CLAIM UNDER THE NUREMBERG CODE (Tenth Cause of Action)

The world's history contains a grotesque and disappointing track record of human experimentation. From the Tuskegee syphilis experiments on young black American men, to the famed Nazi medical experiments that brought about the universal agreement that human experimentation was a crime against humanity and informed consent is an essential pillar of medicine. The current climate of the push for mass vaccination violates both these counts and perpetuates a massive crime against the American public.

Insufficient clinical trials, some of which were the result of fraudulent results, have failed to move any of the available COVID-19 vaccines out of the "experimental" stage. There are currently no FDA-approved COVID-19 vaccines marketable to the public. Furthermore, there is much to learn about the side effects, both short- and long-term, of these vaccines. This is also not the first vaccine that has yielded mass injury following the unfulfilled promise of "safe" and "effective." However, the COVID-19 vaccine is, without a doubt, the most destructive. We can therefore deduce that the people who are currently receiving the vaccine are essentially unwitting participants in real-time safety and efficacy trials. As such, Tyson is essentially requiring that employees participate in human experimentation as a condition of employment.

Given that there is no order or law requiring Tyson Foods to mandate the COVID-19 vaccine for its employees, Tyson should bear the responsibility to ensure that it is adhering to recognized principles of human rights law. The negligent disregard for the safety of its employees, despite the overwhelming evidence that 100% vaccination is not effective, and the

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

coercive and threatening nature of Tyson's vaccine mandate qualifies as participation in a mass experiment on the human public, the initial results of which have generated substantial concern and dismay and, in a sane world, would yield an immediate halt of COVID-19 vaccine administration.

## V.   THE AMENDED COMPLAINT SUFFICIENTLY ALLEGES A CLAIM UNDER FEDERAL AND STATE EMPLOYMENT DISCRIMINATION LAWS (Third, Fourth, Sixth, Seventh & Eighth Causes of Action)

### A.   Plaintiff Was Not Required to Submit An EEOC Complaint To State Claims Under Title VII and the ADA (Third, Sixth & Eighth Causes of Action)

Tyson contends that Plaintiff's Title VII and ADA claims should be dismissed because Plaintiff has not yet filed complaints under the U.S. Equal Employment Opportunity Commission ("EEOC"). MTD, pp. 17-18. However, in regards to the federal Title VII claim, Plaintiff is only seeking injunctive relief, not monetary damages, which is a generally accepted exception to administrative remedy exhaustion requirement.

In *Drew v. Liberty Mutual Insurance Co.,* 480 F.2d 69 (5th Cir. 1973), the court held that where temporary injunctive relief would be appropriate, "filing of the complaint and request for such relief before exhaustion of EEOC conciliation procedures is not fatal to the Court's jurisdiction over the complaint." *Malone v. East Cleveland,* Civil Action No. C75-894., 1978 U.S. Dist. LEXIS 15090, *3-4 (N.D. Ohio 1978).  Similarly, in *Costantino v. TRW, Inc.*, 13 F.3d 969, 974 (6th Cir. 1994), the Sixth Circuit held that traditional exhaustion principles include an exception when adhering to administrative remedies is futile or inadequate. *See also: Bonds v. Heyman,* 950 F.Supp. 1202, 1207 (D.C. Columbia 1997) ["a court does have the power to grant interim injunctive relief in a civil rights case prior to plaintiff's exhaustion of administrative remedies."]; *Sughrim v. New York,* 503 F.Supp.3d 68, 96 (2020). ["Temporary injunctive relief is available on Title VII claims before a plaintiff receives a right-to-sue letter from the EEOC."].

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Plaintiffs were therefore not required to file an EEOC complaint prior to bringing a Title VII claim, because they seek injunctive relief here.

The same exception applies to Plaintiff's ADA claim. Section 107(a) of the ADA states that the remedies and procedures used in the event of a Title VII violation also apply to claims brought under the ADA. 42 U.S.C. § 12117(a): "Congress modeled the ADA on title VII and incorporated its enforcement remedies and procedures into the ADA." *Laster v. NAI, The Michael Co.*, Civil Action No. TDC-18-3200, 2019 U.S. Dist. LEXIS 118500, *8 (D. Md. July 16, 2019); 42 U.S.C. § 12117(a). This Court should therefore deny Tyson's request to dismiss Plaintiff's Title VII and ADA claims on the grounds of failure to exhaust administrative remedies.

### B.   Plaintiff States a Claim of Race Discrimination Under Title VII (Eighth Cause of Action)

Tyson's challenge to Plaintiff's racial discrimination claim under Title VII attempts to equate evidence with allegations in pleadings. Basic Rule 12(b)(6) analysis assumes all factual allegations in a complaint true: "The district court erred … [by] violat[ing] the familiar axiom that on a motion to dismiss, inferences are to be drawn in favor of the non-moving party. [citation] *Twombly* and *Iqbal* did not change this fundamental tenet of Rule 12(b)(6) practice. [citations]." As Tyson itself states, Plaintiff's Amended Complaint alleges that Tyson's COVID-19 vaccine mandate has a disparate impact on African Americans, that studies and polls find that COVID-19 vaccine hesitancy is higher among racial minorities and even includes a published study indicating that black individual are less likely than whites to receive a vaccine in the United States. MTD, pp. 18-19 (citing the Amended Complaint, ¶¶ 213-215).[6] Proving that

---

[6] Tyson also appears to suggest that the published study cited in the Amended Complaint, does not support Plaintiff's racial discrimination claim because it "applies to racial minorities other

COVID-19 vaccine hesitancy is higher among racial minorities, is what discovery and trials are for, and not a grounds for dismissing on the pleadings. In sum, Tyson here moves to dismiss for failure to sufficiently plead a claim under Rule 12(b)(6). But this is not a motion for summary judgment under Rule 56. Tyson's claim that Plaintiff's racial discrimination claim fails to state a claim under Title VII should be denied accordingly.

C. **The Tennessee Supreme Court Holds That Employers Indeed Have a Duty To Accommodate Religious Beliefs Under the THRA, And Even Assuming *Arguendo* It Didn't Plaintiff Still States a Claim Under the THRA (Fourth Cause of Action)**

Although there is no explicit language in the Tennessee Human Rights Act imposing a duty to accommodate religious beliefs, the Tennessee Supreme Court has held that THRA claims are analyzed in the same manner as Title VII claims. Thus in *Tetro v. Elliott Popham, Inc.,* 173 F.3d 988, 993 (6th Cir. 1999) ("*Tetro*"), the Sixth Circuit court held:

> "The Tennessee Supreme Court has held that THRA claims are analyzed in the same manner as Title VII claims. [citing *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 31 (Tenn.1996), which held: 'The stated purpose and intent of the [THRA] is to provide for execution within Tennessee of the policies embodied in the federal civil rights laws. Accordingly, our analysis of the issues in this appeal is the same under both the Tennessee Human Rights Act and Title VII of the Federal Civil Rights Act.']."

Moreover, even if a duty to accommodate isn't an explicit element to bring a THRA claim (which per the authority above, it is), Plaintiff's claim against Tyson under the THRA nevertheless states a cause of action. *See:* Amended Complaint, ¶¶ 144-149 [THRA prima facie elements]; and ¶¶ 156-164 [allegations of Tyson's conduct satisfying elements of a THRA claim]. Plaintiff thus sufficiently alleges a claim under the THRA in her Fourth Cause of Action.

---

than African Americans and to women" *Id.,* at pg. 19, ¶ 1. The fact said study discusses data regarding other minorities, doesn't trump the data discussed regarding black Americans: "Black respondents were 41% less likely to pursue vaccination".

**D.** **The Amended Complaint Sufficiently Alleges Claims Under the ADA and TDA (Sixth & Seventh Causes of Action)**

42 U.S.C. § 12102 lays out the key definitions of a disability for purposes of an action under the ADA. 42 U.S.C. § 12102(1) defines "disability" as: "(A) a physical … impairment that substantially limits one or more major life activities … (C) being regarded as having such an impairment …" 42 U.S.C. § 12102(2) defines "major life activities" as including: "(B) … functions of the immune system" Finally, subdivision (A) of 42 U.S.C. §12102(3) states:

> "An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of [a] perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity."

> Finally, 42 U.S.C. § 12102(4)(A) sets forth "The definition of disability . . . shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter.". Collectively, the statutory scheme of 42 U.S.C. § 12102 clearly and concisely define what an actionable disability protected by the ADA is, where, like in this case, discrimination occurs because the defendant perceives the plaintiff(s) as having a disability.

Tyson's motion first argues that Plaintiff's ADA and TDA claims fail because the Amended Complaint does not plausibly allege that Tyson believes that she has an impairment as that term is defined under the ADA. MTD, pp. 21-23. However, it is undisputed that Tyson's explicit purpose for implementing its COVID-19 vaccine mandate, is to create a work environment with 100% vaccine-induced immunity. As such, Tyson assumes that if the Plaintiff does not submit to mandated COVID-19 vaccinations, then Plaintiff is necessarily immuno-deficient and thereby unable to safely perform her job duties in the workplace. *See:* Amended Complaint, ¶ 189. Tyson's COVID-19 vaccine mandate therefore undisputedly demonstrates

---

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Tyson's perception, indeed **<u>assumption</u>**, that Plaintiff who is unvaccinated are disabled (i.e. has an impairment of "functions of the immune system"), as that term is defined under the ADA (i.e. 28 U.S.C. § 12102(2)(B)).[7]

Tyson next contends that Plaintiff's ADA and TDA claims are insufficiently alleged, because the Amended Complaint admits what Tyson describes as "equal" treatment. MTD, pg. 23, ¶ 3. This misses the point. Whether Tyson's vaccine mandate applied to everyone in the workplace is irrelevant. What is relevant is whether Tyson's mandate disparately treated unvaccinated employees like Plaintiff on the one hand, vis-à-vis vaccinated employees on the other, due to Plaintiff's perceived disability. As discussed above the unequivocal answer is yes, Tyson's misguided assertions of "equal treatment" notwithstanding.

Third and finally, the MTD argues that neither the ADA nor the TDA requires Tyson to reasonably accommodate Plaintiff as a matter of law. The case law again disagrees however. The Supreme Court holds that the ADA protects employees from employers who fail to provide a reasonable accommodation for perceived disabilities: *School Board of Nassau County v. Arline,* 480 U.S. 273, 284-285 (1987) ("*Nassau*"): "The Act is carefully structured to replace such reflexive reactions to actual or perceived handicaps with actions based on reasoned and medically sound judgments …"[8] Circuit Court decisions affirm the same principle. In *Williams v. Philadelphia Housing Authority,* 380 F.3d 751, 775 (3rd Cir. 2004) ("*Williams*"), the Third Circuit held: "In addition to the statutory text and legislative history, the Supreme Court's

---

[7] Tyson disingenuously suggests that the laundry list of physiological, mental and psychological impairments set forth therein, are exhaustive. MTD, pg. 22, ¶ 2. Rather obviously, those hand-picked disorders are both not exhaustive, as well as inapplicable to the facts in this case.
[8] The "Act" referenced in *Nassau,* was the federal Rehabilitation Act of 1973, whose elements in this regard are treated the same as those for the Americans with Disabilities Act of 1990. *Bragdon v. Abbott,* 524 U.S. 624, 632 (1998).

decision in [*Nassau*], also requires that 'regarded as' employees be entitled to reasonable accommodations. In *Kelly v. Metallics West, Inc.*, 410 F.3d 670, 676 (10th Cir. 2005), the court held: "it is in the nature of any 'regarded as disabled' claim that an employee who seeks protections not accorded to one who is impaired but not regarded as disabled does so because of the additional component – 'regarded as' disabled." As such, Tyson's argument that they are not required to reasonably accommodate for perceived impairments such as those alleged in Plaintiff's Amended Complaint under the ADA and the TDA, is false. Plaintiff's Amended Complaint sufficiently pleads claims under the ADA and TDA.

## VI. THE AMENDED COMPLAINT SUFFICIENTLY ALLEGES A CAUSE OF ACTION FOR TYSON'S VIOLATION OF TENNESSEE CODE §§ 14-1-101 *et seq.* (Twelfth Cause of Action)

### A. Plaintiff's Private Right of Action Under Tenn. Code §§ 14-1-101 et seq. Applies To Tyson, Both As a State and Private Actor

Tyson contends that Plaintiff's claim under Tenn. Code 14-1-101 et seq. ("Title 14") fails because Tyson does not fall under the definition of "governmental entity" First, as discussed more thoroughly above, Tyson is indeed a government entity under the Constitutional state action doctrine. *Supra,* at pp. 2-8 above.

Second, the MTD provides a conveniently over-narrow discussion of the relevant provisions of Title 14. The fact is the Tennessee statutory scheme set forth by Title 14 provides various private rights of action arising from imposition of vaccine mandates upon its citizens: "Consistent with our constitutionally recognized and inalienable right of liberty, every person within this state is and must remain free to choose or to decline to be vaccinated against COVID-19 without penalty or threat of penalty." Tenn. Code 14-2-101. Relevant to Plaintiffs' claims against Tyson here, Tenn. Code 14-2-102 states: "A private business, … shall not compel or otherwise take an adverse action against a person to compel the person to provide proof of

vaccination if the person objects to receiving a COVID-19 vaccine for any reason." Under Tenn. Code 14-1-101, "Adverse action" includes: "(A) discriminat[ion] against a person by denying the person employment, privileges, … or other benefits; or (B) discharge, threaten, or otherwise discriminate against an employee in any manner that affects the employee's employment."

Tyson has violated said provisions of Title 14, by requiring that employees who object to receiving the vaccine provide proof of vaccination in order to continue employment at their company. Amended Complaint, ¶ 258. Those who don't or can't, like Plaintiff, are to be effectively fired immediately. *Ibid.* Tyson's COVID-19 vaccine mandate thus unquestionably meets the definition of "adverse action" set forth in Tenn. Code 14-1-101(1), granting Plaintiff a private right of action under the law of the State of Tennessee.

### B.   Tyson Took, and Continues To Take, Adverse Action Against Plaintiff After Title 14 Was Enacted

The MTD next contends that no adverse action arising from imposition of its COVID-19 vaccine mandate was suffered by Plaintiff after Title 14 was enacted on November 12, 2021. MTD, pg. 26. Tyson goes on to assert that because Title 14 is not retroactive, Plaintiff's claims under that provision must be dismissed. *Ibid.* A plain reading of Plaintiff's pleadings and Title 14 respectively, proves otherwise.

First, Tyson unquestionably took adverse action against Plaintiff well after the November 12, 2021 enactment of Title 14, by imposing its COVID-19 vaccine mandate prospectively. As alleged in Plaintiff's Amended Complaint, Tyson announced a November 1, 2021 deadline for their employees to receive COVID-19 vaccines. Amended Complaint, ¶ 5. For those employees who applied for an exemption accommodation (such as Plaintiff), Tyson announced it would place those employees on up to one year of unpaid leave of absence (to November 1, 2022). *Id.,* at ¶ 9. Tyson further announced that after one year those employees placed on unpaid leave

would effectively be terminated even if they eventually surrendered to receive a vaccine, as those employee's positions would not be guaranteed. *Ibid.*; *see also*: Amended Complaint, Exhibits B and C attached thereto. Consequently, the thrust of the adverse action Tyson is and will inflict upon those employees who refuse vaccines (loss of pay every month after November 1, 2021 for year, effective termination at some point in time after November 1, 2021 since their positions would not be guaranteed, etc.), will be suffered by Plaintiff well after the effective date of Title 14 on November 12, 2021.

Second, retroactive application of Title 14 is not barred in any event, as mistakenly stated in the MTD. Tenn. Code § 14-1-104(b) provides: "wherever the application of this title conflicts with the application of other provisions of state law, this title prevails." Tenn. Code § 14-1-103 provides: "The purpose of this title is to safeguard the constitutional rights and liberty interests of persons during the COVID-19 pandemic. This title must be construed broadly to effectuate the purpose described in this section." Finally, nothing in Title 14 states that its provisions cannot be applied retroactively. To the contrary, the aforementioned provisions of Title 14 reveal the Tennessee Legislature's intent for Title 14's application to be broad and comprehensive, in preserving the right of all Tennesseans to decline to take COVID-19 vaccines.

## VII.   THE AMENDED COMPLAINT SUFFICIENTLY ALLEGES A CLAIM UNDER THE FDCA (Ninth Cause of Action)

Tyson contends that Plaintiff's claim under the FDA for a violation of 21 U.S.C. 360bbb-3 fails because there is no private right of action under the FDCA. Acting at the directive of the federal government, Tyson's compliance with the violation of a basic tenet of medicine: that individuals have "the option to refuse or accept the administration of [a] product." 21 U.S.C. § 360bbb-3. All three COVID-19 vaccines marketable in the United States, including the FDA-licensed Pfizer BioNTech product which is not yet available to the public, are still only

authorized under the EUA. The FDCA makes clear that individuals are entitled to informed consent when taking a product authorized for emergency use and always have the option to refuse the product. Yet Tyson employees have not been afforded this option.

If the government is responsible for enforcing and preserving compliance with the FDCA, who will hold the government accountable when extensions of the federal government, such as Tyson acting as a state actor, so egregiously infringe upon people's civil liberties and break the own laws they are sworn to uphold?

## VIII.   THE AMENDED COMPLAINT SUFFICIENTLY ALLEGES AN ASSAULT CLAIM (Thirteenth Cause of Action)

The Tennessee Supreme Court did a comprehensive review of common law assault in in *Hughes v. Metropolitan Gov. of Nashville,* 340 S.W.3d 352 (Tenn. 2011) ("*Hughes*").[9] In *Hughes*, the court reviewed an action involving an employee who sued the driver of a fire department loader in an intimidating manner so as to scare others. The *Hughes* court closely examined common law assault under prior state court of appeals decisions, that generally held that a plaintiff must show that the defendant "intended harm". *Id.,* at 369. The *Hughes* court then examined modern treatises, including the Restatement (Second) of Torts and Prosser & Keeton on the Law of Torts, as well as Tennessee criminal statutes on assault for guidance. *Id.*, 369-370. After meticulous review and discussion of the above-mentioned authorities, the *Hughes* court concluded:

> "In our view, if a defendant intends to create an apprehension of harm in the plaintiff, he or she has committed the intentional tort of assault. … The evidence in the record supports the conclusion that the Defendant, even if engaging in horseplay, committed the intentional tort of assault because he intended to frighten the Plaintiff." *Id.,* at 371.

---

[9] *Hughes* is cited and relied on in Tyson's MTD, at pg. 27, ¶ 2.

Here, Tyson's "inten[t] to create an apprehension of harm in the plaintiff, …", is sufficiently alleged in the Amended Complaint as follows: "Defendants have threatened intentional, imminent harmful and offensive contact upon Plaintiff by way of forced vaccine injection of an experimental, untested, and ineffective mRNA vaccine, …" *Id.*, at pg. 67, ¶ 262. In addition, Plaintiff alleges that Tyson elevated the level of her apprehension of forcing a dangerous vaccine into her body, under penalty of termination, as follows: "… tight deadlines, uncompromising exemption protocols, and a hostile and censored work environment, …" Amended Complaint, pg. 68, ¶ 264. Additionally, the dangerousness of COVID-19 vaccines are also alleged in detail in the Amended Complaint: "As of early September, there have been 14,506 deaths reported to VAERS from COVID-19 vaccines, compared to just 8,673 for the preceding 30 years for all other vaccines. [citation] That is more than 50 times the annual average (see chart by Dr. Guetzhow below). [citation]" (*Id.*, at pg. 24, ¶ 69); *See also:* Amended Complaint, ¶¶ 65-83. This data alleged by Plaintiff, combined with her refusal to submit to an injection of a substance she reasonably believed was harmful and dangerous into her body, constituted an apprehension of harm under penalty of being terminated immediately if she didn't submit. As such, common law assault under Tennessee law is sufficiently alleged by Plaintiff.

## IX.   NONE OF PLAINTIFF'S STATE CLAIMS ARE PREEMPTED BY THE EXECUTIVE ORDER OR CONGRESSIONAL LEGISLATION CITED IN TYSON'S MOTION

The MTD makes one final, sweeping attempt to dismiss all of Plaintiff's state claims, based on federal preemption. However as eloquently stated by the Third Circuit last June: "There is no COVID-19 exception to federalism." *Maglioli v. Alliance HC Holdings*, 16 F.4th 393, 400 (3rd Cir. 2021).

---

Although the analysis of the scope of preemption begins with the text, "interpretation of that language does not occur in a contextual vacuum." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 484-485 (1996) ("*Medtronic*"). Rather, this inquiry is guided by two principles about the nature of preemption. The first principle is that there is a presumption against supplanting "the historic police powers of the States" by federal legislation "unless that [is] the clear and manifest purpose of Congress." *Medtronic, supra,* 518 U.S. at 485 (citing *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947)). As held by the Ninth Circuit regarding federal legislation that touches upon the arena of the police powers of the States: "This presumption against preemption leads us to the principle that express preemption statutory provisions should be given narrow interpretation. [citation omitted]" *Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1060 (9th Cir. 2009) ("*Gordon*").

The second principle of preemption analysis, hinges on the premise that Congress's purpose "'is the ultimate touchstone in every preemption case.'" *Gordon*, 575 F.3d at 1060 (quoting *Medtronic, supra*, 518 U.S. at 485). "As a result, … courts [are] to consider not only the language of the statute itself but also the 'statutory framework' surrounding it and the 'structure and purpose of the statute as a whole.'" *Gordon, supra*, 575 F.3d at 1060 (quoting *Medtronic, supra,* 518 U.S. at 485-486. Ultimately, the guiding principles regarding the nature of preemption: "[are] consistent with both federalism concerns and the historic primacy of state regulation of matters of health and safety." *Medtronic, supra*, 518 U.S. at 485.

A.   **Plaintiff's State Claims Are Not Preempted By President Trump's April 28, 2020 Executive Order**

Tyson argues that former President Trump's Executive Order pursuant to the Defense Production Act ("DPA") preempts all of Plaintiff's state claims. MTD, pp. 29-31. This argument has no merit. The intent of the DPA was to authorize the executive branch to direct private

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

companies to give priority to federal contracts in exigent circumstances. Specifically, the President under the DPA may: "require that performance under contracts or orders (other than contracts of employment) which he deems necessary or appropriate to promote the national defense shall take priority over performance under any other contract or order." 50 U.S.C. § 4511(a). In addition, "for the purpose of assuring such priority," the President may: "require acceptance and performance of such contracts or orders in preference to other contracts or orders by any person he finds to be capable of their performance," and he may "allocate materials, services, and facilities in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense." *Ibid*.

On March 13, 2020, former President Trump declared a national emergency based on the COVID-19 pandemic. 85 Fed. Reg. 15,337 (Mar. 13, 2020). In the weeks that followed, government officials made many statements regarding the operation of industries that constitute critical infrastructure. The government issued nonbinding guidance urging most Americans to stay home and stating that critical infrastructure workers should maintain their normal work schedule.  Food manufacturing and supply workers were among the more than one hundred categories of essential critical infrastructure workers identified by the government in these communications.  Statements by the federal government acknowledged the importance of continued food production and the maintenance of other essential services.

Then on April 28, 2020, former President Trump issued Executive Order 13917, authorizing the Secretary of Agriculture to use the means provided by the DPA: "to determine the proper nationwide priorities and allocation of all the materials, services, and facilities necessary to ensure the continued supply of meat and poultry, consistent with [federal] guidance for the operations of meat and poultry processing facilities," and to "issue such orders and adopt

and revise appropriate rules and regulations as may be necessary to implement this order." 85
Fed. Reg. 26,313, 26,314 (Apr. 28, 2020).

While the U.S. Department of Agriculture (USDA) has expressed its support for the
continuing operation of meat and poultry processing facilities, as of late 2021, it has not
exercised its DPA authority to enter any contracts or issue any orders requiring action by that
industry. During oral argument before the Eighth Circuit Court of Appeals on September 23,
2021, U.S. attorney Lindsey Powell told the court that to date, the USDA has not taken any
action under the authority delegated to it by President Trump's executive order. *See: Hus Bulic v.
Tyson Foods*, No. 21-1010 (8th Cir.)[10]. Moreover, Ms. Powell told the Eighth Circuit the federal
government has not directed Tyson's actions through an exercise of authority under the DPA.
*Ibid.*

Tyson's argument that Executive Order 13917 preempts Plaintiff's state law claims is a
Hail Mary without a touchdown. This is because: (1) former President Trump's executive order
does not constitute an exercise of DPA authority; (2), said order simply declares that meat and
poultry in the food supply chain fall under Section 101(b) of the DPA; (3) the order delegates the
President's Defense Production Act authority over the food supply chain to the Secretary of
Agriculture Sonny Perdue; and (4), almost two years after Executive Order 13917 was signed,
the USDA has not exercised any such authority. Simply put, on both a factual and legal basis,
Tyson's argument falters because it cannot show the executive branch did what Tyson says it did
in its MTD. Factually, the federal government has not entered into any contracts or deals with
meat processors as a result of Executive Order 13917, nor has the government mandated

---

[10] Oral argument recording can be listened to at the following PACER docket link: http://media-
oa.ca8.uscourts.gov/OAaudio/2021/9/211010.MP3

performance or required priority of performance from private meat processors as a result of Executive Order 13917. And legally, a plain reading of the order shows it is not an actual exercise of DPA authority. Finally, Tyson's MTD fails to direct the Court to a single provision of the DPA that expressly preempts Plaintiff's state claims, all of which arise from constitutional violations resulting from Tyson's COVID-19 vaccine mandate.

**B.      Plaintiff's State Claims Are Not Preempted By the Federal Meat Inspection Act or the Poultry Production Act Either**

Tyson next argues that Plaintiff's state claims are preempted by two pieces of Congressional legislation, the Federal Meat Inspection Act ("FMIA") and the Poultry Production Act ("PPIA"). MTD, pp. 31-34. These arguments are meritless and have no basis in the text of those legislative provisions, and are also contradicted by the Supreme Court.

First, FMIA contains the following preemption clause:

"Requirements within the scope of this chapter with respect to premises, facilities and operations of any official establishment which are in addition to, or different than those made under this chapter may not be imposed by any State …" 21 U.S.C. § 678.

The express-preemption clause in FMIA is essentially the same as the preemption clause found in the PPIA.  Both contain "substantially identical preemption language." *See: Grocery Mfrs. of Am., Inc. v. Gerace*, 755 F.2d 993, 996 (2nd Cir. 1985); 21 U.S.C. § 467e. Where the FMIA is responsible for regulating certain aspects of slaughterhouses for beef and pork, the PPIA covers the same standards for poultry processing. In particular, the PPIA prohibits the sale of poultry products if the "labeling is false or misleading." 21 U.S.C. § 458(a)(2) (prohibiting "misbranded" products), § 453(h)(1) (defining "misbranded" as applying to products with "false or misleading" labeling).

A plain reading of preemption clauses in FMIA and the PPIA shows the operative phrase is whether the state law requirements are "within the scope of" the acts. 21 U.S.C. § 678; 21 U.S.C. § 467e. To define the "scope" of an act (and in turn, its preemptive effect), courts examine the "statute's express language" and "its structure and purpose." *In re Aurora Dairy Corp. Organic Milk Mktg. & Sales Practices, Litig.*, 621 F.3d 781, 792 (8th Cir. 2010). This inquiry is guided by the "ultimate touchstone" of discerning Congress's preemptive intent. *Ibid*; see also: *supra,* at pp. 24-25 above.

Here, Congress has aided this inquiry by expressly codifying its intent in the FMIA itself: to "protect[] consumers" from the dangers of unsafe meat. *See:* 21 U.S.C. § 602. The FMIA's consumer-facing purpose defines its scope and places corresponding limits on its preemptive reach. Moreover, the Supreme Court has clarified the scope of FMIA's preemption clause, which is state regulations concerning: "the inspection, handling, and slaughter of livestock for human consumption." *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 455 (2012) ("*Harris*"). There is no mention in the text of FMIA, nor in a single decision interpreting its preemptive reach, that touches upon state laws governing the employer-employee relationship in the context of civil rights, at issue in this case.

In *United States v. Stanko*, 491 F.3d 408 (8th Cir. 2007) ("*Stanko*"), the Eighth Circuit demonstrated a restrictive interpretation of the preemptive effect of the FMIA. In *Stanko*, an individual had been previously convicted for distributing adulterated meat in violation of the FMIA. He was later charged for a separate offense under a state statute prohibiting convicted felons from possessing firearms. That statute contained an exception for state offense convictions pertaining to "unfair trade practices." Mr. Stanko argued he qualified for this exception, contending that his FMIA conviction amounted to a state "unfair trade practices conviction"

because the Act "preempted all state unfair-trade-practices laws." *Id*. at 416. The Eighth Circuit court rejected this argument. It first discerned congressional intent from the FMIA's plain language, concluding that the FMIA was a consumer-protecting law whose "primary" purpose is "protecting consumers from unsafe meat." *Id*. at 416-17 (citing 21 U.S.C. § 602). And because preemption does not happen without the "clear and manifest purpose of Congress," this limited purpose narrowed the FMIA's preemptive reach. *Id*. at 418. The *Stanko* court concluded there was no preemption because: "nothing in the text of the FMIA indicates an intent to preempt state unfair-trade-practices laws in general, nor have we found any cases supporting Stanko's claim that it does so." *Ibid.*

Tyson's argument arrives at the same dead end. The FMIA only preempts requirements within its scope - and for a duty to fall within that scope, there must be some evidence that Congress intended to preempt that duty. But as in *Stanko*, Tyson has failed to point to a single provision of the FMIA, or the PPIA, that indicates any intent to preempt the common-law duties or state law liabilities at issue in this action, which at its core is an employer-employee civil rights dispute.

Moreover, neither the FMIA or the PPIA gives the USDA authority to regulate issues related to worker safety. *See:* Modernization of Swine Slaughter Inspection, 84 Fed. Reg. 52,300, 52,305 (Oct. 1, 2019). Instead, "[the Occupational Safety and Health Administration (OSHA)]" is the Federal agency with statutory and regulatory authority to promote workplace safety and health," *Ibid.* There is no suggestion that the provisions OSHA administers preempt Plaintiffs' claims. Indeed, the Supreme Court has recently issued two rulings expressly holding two COVID-19 vaccine mandate regulations attempted by the executive branch through OSHA, to be unconstitutional because they were beyond the reach of OSHA's regulatory power.

*National Federation of Independent Business v. Dept. of Labor, OSHA,* U.S.  Supreme Court

Docket No. 21A244 (Jan. 13, 2022); and *Alabama Association of Realtors v. DHHS,* 141 S.Ct.

2485 (Aug. 26, 2021).

Further weighing against preemption here is the "savings clause" within the FMIA's

preemption clause, which provides: "This chapter shall not preclude any State [...] from making

requirement [sic] or taking other action, consistent with this chapter, with respect to any other

matters regulated under this chapter." 21 U.S.C. § 678.  The FMIA's savings clause (which is

nearly identical to the savings clause in the PPIA), further clarifies that Plaintiffs' claims are not

preempted by the FMIA. This is because Plaintiff's claims involve common-law claims and civil

rights violations that are "state laws of general application" and extend to nearly all employers in

Tennessee.

For example, there can be little dispute that the duty of employers to avoid engaging in

discriminatory behavior is law of "general application" covered by the savings clause. Nor is

there any question that the duty to not engage in an assault by way of forced injections, is a

generally applicable common-law duty. If FMIA and the PPIA do not address these duties

whatsoever, it follows that those duties are not within the scope of those provisions for purposes

of preemption. If anything, the acute disconnect between the FMIA and the PPIA's focus

(consumers), and that of the duties implicated in this case (civil rights and workplace

discrimination) only further highlights the implausibility that the former preempts the latter.

Tyson cites to the *Harris* decision to support the incredible claim that FMIA preempts

Tennessee's common law civil rights and workplace discrimination measures. MTD, pg. 32. But

even a cursory glance at *Harris* shows nothing could be further from the text of that case. Tyson

contends that "the question is whether the USDA could have adopted the requirement: if the

USDA 'could issue regulations under the FMIA . . . mandating' the requirement at issue, then the state's requirement is preempted." MTD, pg. 32, ¶ 3 (quoting *Harris*, supra, 565 U.S. at 466). This cherry-picked excerpt from *Harris* is entirely misleading. To start, scouring the Code of Federal Regulations in search of congressional purpose cannot possibly substitute for the FMIA's plain language, "which necessarily contains the best evidence of Congress' pre-emptive intent." *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013).

Second, *Harris* actually deeply undermines Tyson's argument, because *Harris*' preemption analysis is focused on the plain language of the FMIA. At issue in *Harris* was whether the FMIA preempted a California animal humane treatment law regulating how slaughterhouses dealt with non-ambulatory pigs (i.e., those unable to walk). *Harris*, 565 U.S. at 458-59. The Court found the state law was within the FMIA's scope (and thus preempted) precisely due to specific provisions within FMIA that: "required slaughterhouses to follow prescribed methods of humane handling" and authorized the Food Safety and Inspection Service ("FSIS") to "issue [] detailed regulations" on humane handling issues. *Id*. at 466 (citing 21 U.S.C. § 603(b) [authorizing regulations to "prevent[] the inhumane slaughtering of livestock"].)

Additionally, *Harris* and *Stanko* provide consistent interpretations of the FMIA's preemptive effect on different laws - and the results are instructive for this case. In *Harris*, a humane-handling law fell within the FMIA's preemptive scope because the Act contained express provisions regulating humane handling. But in *Stanko*, an unfair trade practices law did not fall within the FMIA's preemptive scope because the act had nothing to say about unfair trade practices whatsoever. Here, Tyson has not cited a single provision of the FMIA (or the PPIA) that would cover the workplace safety duties, much less workplace discrimination laws.

Accordingly, Plaintiff's claims against Tyson are on track with *Stanko*, not *Harris*. Plaintiff's state claims are therefore not preempted here.[11]

In sum, Tyson seeks to exploit the FMIA and PPIA, legislation that regulates a specific aspect of an industry, as a shield to argue that preemption erases the entire food industry's obligations under a host of generally applicable laws governing workplace safety, wages, and discrimination–none of which the federal law in question actually regulates. Allowing Tyson's blunderbuss approach to preemption would interpret a law designed to regulate an industry in one respect, to extinguish its duties in all others. *See: Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005): "[I]t seems unlikely that Congress considered a relatively obscure [preemption] provision ... to give pesticide manufacturers virtual immunity from certain forms of tort liability." Tyson's argument here, is tantamount to preemption by regulatory vacuum, effectively immunizing employers from any and all state law liability, so long as the incident in question took place on company soil. This would be the predictably disturbing result of applying preemption in the manner sought by Tyson here, with "uncritical literalism" - which the twin guardrails of congressional intent and statutory language are designed to prevent. *See: Dan's City Used Cards, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013).

///

---

[11] Of note, in a host of other cases, employees have sued Tyson for workplace discrimination, including under the THRA, and neither the FMIA nor the PPIA was given preemptive effect over the plaintiff's state claims: *Reese v. Tyson Foods, Inc.*, 2021 U.S. Dist. LEXIS 228676, *17-23 (W.D. Mo. 2021) [the court found state law, not federal law, preempted, superseded, and displaced plaintiff's claims regarding Tyson's vaccine mandate.]; *West v. Tyson Foods*, 374 Fed. Appx. 624 (6th Cir. 2010) [no preemption of the Kentucky Civil Rights Act.]; *Wu v. Tyson Foods, Inc.*, 189 Fed. Appx. 375 (6th Cir. 2006) [no preemption of the THRA or Tennessee common law.]; *Khalil v. Tyson Foods, Inc.*, 2015 U.S. Dist. LEXIS 97135 (M.D. Tenn. 2015) [no preemption of the THRA.]; *Davis v. Tyson Fresh Meats, Inc.*, 2020 U.S. Dist. LEXIS (M.D. Tenn. 2020) [no preemption of the THRA]; *Callender v. Tyson Fresh Meats, Inc.*, 2017 U.S. Dist. LEXIS 98365 (M.D. Tenn. 2017) [no preemption under the THRA.].

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## <u>CONCLUSION</u>

For the reasons set forth herein, this Court should deny the MTD in its entirety.

Alternatively, Plaintiff requests leave to amend any portions of the Amended Complaint this

Court deems insufficiently pled.

DATED: January 17, 2022

                                               Respectfully submitted,

                                               <u>BY: /s/ Robert E. Barnes</u>
                                               Robert E. Barnes, Esq. (*pro hac vice*)
                                               Tennessee BPR No. 020617
                                               BARNES LAW
                                               700 South Flower Street, Suite 1000
                                               Los Angeles, California 90017
                                               Telephone: (310) 510 -6211
                                               Facsimile: (310) 510-6225
                                               Email: robertbarnes@barneslawllp.com

                                               B. Tyler Brooks
                                               Tennessee BPR No. 025291
                                               LAW OFFICE OF B. TYLER BROOKS, PLLC
                                               P.O. Box 10767
                                               Greensboro, North Carolina 27404
                                               Telephone: (336) 707-8855
                                               Fax: (336) 900-6535
                                               btb@btylerbrookslawyer.com

                                               *Attorneys for Plaintiff*

///

///

---

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document was filed electronically on January 17, 2022.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt, including the counsel of record for defendants indicated below.  Parties may access this filing through the Court's system.


s/Robert E. Barnes
Robert E. Barnes
Tennessee BPR No. 020617

**SERVED:**
J. Gregory Grisham
FISHER & PHILLIPS, LLP
1715 Aaron Brenner Drive, Suite 312
Memphis, TN 38120
ggrisham@fisherphillips.com

*Counsel for Defendants*