# IN THE UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF TENNESSEE (Jackson)

| | |
|---|---|
| ROBBIE JOHNSON, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | )CASE NO.: 1:21-cv-01161 |
| | ) |
| TYSON FOODS, INC., et al., | ) |
| | ) |
| *Defendants*. | ) |
| _____ | ) |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' RENEWED MOTION TO DISMISS PLAINTIFF'S AMENDED VERIFIED COMPLAINT

**TO THE HONORABLE JUDGE OF THE ABOVE-ENTITLED COURT AND TO DEFENDANTS AN THEIR ATTORNEYS OF RECORD:**

Plaintiff Robbie Johnson ("Plaintiff"), files the within memorandum in opposition to Defendants' Renewed Motion to Dismiss Plaintiff's Amended Verified Complaint pursuant to Rule[1] 12(b)(6) (the "MTD")[2].

///

///

---

[1] All references to "Rule" are to the Federal Rules of Civil Procedure, unless designated otherwise.

[2] ECF No. 47.

## ARGUMENT

A court's review of a Rule 12(b)(6) motion assumes all factual allegations in a complaint true. As the court held in *Braden v. Wal-Mart Stores, Inc,* 588 F.3d 585, 595 (8th Cir., 2009): "[I]nferences are to be drawn in favor of the non-moving party. (citation). *Twombly* and *Iqbal* did not change this fundamental tenet of Rule 12(b)(6) practice. (citations).". Moreover, motions to dismiss civil rights claim carry an even higher standard of scrutiny in granting Rule 12(b)(6) motions to dismiss, the court holding that civil rights claims are "scrutinized with special care." *Lillard v. Shelby County Board of Ed.* (6th Cir. 1996) 76 F.3d 716, 724; *see also: Johnson v. State of California,* 207 F.3d 650, 653 (9th Cir. 2000) ["we have emphasized that [when reviewing dismissal under Rule 12(b)(6)], the rule of liberal construction is 'particularly important in civil rights cases.' [citation].]

Tyson's renewed MTD here, seeks to dismiss three claims alleged in Plaintiff's Amended Complaint (the "Amended Complaint")[3], for civil rights violations of: (i) the Tennessee Human Rights Act ("THRA") [*Fourth Cause of Action*]; (ii) the Tennessee Disability Act ("TDA") [*Seventh Cause of Action*]; and (iii) Tenn. Code Ann. § 14-1-101 et al. ("Title 14") [*Twelfth Cause of Action*]. Like Tyson's prior motion to dismiss the Amended Complaint which was granted and denied in part by this Court, Tyson's present MTD does not meet the high standard required to dismiss Plaintiff's civil rights claims at the pleading stage. That said, in the event this Court finds that any of Plaintiff's challenged claims are insufficiently pled, Plaintiff respectfully requests leave to amend to correct any such insufficiencies. *National Council of La Raza v. Chegavske* 800 F.3d 1032, 1041 (9th Cir. 2015); *Davoodi v. Austin Independent School Dist.* 755 F.3d 307, 310 (5th Cir. 2014).

---

[3] ECF No. 24.

I.     **THE AMENDED COMPLAINT SUFFICIENTLY ALLEGES CLAIMS UNDER THE TENNESSEE HUMAN RIGHTS ACT AND THE TENNESSEE DISABILITY ACT EMPLOYMENT DISCRIMINATION LAWS**

   A.     <u>**Plaintiff's THRA Claim Sufficiently Alleges That She Was Discriminated Against By Tyson's Vaccination Mandate On The Basis Of Her Religion, And Employers Do Have a Duty To Accommodate Religious Beliefs Under The THRA**</u> - [*Fourth Cause of Action*]

Tyson's MTD posits two arguments in support of dismissal of Plaintiff's THRA claim. Both are readily disregarded. First, the MTD states in entirely conclusory fashion, that "Plaintiff were treated the same as other employees" simply because Tyson says it is so. MTD, pg. 4. A responsible reading of the allegations in the Amended Complaint reveals otherwise:

> "Plaintiff has now faced termination and disciplinary action for failing to comply with Tyson's vaccination requirements, which directly conflicts with her sincere religious beliefs." Amended Complaint, at ¶157, pg. 46;

> "Tyson's only accommodations provided for employees who sought religious exemptions is one year of unpaid leave, with no guarantee of a position if they comply with the mandate within that year. Noncompliant employees such as Mrs. Johnson, who do not receive a COVID-19 vaccine at the end of the leave of absence period are promised nothing short of termination. This is no reasonable accommodation at all, but rather a punitive measure taken against employees who choose to exercise their religious rights. Indeed Defendants' professed "accommodation" resulted in Plaintiff being fired from her job." *Id.*, at ¶159, pg. 47;

> "As a result of Tyson's draconian vaccine mandate, most employees will be forced to seek alternative employment during that year and those that refuse the vaccination on religious grounds are unlikely to comply with the mandate within the year due to their religious beliefs, and thus will effectively be terminated. Or, like Plaintiff, are in fact permanently terminated. *Id.*, at ¶160, pg. 47.

The MTD also asserts the circular argument that:"by definition, religious discrimination cannot occur when all employees are treated equally. (citation)." MTD, pg. 4. This misses the point entirely. Whether Tyson's vaccine mandate applied to everyone in the workplace is irrelevant when determining whether a plaintiff was impacted in a discriminatory fashion. What is relevant is whether Tyson's mandate disparately treated unvaccinated employees like Plaintiff

on the one hand, vis-à-vis vaccinated employees on the other, due to Plaintiff's religious beliefs. As the above-cited allegations from the Amended Complaint reveal, the unequivocal answer is yes.

The second grounds in Tyson's MTD for dismissal of Plaintiff's THRA claim, that Tyson had no duty to accommodate Plaintiff under that authority because that provision is separate and distinct from the federal Title VII Civil Rights Act of 1964 ("Title VII")[4] in regards to religious discrimination, is equally ineffectual. Although there is no explicit language in the THRA imposing a duty to accommodate religious beliefs, that provision nevertheless states: "It is a discriminatory practice for an employer to: ¶ (1) Fail or refuse to hire or discharge any person or otherwise to discriminate against an individual with respect to … religion, …" Tenn. Code ann. § 4-21-401(a). As held by the Tennessee Supreme Court in *Campbell v. Florida Steel Corp.,* 919 S.W.2d 26, 30-31 (Tenn. 1996) ("*Campbell*"): "We begin our analysis with Title VII of the Civil Rights Act of 1964, which makes it unlawful for an employer to 'discriminate against any individual with respect to … religion, …Likewise, under the Tennessee Human Rights Act, it is unlawful for an employer 'to discriminate against an individual with respect to … religion, …" In other words, the provisions of Title VII and the THRA are virtually identical.

Moreover, the THRA expressly, and without qualification, states that it is to be executed in line with the same policies as Title VII, including in the context of employment discrimination on the basis of religion:

> "(a) It is the purpose and intent of the general assembly by this chapter to: ¶(1) Provide for execution within Tennessee of the policies embodied in the federal Civil Rights Acts of 1964, 1968 and 1972, …; ¶(2) Assure that Tennessee has appropriate legislation prohibiting discrimination in employment, …; ¶(3) Safeguard all individuals within the state from discrimination because of … religion, … in connection with employment and public accommodations."

---

[4] 42 U.S.C. §2000e, et seq.

The *Campell* court also reaffirmed, without qualification, that THRA claims are analyzed in the same manner as federal Title VII claims, as held by the Sixth Circuit in *Tetro v. Elliott Popham, Inc.,* 173 F.3d 988, 993 (6th Cir. 1999):

> "The Tennessee Supreme Court has held that THRA claims are analyzed in the same manner as Title VII claims. (citing *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 31 (Tenn.1996), which held: 'The stated purpose and intent of the [THRA] is to provide for execution within Tennessee of the policies embodied in the federal civil rights laws. Accordingly, ***our analysis of the issues in this appeal is the same under both the Tennessee Human Rights Act and Title VII of the Federal Civil Rights Act*.').**" (emphasis added)[5]

Tyson's over narrow interpretation of the THRA is antithetical to a practical and effective application of that provision. If, as contended in the MTD, a given statute cannot be given application to a specific context (such as religious discrimination in the workplace here), then that statute would have no meaningfully practical effect unless it enumerated each and every potential application of it. To hold statutory law to this standard would require any given statute to contain pages upon pages of verbiage, enumerating each and every context and scenario to which its provisions apply. Needless to say, such a standard is as impractical as it is not required by any published decision. Nor for the same reasons, is it of any consequence that the THRA doesn't explicitly define "religion" in its provisions. MTD, pp. 4-5 ["Unlike Title VII, … the THRA does not define 'religion', …"]. That is because, as held by the Tennessee Supreme Court in *Campell,* not only is the language of Title VII and the THRA virtual identical, but the appropriate analysis "is the same under both the Tennessee Human Rights Act and Title VII of the Federal Civil Rights Act". Campell, *supra,* 919 S.W.2d at 30-31.

---

[5] *See also: Bennett v. Steiner-Liff Iron and Metal Co.,* 826 S.W.2d 119, 121: "The stated purpose and intent of Title 4, Chapter 21, is to provide for execution within Tennessee of the policies embodied in the Federal Civil Rights Act; (§ 4–21–101(a)(1)). Nothing could be more clear".

Accordingly, the THRA absolutely imposes a duty to accommodate an employee's religious beliefs, in the same manner as the companion federal claim under Title VII does. Plaintiff's THRA claim is thus sufficiently pled.

**B.      The Amended Complaint Sufficiently Alleges A Claim Under the Tennessee Disability Act** - [*Seventh Cause of Action*]

Tyson challenges the sufficiency of Plaintiff's allegations under the TDA, on much the same conclusory arguments it ineffectually made regarding her THRA claim. For the same reasons, it fails regarding the TDA. Tyson contends that the TDA allegations in the Amended Complaint are "generalized" and "fail[] to set forth any factual assertions" in support of the three elements required to allege that claim. MTD, pg. 6 (citing *Cardenas-Meade v. Pfizer, Inc.,* 510 F.Appx 367 369 (6th Cir. 2013)). Again, a cursory reading of the Amended Complaint reveals otherwise.

As to the first element of a TDA claim, the Amended Complaint directly alleges that Plaintiff was qualified for the subject position: "Plaintiff was qualified for her position at Tyson, and successfully performed it over a twenty-three year career with the company." Amended Complaint, ¶199, pg. 55.

As to the second element of a TDA claim, the Amended Complaint sufficiently alleges that Plaintiff was disabled under the TDA as follows:

> "Tyson's vaccine mandate discriminates against Plaintiff because it treats her as though she is medically disabled. This is based upon the Defendants' erroneous belief that Plaintiff lacks immunity to COVID-19. Yet, the medical evidence set forth herein demonstrates that immunity gained from previous COVID-19 infection is equal to or superior to the protection offered by vaccination. Therefore, Defendants engaged in unlawful discrimination in violation of the TDA, because Defendants regard Plaintiff as having a physical impairment that disqualifies her from doing her job, and who can only be allowed in the workplace if she takes the COVID-19 vaccine." Amended Complaint, ¶ 202, pg. 56.

As to the third element of a TDA claim, that Plaintiff suffered an adverse employment action because of their perceived disability, that element is sufficiently alleged as well:

> "Plaintiff informed Defendants of her medical concerns regarding the COVID-19 vaccines."; Amended Complaint, ¶200, pg. 56;

> "Yet the Defendants discriminated against Plaintiff on the basis of disability, by forcing her to choose between either taking an untested, experimental mRNA COVID-19 vaccine that could potentially damage her health, or losing her job and livelihood." *Id.,* at ¶201, pg. 56;

> "Because of Tyson's company policy and inherent discrimination on the basis of disability, Mrs. Johnson has been forced to endure adverse employment action, including her permanent discharge from the company." *Id.,* at ¶204, pg. 56;

> "Defendants' COVID-19 vaccine mandate has harmed and continues to harm Plaintiff. Such injury includes, but is not limited to, coercing and harassing her to take an untested and potentially unsafe substance, threatening and then terminating her employment, and threatening and then terminating her income, livelihood and twenty-three year career, on the basis of disability." *Id.,* at ¶206, pg. 57.

Accordingly, the Amended Complaint sufficiently alleges the three elements of a TDA claim.

Next, Tyson again raises the contention that it could not have discriminated against Plaintiff under the TDA, because "Plaintiff admits that Tyson's Policy required that all team members be fully vaccinated. (citation). Consequently, Plaintiff has not asserted any facts that Tyson treated her differently under its Policy because of an actual or perceived disability." MTD, pg. 6. As discussed regarding the same argument in the MTD regarding Plaintiff's THRA claim above (*supra,* at pp. 3-4 above.), the only relevant inquiry is whether Tyson's vaccine mandate disparately treated unvaccinated employees like Plaintiff on the one hand, vis-à-vis vaccinated employees on the other, upon a basis of their perceived disability. Once again, the answer is yes as alleged in the Amended Complaint.

---

Finally, Tyson's MTD argues, as it did regarding Plaintiff's THRA claim, that it is not required to reasonably accommodate Plaintiff under the TDA either. The relevant authority holds otherwise. Courts have held, like with THRA claims, that a claim brought under the TDA is also analyzed under the same principles as the federal Americans with Disabilities Act. In *Bolden v. Lowes Home Ctrs., LLC,* 783 Fed.App'x. 589, 599 (6th Cir. 2019), the Sixth Circuit held accordingly: "The federal act also defines 'discrimination' to include 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.' 42 U.S.C. § 12112(b)(5)(A). A claim brought under the Tennessee Disabilities Act is analyzed under the same principles as the federal act. (citing *Cardenas-Meade v. Pfizer, Inc.*, 510 F. App'x 367, 369 n.2 (6th Cir. 2013))."

As such, Tyson's argument that they are not required to reasonably accommodate for perceived impairments such as those alleged in Plaintiff's Amended Complaint under the TDA, is invalid. The Amended Complaint sufficiently alleges a claim under the TDA.

II. **THE AMENDED COMPLAINT SUFFICIENTLY ALLEGES A CAUSE OF ACTION FOR TYSON'S VIOLATION OF TITLE 14 UNDER TENNESSEE CODE §§ 14-1-101 *et seq.* -** [*Twelfth Cause of Action*]

A. <u>**Plaintiff's Title 14 Claim Applies To Tyson**</u>

Tyson contends that Plaintiff's claim under Title 14 imposes liability for its violation only on a "Government Entity", and thus fails because Tyson is a "private business" as defined by that provision. The Tennessee statutory scheme set forth by Title 14 provides various private rights of action arising from imposition of vaccine mandates upon its citizens: "Consistent with our constitutionally recognized and inalienable right of liberty, every person within this state is and must remain free to choose or to decline to be vaccinated against COVID-19 without penalty or threat of penalty." Tenn. Code 14-2-101.

Relevant to Plaintiff's claims against Tyson here, Tenn. Code 14-2-102 states: "A private business, … shall not compel or otherwise take an adverse action against a person to compel the person to provide proof of vaccination if the person objects to receiving a COVID-19 vaccine for any reason." As such, Tyson's contention that Title 14 does not apply to private businesses is false, because it expressly does: "***A private business***, … shall not compel or otherwise take an adverse action" (emphasis added).

Tyson has violated said provisions of Title 14, by requiring that employees who object to receiving the vaccine provide proof of vaccination in order to continue employment at their company. Amended Complaint, ¶ 258, pg. 66.[6] Those who don't or can't, like Plaintiff, are effectively fired. *Ibid.* Tyson's COVID-19 vaccine mandate thus unquestionably meets the definition of "adverse action" set forth in Tenn. Code 14-1-101(1), granting Plaintiff a valid Title 14 claim against Tyson.[7]

**B.      <u>Plaintiff's Title 14 Claim Is Not Temporally Precluded, Because Tyson Took, and Continues To Take, Adverse Action Against Plaintiff After That Provision Was Enacted</u>**

The MTD next contends that Plaintiff's Title 14 claim should be dismissed, because no adverse action arising from imposition of its COVID-19 vaccine mandate was suffered by

---

[6] Under Tenn. Code 14-1-101, "Adverse action" includes: "(A) discriminat[ion] against a person by denying the person employment, privileges, … or other benefits; or (B) discharge, threaten, or otherwise discriminate against an employee in any manner that affects the employee's employment."

[7] Indeed, as Tyson's counsel itself interprets Title 14 to the public on its firm website, its provisions apply by its terms to: "[p]rivate employers who employ one or more employees within Tennessee, governmental entities, and schools are prohibited from requiring proof of COVID-19 vaccination or taking adverse action against an employee or applicant for refusing to provide proof of vaccination *if the employee or applicant objects to vaccination for any reason*." (emphasis original). *See:* https://www.fisherphillips.com/news-insights/new-tennessee-law-restricts-workplace-vaccine-requirements.html

Plaintiff after that provision was enacted on November 12, 2021. MTD, pp. 7-8. Tyson goes on to assert that because Title 14 is not retroactive, Plaintiff's claim under that provision must be dismissed. *Ibid.* A plain reading of Plaintiff's pleadings and Title 14 respectively, proves otherwise.

First, Tyson unquestionably took adverse action against Plaintiff well after the November 12, 2021 enactment of Title 14, by imposing its COVID-19 vaccine mandate prospectively. As alleged in the Amended Complaint, Tyson announced a November 1, 2021 deadline for their employees to receive COVID-19 vaccines. Amended Complaint, ¶ 5, pg. 5. For those employees who applied for a medical or religious accommodation (such as Plaintiff), Tyson announced it would place those employees on up to one year of unpaid leave of absence (to November 1, 2022). *Id.,* at ¶ 9, pg. 6. Tyson further announced that after one year those employees placed on unpaid leave would effectively be terminated even if they eventually surrendered to receive a vaccine, as those employee's positions would not be guaranteed. *Ibid*; *see also*: Amended Complaint, Exhibit B attached thereto. Consequently, the thrust of the adverse action Tyson is and will inflict upon those employees who refuse vaccines (loss of pay every month after November 1, 2021 for year, effective termination at some point in time after November 1, 2021 since their positions would not be guaranteed, etc.), will be suffered by Plaintiff well after the effective date of Title 14 on November 12, 2021.

Second, retroactive application of Title 14 is not barred in any event, as mistakenly stated in the MTD. Tenn. Code § 14-1-104(b) provides: "wherever the application of this title conflicts with the application of other provisions of state law, this title prevails." Tenn. Code § 14-1-103 provides: "The purpose of this title is to safeguard the constitutional rights and liberty interests of persons during the COVID-19 pandemic. This title must be construed broadly to effectuate the

purpose described in this section." Nothing in Title 14 states that its provisions cannot be applied retroactively. To the contrary, the aforementioned provisions of Title 14 reveal the Tennessee Legislature's intent for Title 14's application to be broad and comprehensive, in preserving the right of all Tennesseans to decline to take COVID-19 vaccines. Plaintiff's Title 14 claim is thus not dismissible under Rule 12(b)(6).

III.   **NONE OF PLAINTIFF'S STATE CLAIMS ARE PREEMPTED BY THE EXECUTIVE ACTS CITED IN TYSON'S MOTION** – [Fourth, Seventh and Twelfth Causes of Action]

The MTD makes one final, sweeping attempt to dismiss the Amended Complaint's Fourth, Seventh and Twelfth causes of action, based on federal preemption. However as eloquently summed up by the Third Circuit last year: "There is no COVID-19 exception to federalism." *Maglioli v. Alliance HC Holdings*, 16 F.4th 393, 400 (3rd Cir. 2021).

Although the analysis of the scope of preemption begins with the text, "interpretation of that language does not occur in a contextual vacuum." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 484-485 (1996) ("*Medtronic*"). Rather, the inquiry is guided by two principles about the nature of preemption. The first principle is that there is a presumption against supplanting "the historic police powers of the States" by federal legislation "unless that [is] the clear and manifest purpose of Congress." *Medtronic, supra,* 518 U.S. at 485 (citing *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947)). As held by the Ninth Circuit regarding federal legislation that touches upon the arena of the police powers of the States: "This presumption against preemption leads us to the principle that express preemption statutory provisions should be given narrow interpretation. [citation omitted]" *Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1060 (9th Cir. 2009) ("*Gordon*").

The second principle of preemption analysis, hinges on the premise that Congress's purpose "'is the ultimate touchstone in every preemption case.'" *Gordon*, 575 F.3d at 1060 (quoting *Medtronic, supra*, 518 U.S. at 485). "As a result, … courts [are] to consider not only the language of the statute itself but also the 'statutory framework' surrounding it and the 'structure and purpose of the statute as a whole.'" *Gordon, supra*, 575 F.3d at 1060 (quoting *Medtronic, supra,* 518 U.S. at 485-486. Ultimately, the guiding principles regarding the nature of preemption: "[are] consistent with both federalism concerns and the historic primacy of state regulation of matters of health and safety." *Medtronic, supra*, 518 U.S. at 485.

A.   **Plaintiff's State Claims Are Not Preempted By President Trump's April 28, 2020 Executive Order**

Tyson argues that former President Trump's Executive Order pursuant to the Defense Production Act ("DPA") preempts all of Plaintiff's state claims. MTD, pp. 9-11. This argument has no merit. The intent of the DPA was to authorize the executive branch to direct private companies to give priority to federal contracts in exigent circumstances. Specifically, the President under the DPA may: "require that performance under contracts or orders (other than contracts of employment) which he deems necessary or appropriate to promote the national defense shall take priority over performance under any other contract or order." 50 U.S.C. § 4511(a). In addition, "for the purpose of assuring such priority," the President may: "require acceptance and performance of such contracts or orders in preference to other contracts or orders by any person he finds to be capable of their performance," and he may "allocate materials, services, and facilities in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense." *Ibid*.

On March 13, 2020, former President Trump declared a national emergency based on the COVID-19 pandemic. 85 Fed. Reg. 15,337 (Mar. 13, 2020). In the weeks that followed,

government officials made many statements regarding the operation of industries that constitute critical infrastructure. The government issued nonbinding guidance urging most Americans to stay home and stating that critical infrastructure workers should maintain their normal work schedule.  Food manufacturing and supply workers were among the more than one hundred categories of essential critical infrastructure workers identified by the government in these communications.  Statements by the federal government acknowledged the importance of continued food production and the maintenance of other essential services.

Then on April 28, 2020, former President Trump issued Executive Order 13917, authorizing the Secretary of Agriculture to use the means provided by the DPA: "to determine the proper nationwide priorities and allocation of all the materials, services, and facilities necessary to ensure the continued supply of meat and poultry, consistent with [federal] guidance for the operations of meat and poultry processing facilities," and to "issue such orders and adopt and revise appropriate rules and regulations as may be necessary to implement this order." 85 Fed. Reg. 26,313, 26,314 (Apr. 28, 2020).

While the U.S. Department of Agriculture (USDA) has expressed its support for the continuing operation of meat and poultry processing facilities, as of late 2021, it has not exercised its DPA authority to enter any contracts or issue any orders requiring action by that industry. During oral argument before the Eighth Circuit Court of Appeals on September 23, 2021, U.S. attorney Lindsey Powell told the court that to date, the USDA has not taken any action under the authority delegated to it by President Trump's executive order. *See: Hus Bulic v. Tyson Foods*, No. 21-1010 (8th Cir.)[8]. Moreover, Ms. Powell told the Eighth Circuit the federal

---

[8] Oral argument recording can be listened to at the following PACER docket link: http://media-oa.ca8.uscourts.gov/OAaudio/2021/9/211010.MP3

government has not directed Tyson's actions through an exercise of authority under the DPA. *Ibid.*

Tyson's argument that Executive Order 13917 preempts Plaintiff's state law claims is a Hail Mary without a touchdown. This is because: (1) former President Trump's executive order does not constitute an exercise of DPA authority; (2) said order simply declares that meat and poultry in the food supply chain fall under Section 101(b) of the DPA; (3) the order delegates the President's Defense Production Act authority over the food supply chain to the Secretary of Agriculture; and (4), almost two years after Executive Order 13917 was signed, the USDA has not exercised any such authority. Simply put, on both a factual and legal basis, Tyson's argument falters because it cannot show the executive branch did what Tyson says it did in its MTD. Factually, the federal government has not entered into any contracts or deals with meat processors as a result of Executive Order 13917, nor has the government mandated performance or required priority of performance from private meat processors as a result of Executive Order 13917. And legally, a plain reading of the order shows it is not an actual exercise of DPA authority. Finally, Tyson's MTD fails to direct the Court to a single provision of the DPA that expressly preempts Plaintiff's state claims, all of which arise from constitutional violations resulting from Tyson's COVID-19 vaccine mandate.

**B.**    **Plaintiff's State Claims Are Not Preempted By the Federal Meat Inspection Act or the Poultry Production Act Either**

Tyson next argues that Plaintiff's state claims are preempted by two pieces of Congressional legislation, the Federal Meat Inspection Act ("FMIA") and the Poultry Production Act ("PPIA"). MTD, pp. 11-14. These arguments are meritless and have no basis in the text of those legislative provisions, and are also contradicted by the Supreme Court.

First, FMIA contains the following preemption clause:

"Requirements within the scope of this chapter with respect to premises, facilities and operations of any official establishment which are in addition to, or different than those made under this chapter may not be imposed by any State …" 21 U.S.C. § 678.

The express-preemption clause in FMIA is essentially the same as the preemption clause found in the PPIA. Both contain "substantially identical preemption language." *See: Grocery Mfrs. of Am., Inc. v. Gerace*, 755 F.2d 993, 996 (2nd Cir. 1985); 21 U.S.C. § 467e. Where the FMIA is responsible for regulating certain aspects of slaughterhouses for beef and pork, the PPIA covers the same standards for poultry processing. In particular, the PPIA prohibits the sale of poultry products if the "labeling is false or misleading." 21 U.S.C. § 458(a)(2) (prohibiting "misbranded" products), § 453(h)(1) (defining "misbranded" as applying to products with "false or misleading" labeling).

A plain reading of preemption clauses in FMIA and the PPIA shows the operative phrase is whether the state law requirements are "within the scope of" the acts. 21 U.S.C. § 678; 21 U.S.C. § 467e. To define the "scope" of an act (and in turn, its preemptive effect), courts examine the "statute's express language" and "its structure and purpose." *In re Aurora Dairy Corp. Organic Milk Mktg. & Sales Practices, Litig.*, 621 F.3d 781, 792 (8th Cir. 2010). This inquiry is guided by the "ultimate touchstone" of discerning Congress's preemptive intent. *Ibid*.

Here, Congress has aided this inquiry by expressly codifying its intent in the FMIA itself: to "protect[] consumers" from the dangers of unsafe meat. *See:* 21 U.S.C. § 602. The FMIA's consumer-facing purpose defines its scope and places corresponding limits on its preemptive reach. Moreover, the Supreme Court has clarified the scope of FMIA's preemption clause, which is state regulations concerning: "the inspection, handling, and slaughter of livestock for human consumption." *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 455 (2012) ("*Harris*"). There is no mention in the text of FMIA, nor in a single decision interpreting its preemptive reach, that

touches upon state laws governing the employer-employee relationship in the context of civil rights, at issue in this case.

In *United States v. Stanko*, 491 F.3d 408 (8th Cir. 2007) ("*Stanko*"), the Eighth Circuit demonstrated a restrictive interpretation of the preemptive effect of the FMIA. In *Stanko*, an individual had been previously convicted for distributing adulterated meat in violation of the FMIA. He was later charged for a separate offense under a state statute prohibiting convicted felons from possessing firearms. That statute contained an exception for state offense convictions pertaining to "unfair trade practices." Mr. Stanko argued he qualified for this exception, contending that his FMIA conviction amounted to a state "unfair trade practices conviction" because the Act "preempted all state unfair-trade-practices laws." *Id*. at 416. The Eighth Circuit court rejected this argument. It first discerned congressional intent from the FMIA's plain language, concluding that the FMIA was a consumer-protecting law whose "primary" purpose is "protecting consumers from unsafe meat." *Id*. at 416-17 (citing 21 U.S.C. § 602). And because preemption does not happen without the "clear and manifest purpose of Congress," this limited purpose narrowed the FMIA's preemptive reach. *Id*. at 418. The *Stanko* court concluded there was no preemption because: "nothing in the text of the FMIA indicates an intent to preempt state unfair-trade-practices laws in general, nor have we found any cases supporting Stanko's claim that it does so." *Ibid.*

Tyson's argument arrives at the same dead end. The FMIA only preempts requirements within its scope - and for a duty to fall within that scope, there must be some evidence that Congress intended to preempt that duty. But as in *Stanko*, Tyson has failed to point to a single provision of the FMIA, or the PPIA, that indicates any intent to preempt the common-law duties

or state law liabilities at issue in this action, which at its core is an employer-employee civil rights dispute.

Moreover, neither the FMIA or the PPIA gives the USDA authority to regulate issues related to worker safety. *See:* Modernization of Swine Slaughter Inspection, 84 Fed. Reg. 52,300, 52,305 (Oct. 1, 2019). Instead, "[the Occupational Safety and Health Administration (OSHA)]" is the Federal agency with statutory and regulatory authority to promote workplace safety and health," *Ibid.* There is no suggestion that the provisions OSHA administers preempt Plaintiff's claims. Indeed, the Supreme Court has recently issued two rulings expressly holding two COVID-19 vaccine mandate regulations attempted by the executive branch through OSHA, to be unconstitutional because they were beyond the reach of OSHA's regulatory power. *National Federation of Independent Business v. Dept. of Labor, OSHA,* U.S. Supreme Court Docket No. 21A244 (Jan. 13, 2022); and *Alabama Association of Realtors v. DHHS*, 141 S.Ct. 2485 (Aug. 26, 2021).

Further weighing against preemption here is the "savings clause" within the FMIA's preemption clause, which provides: "This chapter shall not preclude any State [...] from making requirement [sic] or taking other action, consistent with this chapter, with respect to any other matters regulated under this chapter." 21 U.S.C. § 678. The FMIA's savings clause (which is nearly identical to the savings clause in the PPIA), further clarifies that Plaintiff's claims are not preempted by the FMIA. This is because Plaintiff's claims involve common-law claims and civil rights violations that are "state laws of general application" and extend to nearly all employers in Tennessee.

For example, there can be little dispute that the duty of employers to avoid engaging in discriminatory behavior is law of "general application" covered by the savings clause. If FMIA

and the PPIA do not address these duties whatsoever, it follows that those duties are not within the scope of those provisions for purposes of preemption. If anything, the acute disconnect between the FMIA and the PPIA's focus (consumers), and that of the duties implicated in this case (civil rights and workplace discrimination) only further highlights the implausibility that the former preempts the latter.

Tyson cites to the *Harris* decision to support the incredible claim that FMIA preempts Tennessee's common law civil rights and workplace discrimination measures. MTD, pp. 11-12. But even a cursory glance at *Harris* shows nothing could be further from the text of that case. Tyson contends that "the question is whether the USDA could have adopted the requirement: if the USDA 'could issue regulations under the FMIA . . . mandating' the requirement at issue, then the state's requirement is preempted." MTD, pg. 12 (quoting *Harris*, supra, 565 U.S. at 466). This cherry-picked excerpt from *Harris* is entirely misleading. To start, scouring the Code of Federal Regulations in search of congressional purpose cannot possibly substitute for the FMIA's plain language, "which necessarily contains the best evidence of Congress' pre-emptive intent." *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013).

Second, *Harris* actually deeply undermines Tyson's argument, because *Harris*' preemption analysis is focused on the plain language of the FMIA. At issue in *Harris* was whether the FMIA preempted a California animal humane treatment law regulating how slaughterhouses dealt with non-ambulatory pigs (i.e., those unable to walk). *Harris*, 565 U.S. at 458-59. The Court found the state law was within the FMIA's scope (and thus preempted) precisely due to specific provisions within FMIA that: "required slaughterhouses to follow prescribed methods of humane handling" and authorized the Food Safety and Inspection Service

("FSIS") to "issue [] detailed regulations" on humane handling issues. *Id.* at 466 (citing 21 U.S.C. § 603(b) [authorizing regulations to "prevent[] the inhumane slaughtering of livestock"].)

Additionally, *Harris* and *Stanko* provide consistent interpretations of the FMIA's preemptive effect on different laws - and the results are instructive for this case. In *Harris*, a humane-handling law fell within the FMIA's preemptive scope because the Act contained express provisions regulating humane handling. But in *Stanko*, an unfair trade practices law did not fall within the FMIA's preemptive scope because the act had nothing to say about unfair trade practices whatsoever. Here, Tyson has not cited a single provision of the FMIA (or the PPIA) that would cover the workplace safety duties, much less workplace discrimination laws. Accordingly, Plaintiff's claims against Tyson are on track with *Stanko*, not *Harris*. Plaintiff's state claims are therefore not preempted here.[9]

In sum, Tyson seeks to exploit the FMIA and PPIA, legislation that regulates a specific aspect of an industry, as a shield to argue that preemption erases the entire food industry's obligations under a host of generally applicable laws governing workplace safety, wages, and discrimination–none of which the federal law in question actually regulates. Allowing Tyson's blunderbuss approach to preemption would interpret a law designed to regulate an industry in one respect, to extinguish its duties in all others. *See: Bates v. Dow Agrosciences LLC*, 544 U.S.

---

[9] Of note, in a host of other cases, employees have sued Tyson for workplace discrimination, including under the THRA, and neither the FMIA nor the PPIA was given preemptive effect over the plaintiff's state claims: *Reese v. Tyson Foods, Inc.*, 2021 U.S. Dist. LEXIS 228676, *17-23 (W.D. Mo. 2021) [the court found state law, not federal law, preempted, superseded, and displaced plaintiff's claims regarding Tyson's vaccine mandate.]; *West v. Tyson Foods*, 374 Fed. Appx. 624 (6th Cir. 2010) [no preemption of the Kentucky Civil Rights Act.]; *Wu v. Tyson Foods, Inc.*, 189 Fed. Appx. 375 (6th Cir. 2006) [no preemption of the THRA or Tennessee common law.]; *Khalil v. Tyson Foods, Inc.*, 2015 U.S. Dist. LEXIS 97135 (M.D. Tenn. 2015) [no preemption of the THRA.]; *Davis v. Tyson Fresh Meats, Inc.*, 2020 U.S. Dist. LEXIS (M.D. Tenn. 2020) [no preemption of the THRA]; *Callender v. Tyson Fresh Meats, Inc.*, 2017 U.S. Dist. LEXIS 98365 (M.D. Tenn. 2017) [no preemption under the THRA.].

431, 449 (2005): "[I]t seems unlikely that Congress considered a relatively obscure [preemption] provision ... to give pesticide manufacturers virtual immunity from certain forms of tort liability." Tyson's argument here, is tantamount to preemption by regulatory vacuum, effectively immunizing employers from any and all state law liability, so long as the incident in question took place on company soil. This would be the predictably disturbing result of applying preemption in the manner sought by Tyson here, with "uncritical literalism" - which the twin guardrails of congressional intent and statutory language are designed to prevent. *See: Dan's City Used Cards, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013).

## <u>CONCLUSION</u>

For the reasons set forth herein, this Court should deny the MTD in its entirety. Alternatively, Plaintiff requests leave to amend any portions of the Amended Complaint this Court deems insufficiently pled.

DATED: December 30, 2022                Respectfully submitted,

                                        BY: /s/ Robert E. Barnes

                                        Robert E. Barnes, Esq. (*pro hac vice*)
                                        Tennessee BPR No. 020617
                                        BARNES LAW
                                        700 South Flower Street, Suite 1000
                                        Los Angeles, California 90017
                                        Telephone: (310) 510 -6211
                                        Email: robertbarnes@barneslawllp.com

                                        B. Tyler Brooks
                                        Tennessee BPR No. 025291
                                        LAW OFFICE OF B. TYLER BROOKS, PLLC
                                        P.O. Box 10767
                                        Greensboro, North Carolina 27404
                                        Telephone: (336) 707-8855
                                        Email: btb@btylerbrookslawyer.com

                                        *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document was filed electronically on December 30, 2022.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt, including the counsel of record for defendants indicated below.  Parties may access this filing through the Court's system.

<u>s/Robert E. Barnes</u>
Robert E. Barnes
Tennessee BPR No. 020617

**SERVED:**
J. Gregory Grisham
FISHER & PHILLIPS, LLP
1715 Aaron Brenner Drive, Suite 312
Memphis, TN 38120
ggrisham@fisherphillips.com

*Counsel for Defendants*